UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| AMAZON.COM, INC., a Delaware corporation; AMAZON.COM SERVICES LLC, a Delaware limited liability company; UBER TECHNOLOGIES, INC., a Delaware corporation; and LYFT, INC., a Delaware corporation, | No. |
| | **COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF** |
| Plaintiffs, | |
| v. | |
| GARY HUTTON, an individual; HUTTRONICS LLC, a Wyoming limited liability company, individually and collectively doing business as HUTTRONICS; and DOES 1-10, | |
| Defendants. | |

## I.      INTRODUCTION

1.      This case involves Defendants' unlawful and expressly prohibited sale of counterfeit Uber Technologies, Inc. ("Uber") and Lyft, Inc. ("Lyft") products. Amazon.com, Inc., Amazon.com Services LLC (collectively, "Amazon"), Uber, and Lyft (together with Amazon, "Plaintiffs") jointly bring this lawsuit to permanently prevent and enjoin Defendants from causing future harm to Amazon's customers, reputation, and intellectual property ("IP"), and Uber's and Lyft's users, reputations, and IP, and to hold Defendants accountable for their illegal actions.

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF - 1

2.      Amazon.com Services LLC owns and operates the Amazon.com store (the "Amazon Store"), and Amazon's affiliates own and operate equivalent counterpart international stores and websites. Amazon's stores offer products and services to customers in more than 100 countries around the globe. Some of the products are sold directly by Amazon entities, while others are sold by Amazon's numerous third-party selling partners. The Amazon brand is one of the most well-recognized, valuable, and trusted brands in the world. To protect its customers and safeguard its reputation for trustworthiness, Amazon invests heavily in both time and resources to prevent counterfeit and infringing goods from being sold in its stores. In 2022 alone, Amazon invested over $1.2 billion and employed more than 15,000 people to protect its stores from fraud and abuse. Amazon stopped over 800,000 suspected bad actor selling accounts before they published a single listing for sale.

3.      Uber and Lyft are leaders in the ride-share industry. Although they are competitors, they jointly bring this lawsuit—with Amazon—to help protect their respective IP and the safety of Lyft and Uber users. Defendants' unauthorized sale of counterfeit Uber and Lyft signs and decals in the Amazon Store creates a risk that the counterfeit products will be used by bad actors with improper motives, potentially jeopardizing the safety of riders.

4.      Uber was founded more than twelve years ago and is now a worldwide leader in the ride-share industry. Uber offers access to a range of services under its various UBER trademarks, which users can request through apps on their smartphone or through Uber's websites. Uber develops and operates proprietary technology applications supporting a variety of offerings on its platform. Among its offerings, Uber connects consumers ("riders") with independent providers of transportation ("drivers") for ridesharing services. Uber's technology is available in more than seventy countries worldwide, including across the United States. Rideshare-related services available through Uber's platform are often identified by a sign bearing the UBER trademark displayed on the vehicle. The Uber brand symbolizes access to not only the quick, affordable services available at the touch of a button, but also the dependability its users have come to enjoy from the company.

Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1640
206.622.3150 main · 206.757.7700 fax

5.      Lyft is also a leader in the ride-sharing industry. Lyft was started more than twelve years ago under the name Zimride. Lyft's platform is a ridesharing marketplace that connects drivers with riders (collectively, "users") under its various LYFT trademarks, which users can request through apps on their smartphone or online. Lyft's platform is available domestically in every state and in multiple Canadian cities. Drivers providing rides on Lyft's platform are often signified by an emblem with the LYFT trademark displayed on the vehicle. The Lyft brand symbolizes access to not only the quick, affordable services available at the touch of a button, but also the dependability its users have come to enjoy from the company.

6.      Uber owns, manages, enforces, licenses, and maintains IP, including various trademarks. Relevant to this Complaint, Uber owns the following registered trademarks ("Uber Trademarks").

| **Mark** | **Reg. No.** | **International Class / Goods & Services (excerpt)** |
|---|---|---|
| UBER | 5,860,001 | 9. Signaling device comprised of receivers and transmitters of electronic signals for matching drivers to passengers |
| UBER | 6,584,142 | 11. lighting apparatus and installations, namely, luminous tubes for lighting, searchlights, vehicle reflectors, lights for vehicles; safety lamps; …vehicle lights for assisting rideshare passengers to locate vehicles; spot lights; lights for vehicles …solar-powered all-weather lights; lights for use in illuminating signs and displays; LED and HID light assemblies for vehicles; LED lighting assemblies for illuminated signs; light reflectors; lighting apparatus and installations for vehicles; light panels for vehicles, namely, cars, motorcars, automobiles, trucks, vans, SUVs, …. |
| UBER | 6,175,437 | 16. Printed matter, namely, decals, stickers. |
| UBER | 3,977,893 | 9. Computer software for coordinating transportation services, namely, software for the automated scheduling and dispatch of motorized vehicles<br>38. Telecommunications services, namely, routing calls, SMS messages, and push-notifications to local third-party motorized vehicle dispatchers in the vicinity of the caller using mobile phones<br>39. Providing a website featuring information regarding transportation services and bookings for transportation services<br>42. Providing temporary use of online non-downloadable software for providing transportation services, bookings for transportation services and dispatching motorized vehicles to customers |

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF - 3

7.     All of these registrations are valid, unrevoked, and subsisting, and constitute prima facie evidence of Uber's exclusive ownership of the marks. Registration No. 3,977,893 is also incontestable, which constitutes conclusive evidence of the validity of the mark and Uber's exclusive right to use it in commerce. True and correct copies of the registration certificates for the Uber Trademarks are attached as **Exhibit A**.

8.     Uber has continuously used the Uber Trademarks in connection with the promotion, advertising, and sales of its goods and services. Uber has invested millions of dollars and has expended significant effort in advertising, promoting, and developing the Uber Trademarks in the United States and around the world. As a result of such advertising and expenditures, Uber has established considerable goodwill in the Uber Trademarks. The Uber Trademarks have become widely known and recognized throughout the world for quick, dependable, and affordable products and services. The Uber Trademarks are famous and distinctive, and have become associated by the consuming public exclusively with Uber. The Uber Trademarks are an invaluable asset of substantial and inestimable worth to Uber.

9.     Lyft owns, manages, enforces, licenses, and maintains IP, including various trademarks. Relevant to this Complaint, Lyft owns the following registered trademarks ("Lyft Trademarks").

| **Mark** | **Reg. No.** | **International Class / Goods & Services (excerpt)** |
|---|---|---|
| LYFT | 4,686,618 | 9. Computer software for coordinating transportation services, namely, software for electronic message alerts featuring leads, optimal matches, and matching posts for services, scheduling, namely, connecting transportation providers with individuals and groups needing rides, the arrangement and booking of transportation, the sending and receiving of electronic messages, and creating profiles 38. Telecommunications services, namely, routing calls, messages, and push-notifications to transportation providers and riders |

Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1640
206.622.3150 main · 206.757.7700 fax

| Mark | Reg. No. | International Class / Goods & Services (excerpt) |
|---|---|---|
| LYFT | 6,170,586 | 9. Luminous signs using light emitting diodes and electronic controllers to produce real-time and programmable messages and information displays; luminous signs using light emitting diodes and electronic controllers to project data from a mobile device; illuminating equipment for vehicles, namely, LED information displays<br>11. Electric luminaries for vehicles; lighting installations, namely, vehicle lights; lights for use in illuminating signs and displays; illuminating equipment for vehicles, namely, electrical lamps |
| lyft | 6,170,587 | 9. Luminous signs using light emitting diodes and electronic controllers to produce real-time and programmable messages and information displays; luminous signs using light emitting diodes and electronic controllers to project data from a mobile device; illuminating equipment for vehicles, namely, LED information displays<br>11. Electric luminaries for vehicles; lighting installations, namely, vehicle lights; lights for use in illuminating signs and displays; illuminating equipment for vehicles, namely, electrical lamps |
| LYFT | 4,698,330 | 39. Transportation of passengers by motorized vehicle; Transportation of passengers by vehicle through a network of transportation providers |
| lyft | 4,698,331 | 9. Computer software for coordinating transportation services, namely, software for electronic message alerts featuring leads, optimal matches, and matching posts for services, scheduling, namely, connecting transportation providers with individuals and groups needing rides, the arrangement and booking of transportation, electronic messages<br>38. Telecommunications services, namely, routing calls, messages, and push-notifications to transportation providers and riders39. Transportation of passengers by motorized vehicle; Transportation of passengers by vehicle through a network of transportation providers |

10.     All of these registrations are valid, unrevoked, and subsisting, and constitute prima facie evidence of Lyft's exclusive ownership of the marks. Registration Nos. 4,686,618;

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF - 5

Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1640
206.622.3150 main · 206.757.7700 fax

4,698,330; and 4,698,331 are also incontestable, which constitutes conclusive evidence of the validity of the marks and Lyft's exclusive right to use them in commerce. True and correct copies of the registration certificates for the Lyft Trademarks are attached as **Exhibit B**.

11.    Lyft has continuously used the Lyft Trademarks in connection with the promotion, advertising, and sales of its goods and services. Lyft has invested millions of dollars and has expended significant effort in advertising, promoting, and developing the Lyft Trademarks in the United States. As a result of such advertising and expenditures, Lyft has established considerable goodwill in the Lyft Trademarks. The Lyft Trademarks have become widely known and recognized throughout the U.S. for quick, dependable, and affordable products and services. The Lyft Trademarks are famous and distinctive, and have become associated by the consuming public exclusively with Lyft. The Lyft Trademarks are an invaluable asset of substantial and inestimable worth to Lyft.

12.    From February 2018 through August 2019, Defendants advertised, marketed, offered, distributed, and sold counterfeit Uber and/or Lyft products in the Amazon Store, using the Uber Trademarks and/or the Lyft Trademarks, without authorization, in order to deceive customers and users about the authenticity and origin of the products and the products' affiliation with Uber and Lyft.

13.    As a result of their illegal actions, Defendants have infringed and misused Uber's and Lyft's IP; breached their contracts with Amazon; willfully deceived and harmed Amazon and its customers, and Uber and Lyft and their users; compromised the integrity of the Amazon Store; and undermined the trust that customers and users place in Amazon, Uber, and Lyft. Defendants' illegal actions have caused Amazon, Uber, and Lyft to expend significant resources to investigate and combat Defendants' wrongdoing and to bring this lawsuit to prevent Defendants from inflicting future harm to Amazon's customers and Uber's and Lyft's users.

Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1640
206.622.3150 main · 206.757.7700 fax

## II.     PARTIES

14.     Amazon.com, Inc. is a Delaware corporation with its principal place of business in Seattle, Washington. Amazon.com Services LLC is a Delaware company with its principal place of business in Seattle, Washington.

15.     Uber Technologies, Inc. is a Delaware corporation with its principal place of business in San Francisco, California.

16.     Lyft, Inc. is a Delaware corporation with its principal place of business in San Francisco, California.

17.     Defendants are a collection of individuals and entities, both known and unknown, who conspired and operated in concert with each other to engage in the counterfeiting scheme alleged in this Complaint. Defendants are subject to liability for their wrongful conduct both directly and under principles of secondary liability including, without limitation, *respondeat superior*, vicarious liability, and/or contributory infringement.

18.     On information and belief, Defendant Gary Hutton, d/b/a Huttronics ("Defendant Hutton"), is an individual residing in Torrance, California who personally participated in and/or had the right and ability to supervise, direct, and control the wrongful conduct alleged in this Complaint, including through owning and operating the selling account in the Amazon Store with the name "Huttronics" (referred to as the "Huttronics Selling Account"), and derived a direct financial benefit as a result of that wrongful conduct.

19.     On information and belief, Defendant Huttronics LLC, d/b/a Huttronics ("Defendant Huttronics"), is a Wyoming limited liability company owned, operated, managed, and controlled by Defendant Hutton, who is its CEO. On further information and belief, Defendant Huttronics had the right and ability to supervise, direct, and control the wrongful conduct alleged in this Complaint, including the Huttronics Selling Account, and derived a direct financial benefit as a result of that wrongful conduct.

20.     On information and belief, Defendants Does 1-10 (the "Doe Defendants") are individuals and/or entities working in active concert with each other and the named Defendants

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF - 7

to knowingly and willfully manufacture, import, advertise, market, offer, distribute, and sell counterfeit Uber and Lyft products. The identities of the Doe Defendants are presently unknown to Plaintiffs.

## III.    JURISDICTION AND VENUE

21.    The Court has subject matter jurisdiction over Uber's and Lyft's Lanham Act claims for trademark infringement, and Amazon's, Uber's, and Lyft's Lanham Act claims for false designation of origin and false advertising, pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338(a). The Court has subject matter jurisdiction over Amazon's breach of contract claim and Amazon's, Uber's, and Lyft's claims for violation of the Washington Consumer Protection Act, pursuant to 28 U.S.C. § 1367.

22.    The Court has personal jurisdiction over Defendants because they transacted business and committed tortious acts within and directed to the State of Washington, and Amazon's, Uber's, and Lyft's claims arise from those activities. Defendants affirmatively undertook to do business with Amazon, a corporation with its principal place of business in Washington, and sold in the Amazon Store products bearing counterfeit versions of the Uber Trademarks and/or Lyft Trademarks which otherwise infringed Uber's and Lyft's IP. Additionally, Defendants shipped products bearing counterfeit versions of the Uber Trademarks and the Lyft Trademarks to consumers in Washington. Each Defendant committed, or facilitated the commission of, tortious acts in Washington and has wrongfully caused Amazon, Uber, and Lyft substantial injury in Washington.

23.    Further, the named Defendants have consented to the jurisdiction of this Court by agreeing to the Amazon Services Business Solutions Agreement ("BSA"), which provides that the "Governing Courts" for claims to enjoin infringement or misuse of IP rights and claims related to the sale of counterfeit products in the Amazon Store are the state or federal courts located in King County, Washington.

24.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in the Western District of

Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1640
206.622.3150 main · 206.757.7700 fax

Washington. Venue is also proper in this Court because Defendants consented to it under the BSA.

25.     Pursuant to Local Civil Rule 3(e), intra-district assignment to the Seattle Division is proper because the claims arose in this Division, where (a) Amazon resides, (b) injuries giving rise to suit occurred, and (c) Defendants directed their unlawful conduct.

## IV.     FACTS

### A.     Amazon's Efforts to Prevent the Sale of Counterfeit Goods

26.     Amazon works hard to build and protect the reputation of its stores as a place where customers can conveniently select from a wide array of authentic goods and services at competitive prices. Amazon invests vast resources to ensure that when customers make purchases in Amazon's stores—either directly from Amazon or from one of its millions of third-party sellers—customers receive authentic products made by the true manufacturer of those products.

27.     A small number of bad actors seek to take advantage of the trust customers place in Amazon by attempting to create Amazon selling accounts to advertise, market, offer, distribute, and sell counterfeit or otherwise infringing products. These bad actors seek to misuse and infringe the trademarks and other IP of the true manufacturers of those products to deceive Amazon and its customers. This unlawful and expressly prohibited conduct undermines the trust that customers, sellers, and manufacturers place in Amazon, and tarnishes Amazon's brand and reputation, thereby causing irreparable harm to Amazon.

28.     Amazon continues to innovate to stay ahead of bad actors, and requires new and existing selling partners to verify their identity and documentation. Amazon investigators review the seller-provided identity documents to determine whether those documents are both valid and legitimate, such as confirming that the seller has provided a fully legible copy of the document, verifying that the document matches the information the seller provided to Amazon with respect to their identity, and analyzing whether the document shows any signs of alteration, tampering, or fabrication. These measures have made it more difficult for bad actors to hide. Amazon's

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF - 9

seller verification, coupled with continued advancements in Amazon's machine learning-based detection, are deterring bad actors from even attempting to create new Amazon selling accounts. The number of bad actor attempts to create new selling accounts decreased from 6 million attempts in 2020, to 2.5 million attempts in 2021, to 800,000 attempts in 2022.

29.     Amazon prohibits the sale of inauthentic and fraudulent products and is constantly innovating on behalf of its customers and working with brands, manufacturers, rights owners, and others to improve the detection and prevention of counterfeit products from ever being offered to customers in Amazon's stores. Amazon employs dedicated teams of software engineers, research scientists, program managers, and investigators to prevent counterfeits from being offered in Amazon's stores. Amazon's systems automatically and continuously scan thousands of data points to prevent, detect, and remove counterfeits from its stores and to terminate the selling accounts of bad actors before they can offer counterfeit products. When Amazon identifies issues based on this feedback, it takes action to address them. Amazon also uses this intelligence to improve its proactive prevention controls.

30.     In 2017, Amazon launched Brand Registry, a free service that offers rights owners an enhanced suite of tools for monitoring and reporting potential instances of infringement, regardless of their relationship with Amazon. Brand Registry delivers automated brand protections that use machine learning to predict infringement and proactively protect brands' IP. Brand Registry also provides a powerful Report a Violation Tool that allows brands to search for and report potentially infringing products using state-of-the-art image search technology. In 2022, through continued improvements in Amazon's automated protections, brands found fewer infringing products in Amazon's stores, with the number of valid notices of infringement submitted by brands in Brand Registry decreasing by more than 35% from 2021.

31.     In 2019, Amazon launched Project Zero, a program to empower brands to help Amazon drive counterfeits to zero. Project Zero introduced a novel self-service counterfeit removal tool that enables brands to remove counterfeit listings directly from Amazon's stores. This enables brands to take down counterfeit product offerings on their own within minutes. In

Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1640
206.622.3150 main · 206.757.7700 fax

2022, there were more than 22,000 brands enrolled in Project Zero. For every listing removed by a brand, Amazon's automated protections removed more than 1,000 listings through scaled technology and machine learning, stopping those listings from appearing in Amazon's stores.

32.     Once a seller begins selling in Amazon's stores, Amazon continues to monitor the selling account's activities for risks. If Amazon identifies a bad actor, it closes that actor's selling account, withholds funds disbursement, and investigates whether other accounts are involved in unlawful activities.

33.     In addition to the measures discussed above, Amazon actively cooperates with rights owners and law enforcement to identify and prosecute bad actors suspected of engaging in illegal activity. Lawsuits, like this one, as well as criminal referrals, are integral components of Amazon's efforts to combat counterfeits and other inauthentic products.

**B.      Uber's Commitments to Brand Protection and Safety**

34.     Uber has a well-established brand protection program and regularly polices infringements of its trademarks, including the production and sale of counterfeit Uber-branded products. Uber uses a third party brand protection vendor and is enrolled in Amazon Brand Registry and Project Zero in order to combat counterfeiting activity, including Defendants' illegal activity described in this Complaint.

35.     Uber values the safety and privacy of the users of its platform, implementing multiple in-app safety features and background checks and screenings for drivers using the Uber platform. Drivers who maintain the requirements of Uber's rigorous screening process are permitted to display in their vehicle Uber-branded signage provided by Uber, as further detailed below. Uber does not sell signage bearing the Uber Trademarks to drivers, nor has it authorized any party to do so. Because of Uber's multi-layered safety and security approach, riders rely on the fact that vehicles displaying signage with the Uber Trademarks are driven by individuals approved by Uber.

Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1640
206.622.3150 main · 206.757.7700 fax

**C.      Lyft's Commitments to Brand Protection and Safety**

36.      Lyft has a well-established brand protection program and regularly polices infringements of its trademarks, including the production and sale of counterfeit Lyft-branded products. Lyft uses a third party brand protection vendor and is enrolled in Amazon Brand Registry and Project Zero in order to combat counterfeiting activity, including Defendants' illegal activity described in this Complaint.

37.      Lyft values the safety and privacy of the users of its platform, implementing multiple in-app safety features and background checks and screenings for drivers using the Lyft platform. Drivers who maintain the requirements of Lyft's rigorous screening process are permitted to display in their vehicle Lyft-branded signage provided by Lyft, as further detailed below. Lyft does not sell signage bearing the Lyft Trademarks to drivers. Because of Lyft's multi-layered safety and security approach, riders rely on the fact that vehicles displaying signage with the Lyft Trademarks are driven by individuals approved by Lyft.

**D.      Defendants Created an Amazon Selling Account and Agreed Not to Sell Counterfeit Goods**

38.      Defendants established, controlled, and operated the Huttronics Selling Account detailed in Section G below, through which they sought to advertise, market, offer, distribute, and sell counterfeit Uber and Lyft products.

39.      To become a third-party seller in the Amazon Store, sellers are required to agree to the BSA, which governs the applicant's access to and use of Amazon's services and states Amazon's rules for selling in the Amazon Store. By entering into the BSA, each seller represents and warrants that it "will comply with all applicable Laws in [the] performance of its obligations and exercise of its rights" under the BSA. A true and correct copy of the applicable version of the BSA, namely, the version Defendants last agreed to when using Amazon's services, is attached as **Exhibit C**.

40.      Under the terms of the BSA, Amazon specifically identifies the sale of counterfeit goods as "deceptive, fraudulent, or illegal activity" in violation of Amazon's policies, reserving

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF - 12

the right to withhold payments and terminate the selling account of any bad actor who engages in such conduct. Ex. C, ¶¶ 2-3. The BSA requires the seller to defend, indemnify, and hold harmless Amazon against any claims or losses arising from the seller's "actual or alleged infringement of any Intellectual Property Rights." *Id.* ¶ 6.1.

41.     Additionally, the BSA incorporates, and sellers therefore agree to be bound by, Amazon's Anti-Counterfeiting Policy, the applicable version of which is attached as **Exhibit D**. The Anti-Counterfeiting Policy expressly prohibits the sale of counterfeit goods in the Amazon Store:

- The sale of counterfeit products is strictly prohibited.

- You may not sell any products that are not legal for sale, such as products that have been illegally replicated, reproduced, or manufactured[.]

- You must provide records about the authenticity of your products if Amazon requests that documentation[.]

    Failure to abide by this policy may result in loss of selling privileges, funds being withheld, destruction of inventory in our fulfillment centers, and other legal consequences.

*Id.*

42.     Amazon's Anti-Counterfeiting Policy further describes Amazon's commitment to preventing the sale and distribution of counterfeit goods in the Amazon Store together with the consequences of doing so:

- Sell Only Authentic and Legal Products. It is your responsibility to source, sell, and fulfill only authentic products that are legal for sale. Examples of prohibited products include:

    o   Bootlegs, fakes, or pirated copies of products or content

    o   Products that have been illegally replicated, reproduced, or manufactured

    o   Products that infringe another party's intellectual property rights

- Maintain and Provide Inventory Records. Amazon may request that you provide documentation (such as invoices) showing the authenticity of your products or your authorization to list them for sale. You may remove pricing information from these documents, but providing documents that have been edited in any other way or that are misleading is a violation of this policy and will lead to enforcement against your account.

Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1640
206.622.3150 main · 206.757.7700 fax

- Consequences of Selling Inauthentic Products. If you sell inauthentic products, we may immediately suspend or terminate your Amazon selling account (and any related accounts), destroy any inauthentic products in our fulfillment centers at your expense, and/or withhold payments to you.

- Amazon Takes Action to Protect Customers and Rights Owners. Amazon also works with manufacturers, rights holders, content owners, vendors, and sellers to improve the ways we detect and prevent inauthentic products from reaching our customers. As a result of our detection and enforcement activities, Amazon may:

  o Remove suspect listings.

  o Take legal action against parties who knowingly violate this policy and harm our customers. In addition to criminal fines and imprisonment, sellers and suppliers of inauthentic products may face civil penalties including the loss of any amounts received from the sale of inauthentic products, the damage or harm sustained by the rights holders, statutory and other damages, and attorney's fees.

- Reporting Inauthentic Products. We stand behind the products sold on our site with our A-to-z Guarantee, and we encourage rights owners who have product authenticity concerns to notify us. We will promptly investigate and take all appropriate actions to protect customers, sellers, and rights holders. You may view counterfeit complaints on the Account Health page in Seller Central.

*Id.*

43.    When Defendants registered as a third-party seller in the Amazon Store and established the Huttronics Selling Account, they agreed not to advertise, market, offer, sell, or distribute counterfeit products, and agreed to provide Amazon with accurate and complete information and to ensure that information remained as such.

**E.    Uber's Terms of Service Forbid the Sale of Unauthorized Products Bearing the Uber Trademarks**

44.    Drivers using the Uber platform are bound by the Uber Platform Access Agreement, a true and correct copy of the current version of which is attached as **Exhibit E**.

45.    Uber grants drivers who access its platform a "limited license to use, wear, or display Uber Branded Materials [such as stickers, decals, lights and other material displaying the Uber Trademarks] provided directly to [drivers] by Uber" in connection with providing ride services through Uber's platform. Ex. E, ¶ 2.7. Such materials provided by Uber are defined as "Authorized Uber Branded Materials." Drivers who access Uber's platform agree not to "(i) use,

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF - 14

wear, or display Uber-Branded Materials that are not Authorized Uber Branded Materials[,] (ii) purchase, accept, offer to sell, sell or otherwise transfer Uber Branded Materials that are not Authorized Uber Branded Materials or (iii) offer to sell or sell, or otherwise transfer Authorized Uber Branded Materials, without Uber's prior written permission, or (iv) display Uber Branded Materials when [drivers] are not accessing the Platform." *Id.* Drivers further agree to "destroy and discard any Uber Branded Materials" in the event their Uber account is closed. *Id.*

46.  The Uber Platform Access Agreement further provides that Uber's intellectual property, including the Uber Trademarks, remains the property of Uber, and that drivers accessing the Uber platform are only provided the limited license to use such intellectual property as set forth in the license contained in the Uber Platform Access Agreement. *Id.* at ¶ 9. The Uber Platform Access Agreement expressly states that drivers must not, among other things, "license, sublicense, copy, modify, distribute, create, sell, resell, transfer, or lease any part of … the Authorized Uber Branded Materials." *Id.*

47.  Therefore, Uber's Platform Access Agreement specifically forbids the manufacture or sale of products bearing the Uber Trademarks.

48.  Uber provides new drivers who access the Uber platform with a decal bearing the Uber Trademarks for use on a driver's vehicle when using the app and provides replacement decals as needed. Some jurisdictions require drivers using ride-share apps to display such decals. Only approved drivers are authorized to display decals bearing the Uber Trademarks.

49.  Additionally, as part of a voluntary pilot program, Uber has provided some drivers with illuminated signs, referred to as "Beacons," that drivers can use to help riders find them. Drivers who receive Beacons must agree to terms stating that the devices remain the property of Uber, and that the driver may not "transfer, loan, or sell" the devices.

50.  As described below, Defendants sold products bearing Uber Trademarks that were not manufactured, licensed, or authorized by Uber.

Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1640
206.622.3150 main · 206.757.7700 fax

**F.      Lyft's Terms of Service Forbid the Sale of Unauthorized Products Bearing the Lyft Trademarks**

51.      Drivers on the Lyft platform are bound by Lyft's Terms of Service, a true and correct copy of the current version is attached as **Exhibit F**.

52.      Under Lyft's Terms of Service, drivers accessing the Lyft platform are granted, during the term of their relationship with Lyft, and subject to the driver's compliance with Lyft's Terms of Service, a "limited, revocable, non-exclusive license to display and use the Lyft Marks solely on the Lyft stickers/decals, and any other Lyft-Branded items provided by Lyft directly to [drivers] in connection with providing the Rideshare Services." Ex. F, ¶ 11. The license is non-transferrable and non-assignable. *Id.*

53.      Additionally, drivers accessing the Lyft platform acknowledge that Lyft is the owner of the Lyft Marks, including any goodwill associated with the marks, and agree that they will not "create any materials that use the Lyft Marks or any derivatives of the Lyft Marks as a trademark, service mark, trade name or trade dress, other than as expressly approved by Lyft in writing." *Id.* Drivers accessing the Lyft platform further agree they "will not rent, lease, lend, sell, or otherwise redistribute the Lyft driver amp,[1] or manufacture, produce, print, sell, distribute, purchase, or display counterfeit/inauthentic Lyft driver amps or other Lyft Marks or (including but not limited to signage, stickers, apparel, or decals) from any source other than directly from Lyft." *Id.*

54.      Therefore, Lyft's Terms of Service specifically forbid the manufacture or sale of products bearing the Lyft Trademarks by users of its platform.

55.      Lyft provides new approved drivers accessing its platform with a welcome kit that includes official Lyft decals bearing the Lyft Trademarks for use on a driver's vehicle when using the app and provides replacement decals as needed. Only active and approved drivers are authorized to use the Lyft decal or other Lyft trademarks. Some jurisdictions require drivers on

---

[1] The Lyft Amp is a unique dashboard mounted glowing emblem displaying the LYFT trademark that Lyft directly offers to eligible drivers using the Lyft platform, which allows riders to instantly recognize a car as one driving with the Lyft platform.

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF - 16

the Lyft platform to display such decals, as they allow for easier identification for riders seeking to locate their requested rides. Lyft provides eligible drivers who meet certain criteria with a Lyft Amp to further identify the vehicle for riders.

56.     As described below, Defendants sold products bearing Lyft Trademarks that were not manufactured, licensed, or authorized by Lyft.

**G.     Defendants' Sale of Counterfeit Uber and Lyft Products**

57.     On information and belief, from February 2018 through August 2019, Defendants advertised, marketed, offered, distributed, and sold counterfeit products bearing the Uber Trademarks and/or Lyft Trademarks in the Amazon Store. Counterfeit Uber- and Lyft-branded products sold by Defendants are identified and described below.

58.     Amazon proactively scans listings to detect counterfeit Uber and Lyft rideshare signs that are listed in the Amazon Store. If Amazon determines that a listed product is likely counterfeit, whether based on internal signals or on information from Uber and Lyft, Amazon removes the listing from the Amazon Store. In response, bad actors have attempted to intentionally evade Plaintiffs' efforts to detect these counterfeit products, and so Amazon is developing automated image recognition tools that proactively detect bad actors' obfuscation, flagging these products for removal and enforcement.

59.     On information and belief, at all times described herein, the Huttronics Selling Account was controlled and operated by the named Defendants, and, on information and belief, other unknown parties.

60.     On April 5, 2022, Uber reviewed images of a product from inventory that Defendant listed as "Uber Lyft Sign with Bright LED Lights for Car" and shipped to Amazon warehouses for sale to customers in the Amazon Store under the Huttronics Selling Account. On June 3, 2022, Lyft reviewed images of the same product. Based on a review of those images, Uber and Lyft were able to determine that the product displayed unauthorized depictions of the Uber Trademarks and the Lyft Trademarks.

Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1640
206.622.3150 main · 206.757.7700 fax

*Figure 1. An image of the counterfeit Uber/Lyft sign sold by Defendants:*



61.      On June 5, 2022, Uber reviewed images of a product from inventory that Defendants listed as "Rideshare LED Sign" and shipped to Amazon warehouses for sale to customers in the Amazon Store under the Huttronics Selling Account. On June 14, 2022, Lyft reviewed images of the same product. Based on a review of those images, Uber and Lyft were able to determine that the product displayed unauthorized depictions of the Uber Trademarks and the Lyft Trademarks.

*Figure 2. An image of the counterfeit Uber/Lyft sign sold by Defendants:*



62.      On April 5, 2022, Uber reviewed images of a product from inventory that Defendants listed as "Uber Signs Rideshare LED Sign" and shipped to Amazon warehouses for sale to customers in the Amazon Store under the Huttronics Selling Account. On June 3, 2022, Lyft reviewed images of the same product. Based on a review of those images, Uber and Lyft

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF - 18

Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1640
206.622.3150 main · 206.757.7700 fax

were able to determine that the product displayed unauthorized depictions of the Uber Trademarks and the Lyft Trademarks.

*Figure 3. An image of the counterfeit Uber/Lyft sign sold by Defendants:*



63.     On June 14, 2022, Lyft reviewed images of a product from inventory that Defendants listed as "Rideshare LED Sign" and shipped to Amazon warehouses for sale to customers in the Amazon Store under the Huttronics Selling Account. Based on a review of those images, Lyft was able to determine that the product displayed unauthorized depictions of the Lyft Trademarks.

*Figure 4. An image of the counterfeit Lyft sign sold by Defendants:*



64.     In addition to their counterfeiting activities in the Amazon Store, from at least as early as 2018 to the present, Defendants also advertised, marketed, offered, and sold counterfeit

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF - 19

products bearing the Uber Trademarks and/or the Lyft Trademarks on their website

https://huttronics.com (the "Huttronics Website"). Examples of the counterfeit products

Defendants are listing for sale on the Huttronics Website are attached as **Exhibit G**. Uber and

Lyft examined the products listed for sale on the Huttronics Website and determined that they

display unauthorized depictions of the Uber Trademarks and the Lyft Trademarks.

65.     On August 16, 2021, Plaintiffs' investigator conducted a test purchase from the

Huttronics Website of a product advertised as "UBER Lyft LED Sign, Bright LED Lights,

Wireless, Removable, USB Rechargeable Lithium Ion Battery." Defendants shipped to

Plaintiffs' investigator a product that bears the Uber Trademarks and the Lyft Trademarks. Uber

and Lyft have examined the product and determined that it displays unauthorized depictions of

the Uber Trademarks and the Lyft Trademarks.

*Figure 5. An image of the counterfeit Uber/Lyft sign sold by Defendants on
the Huttronics Website:*



66.     On August 25, 2022, Plaintiffs' investigator conducted a test purchase from the

Huttronics Website of a product advertised as "UBER Lyft LED Sign." Defendants shipped to

Plaintiffs' investigator a product that bears the Uber Trademarks and the Lyft Trademarks. Uber

and Lyft have examined the product and determined that it displays unauthorized depictions of

the Uber Trademarks and the Lyft Trademarks.

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF - 20

*Figure 6. An image of the counterfeit Uber/Lyft sign sold by Defendants on the Huttronics Website:*



### H.   Amazon Shut Down Defendants' Selling Accounts

67.   By selling counterfeit and infringing Uber and Lyft products, Defendants falsely represented to Amazon and its customers that the products Defendants sold were genuine products made by Uber and Lyft. Defendants also knowingly and willfully used Uber's and Lyft's IP in connection with the advertising, marketing, offering, distributing, and selling of counterfeit and infringing Uber and Lyft products.

68.   At all times, Defendants knew they were prohibited from violating third-party IP rights or any applicable laws while selling products in the Amazon Store. Defendants have breached the terms of their agreement with Amazon, deceived Amazon's customers and Amazon, infringed and misused the IP rights of Uber and Lyft, harmed the integrity of and customer trust in the Amazon Store, and tarnished Amazon's, Uber's, and Lyft's brands.

69.   In September 2021, after receiving notice from Uber and Lyft of Defendants' activities, Amazon verified Defendants' unlawful sale of counterfeit Uber and Lyft products and blocked the Huttronics Selling Account. In doing so, Amazon exercised its rights under the BSA to protect its customers and the reputations of Amazon, Uber, and Lyft.[2]

---

[2] Although Amazon blocked the Huttronics Selling Account, Defendants continued to sell their counterfeit products on external websites.

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF - 21

Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1640
206.622.3150 main · 206.757.7700 fax

70.     After Amazon blocked the Huttronics Selling Account, Defendants submitted a written appeal to Amazon in May 2022 seeking reinstatement of the Selling Account. Defendants' written appeal admitted that the signs Defendants sold in the Amazon Store violated the IP rights of Uber and Lyft. Defendants also claimed that they had "permanently discontinued sourcing and selling these infringing products on Amazon or any other marketplace." Despite Defendants' acknowledgement that their products violate Uber's and Lyft's IP rights and their claim that they stopped selling such products, they have continued to sell these counterfeit products on the Huttronics.com website, as shown above, and even made a sale of a counterfeit product in August 2022.

71.     Plaintiffs also used the intelligence gathered through their investigative efforts to support criminal law enforcement action against these bad actors. Based in part on information Plaintiffs previously provided to the Los Angeles County Sheriff's Department, law enforcement executed a search warrant of Defendant Hutton's residence in Torrance, California on May 24, 2023. Law enforcement seized counterfeit products bearing the Uber Trademarks and Lyft Trademarks during the search. Defendant Hutton was present during the search and was arrested.

## V.     CLAIMS

### FIRST CLAIM
*(by Uber and Lyft against Defendant Huttronics and Doe Defendants)*
**Trademark Counterfeiting and Trademark Infringement – 15 U.S.C. § 1114**

72.     Plaintiffs Uber and Lyft incorporate by reference the allegations of the preceding paragraphs as though set forth herein.

73.     The activities of Defendant Huttronics and the Doe Defendants constitute counterfeiting and infringement of the Uber Trademarks and the Lyft Trademarks as described in the paragraphs above.

74.     Uber owns the Uber Trademarks and advertises, markets, offers, distributes, and sells its products and services using the Uber Trademarks described above and uses those trademarks to distinguish its products from the products and related items of others in the same or related fields.

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF - 22

75.     Because of Uber's long, continuous, and exclusive use of the Uber Trademarks identified in this Complaint, the trademarks have come to mean—and are understood by Amazon customers, Uber users, and the public to signify—products and/or services associated with Uber.

76.     Lyft owns the Lyft Trademarks and advertises, markets, offers, distributes, and sells its products and services using the Lyft Trademarks described above and uses those trademarks to distinguish its products from the products and related items of others in the same or related fields.

77.     Because of Lyft's long, continuous, and exclusive use of the Lyft Trademarks identified in this Complaint, the trademarks have come to mean—and are understood by Amazon customers, Lyft users, and the public to signify—products and/or services associated with Lyft.

78.     Defendant Huttronics and the Doe Defendants unlawfully advertised, marketed, offered, distributed and sold products bearing counterfeit and infringing versions of the Uber Trademarks and the Lyft Trademarks with the intent and likelihood of causing customer confusion, mistake, and deception as to the products' source, origin, and authenticity. Specifically, Defendant Huttronics and the Doe Defendants intended Amazon customers, Uber and Lyft users, and the public to believe, incorrectly, that the products originated from, were affiliated with, and/or were authorized by Uber or Lyft and likely caused such erroneous customer beliefs.

79.     As a result of the wrongful conduct by Defendant Huttronics and the Doe Defendants, Uber and Lyft are entitled to recover from Defendant Huttronics and the Doe Defendants their actual damages, Defendant Huttronics' and the Doe Defendants' profits attributable to the infringement, treble damages, and attorneys' fees pursuant to 15 U.S.C. § 1117(a) and (b). Alternatively, Uber and Lyft are entitled to statutory damages under 15 U.S.C. § 1117(c) for Defendant Huttronics' and the Doe Defendants' use of counterfeit marks.

80.     Uber and Lyft are further entitled to injunctive relief, including an order impounding all counterfeit and infringing products and promotional materials in the possession of Defendant Huttronics and the Doe Defendants. Uber and Lyft have no adequate remedy at law

Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1640
206.622.3150 main · 206.757.7700 fax

for the wrongful conduct by Defendant Huttronics and the Doe Defendants because, among other things: (a) the Uber Trademarks and the Lyft Trademarks are unique and valuable properties that have no readily determinable market value; (b) the counterfeiting and infringing activities by Defendant Huttronics and the Doe Defendants constitute harm to Uber's and Lyft's reputations and goodwill such that Uber and Lyft could not be made whole by any monetary award; (c) if Defendant Huttronics' and the Doe Defendants' wrongful conduct is allowed to continue, the public is likely to become further confused, mistaken, or deceived as to the source, origin, or authenticity of the counterfeit and infringing materials; and (d) the resulting harm to Uber and Lyft, due to Defendant Huttronics' and the Doe Defendants' wrongful conduct, is likely to be continuing.

## SECOND CLAIM
### *(by Uber and Lyft against Defendant Huttronics and the Doe Defendants)*
### False Designation of Origin and False Advertising – 15 U.S.C. § 1125(a)

81.     Plaintiffs Uber and Lyft incorporate by reference the allegations of the preceding paragraphs as though set forth herein.

82.     Uber owns the Uber Trademarks and advertises, markets, offers, distributes, and sells its products and services using the trademarks described above and uses the trademarks to distinguish its products from the products and related items of others in the same or related fields.

83.     Because of Uber's long, continuous, and exclusive use of the Uber Trademarks identified in this Complaint, the trademarks have come to mean—and are understood by Amazon customers, Uber users, and the public to signify—products and/or services associated with Uber.

84.     Lyft owns the Lyft Trademarks and advertises, markets, offers, distributes, and sells its products and services using the trademarks described above and uses the trademarks to distinguish its products from the products and related items of others in the same or related fields.

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF - 24

85.     Because of Lyft's long, continuous, and exclusive use of the Lyft Trademarks identified in this Complaint, the trademarks have come to mean—and are understood by Amazon customers, Lyft users, and the public to signify—products and/or services associated with Lyft.

86.     Defendant Huttronics' and the Doe Defendants' wrongful conduct includes the infringement of the Uber Trademarks and the Lyft Trademarks in connection with Defendant Huttronics' and the Doe Defendants' commercial advertising, marketing, offering, distributing, or selling of counterfeit Uber and Lyft products in interstate commerce.

87.     In advertising, marketing, offering, distributing, and selling products bearing counterfeit versions of the Uber Trademarks and the Lyft Trademarks, Defendant Huttronics and the Doe Defendants have used, and on information and belief continue to use, the trademarks referenced above to compete unfairly with Uber and Lyft and to deceive Amazon customers, Uber and Lyft users, and the public. Upon information and belief, Defendant Huttronics' and the Doe Defendants' wrongful conduct misleads and confuses Amazon customers, Uber and Lyft users, and the public as to the origin and authenticity of the goods and services advertised, marketed, offered, distributed, or sold in connection with the Uber Trademarks and the Lyft Trademarks and wrongfully trades upon Uber's and Lyft's goodwill and business reputations.

88.     The conduct by Defendant Huttronics and the Doe Defendants constitutes (a) false designation of origin, (b) false or misleading description, and (c) false or misleading representation that products originate from or are authorized by Uber and Lyft, all in violation of 15 U.S.C. § 1125(a)(1)(A).

89.     The conduct by Defendant Huttronics and the Doe Defendants also constitutes willful false statements in connection with goods and/or services distributed in interstate commerce in violation of 15 U.S.C. § 1125(a)(1)(B).

90.     Uber and Lyft are entitled to an injunction against Defendant Huttronics and the Doe Defendants, their officers, agents, representatives, servants, employees, successors, and assigns, and all other persons in active concert or participation with them, as set forth in the Prayer for Relief below. The acts by Defendant Huttronics and the Doe Defendants have caused

Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1640
206.622.3150 main · 206.757.7700 fax

1   irreparable injury to Uber and Lyft. On information and belief, that injury is continuing. An

2   award of monetary damages cannot fully compensate Uber and Lyft for their injuries, and Uber

3   and Lyft lack an adequate remedy at law.

4       91.     Uber and Lyft are further entitled to recover Defendant Huttronics' and the Doe

5   Defendants' profits, Uber's and Lyft's damages for its losses, and Uber's and Lyft's costs to

6   investigate and remediate Defendant Huttronics' and the Doe Defendants' conduct and bring this

7   action, including their attorneys' fees, in an amount to be determined. Uber and Lyft are also

8   entitled to the trebling of any damages award as allowed by law.

### THIRD CLAIM
*(by Amazon against all Defendants)*
**False Designation of Origin and False Advertising – 15 U.S.C. § 1125(a)**

11      92.     Plaintiff Amazon incorporates by reference the allegations of the preceding

12  paragraphs as though set forth herein.

13      93.     Amazon's reputation for trustworthiness is at the heart of its relationship with

14  customers. Defendants' actions in selling counterfeits pose a threat to Amazon's reputation

15  because they undermine and jeopardize customer trust in the Amazon Store.

16      94.     Specifically, Defendants deceived Amazon and its customers about the

17  authenticity of the products they were advertising, marketing, offering, distributing, and selling,

18  in direct and willful violation of the BSA and Amazon's Anti-Counterfeiting Policies.

19  Defendants' deceptive acts were material to Amazon's decision to allow Defendants to sell their

20  products in the Amazon Store because Amazon would not have allowed Defendants to do so but

21  for their deceptive acts.

22      95.     In advertising, marketing, offering, distributing, and selling counterfeit Uber and

23  Lyft products in the Amazon Store, Defendants made false and misleading statements of fact

24  about the origin, sponsorship, or approval of those products in violation of 15 U.S.C. §

25  1125(a)(1)(A).

26      96.     Defendants' acts also constitute willful false statements in connection with goods

27  and/or services distributed in interstate commerce in violation of 15 U.S.C. § 1125(a)(1)(B).

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF - 26

Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1640
206.622.3150 main · 206.757.7700 fax

97.     As described above, Defendants, through their illegal acts, have willfully deceived Amazon and its customers, jeopardized the trust that customers place in the Amazon Store, tarnished Amazon's brand and reputation, and harmed Amazon and its customers. Defendants' misconduct has also caused Amazon to expend significant resources to investigate and combat Defendants' wrongdoing and to bring this lawsuit to prevent Defendants from causing further harm to Amazon and its customers. Defendants' illegal acts have caused irreparable injury to Amazon and, on information and belief, that injury is ongoing at least to the extent that Defendants continue to establish selling accounts under different or false identities. An award of monetary damages alone cannot fully compensate Amazon for its injuries, and thus Amazon lacks an adequate remedy at law.

98.     Amazon is entitled to an injunction against Defendants, their officers, agents, representatives, servants, employees, successors, and assigns, and all other persons in active concert or participation with them, as set forth in the Prayer for Relief below, along with its attorneys' fees and costs in investigating and bringing this lawsuit.

99.     Amazon is also entitled to recover its damages arising from Defendants' sale of counterfeit products in the Amazon Store.

**FOURTH CLAIM**
*(by Uber and Lyft against Defendant Huttronics and the Doe Defendants)*
**Violation of Washington Consumer Protection Act, RCW 19.86.010, *et seq.***

100.    Plaintiffs Uber and Lyft incorporate by reference the allegations of the preceding paragraphs as though set forth herein.

101.    The advertising, marketing, offering, distributing, and selling of counterfeit Uber and Lyft products by Defendant Huttronics and the Doe Defendants constitutes an unfair method of competition and unfair and deceptive acts or practices in the conduct of trade or commerce, in violation of RCW 19.86.020.

102.    The advertising, marketing, offering, distributing, and selling of counterfeit Uber and Lyft products by Defendant Huttronics and the Doe Defendants harms the public interest by deceiving Uber and Lyft users about the authenticity, origins, and sponsorship of the products.

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF - 27

Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1640
206.622.3150 main · 206.757.7700 fax

103.    The advertising, marketing, offering, distributing, and selling of counterfeit Uber and Lyft products by Defendant Huttronics and the Doe Defendants directly and proximately causes harm to and tarnishes Uber's and Lyft's reputations and brands, and damages their business and property interests and rights.

104.    Accordingly, Uber and Lyft seek to enjoin further violations of RCW 19.86.020 and recover from Defendant Huttronics and the Doe Defendants their attorneys' fees and costs. Uber and Lyft further seek to recover from Defendant Huttronics and the Doe Defendants their actual damages, trebled.

**FIFTH CLAIM**
***(by Amazon against all Defendants)***
**Violation of Washington Consumer Protection Act, RCW 19.86.010, *et seq.***

105.    Plaintiff Amazon incorporates by reference the allegations of the preceding paragraphs as though set forth herein.

106.    Defendants' advertising, marketing, offering, distributing, and selling of counterfeit Uber and Lyft products constitute an unfair method of competition and unfair and deceptive acts or practices in the conduct of trade or commerce, in violation of RCW 19.86.020.

107.    Defendants' advertising, marketing, offering, distributing, and selling of counterfeit Uber and Lyft products harm the public interest by deceiving Amazon customers about the authenticity, origins, and sponsorship of the products.

108.    Defendants' advertising, marketing, offering, distributing, and selling of counterfeit Uber and Lyft products directly and proximately causes harm to and tarnishes Amazon's reputation and brand, and damages its business and property interests and rights.

109.    Accordingly, Amazon seeks to enjoin further violations of RCW 19.86.020 and recover from Defendants their attorneys' fees and costs. Amazon further seeks to recover its actual damages, trebled, with regard to Defendants' activities involving the sale of counterfeit products.

Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1640
206.622.3150 main · 206.757.7700 fax

## SIXTH CLAIM

**(by Amazon.com Services LLC[3] against Defendants Huttronics and Hutton)**
**Breach of Contract**

110.     Plaintiff Amazon incorporates by reference the allegations of the preceding paragraphs as though set forth herein.

111.     Defendants Huttronics and Hutton established an Amazon Selling Account and entered into Amazon's BSA, a binding and enforceable contract between Defendants Huttronics and Hutton and Amazon. Defendants Huttronics and Hutton also contractually agreed to be bound by the policies incorporated by reference into the BSA, including Amazon's Anti-Counterfeiting Policy and other policies as maintained on the Amazon seller website.

112.     Amazon performed all obligations required of it under the terms of the contract with Defendants Huttronics and Hutton or was excused from doing so.

113.     Defendants Huttronics and Hutton's sale and distribution of counterfeit Uber and Lyft products materially breached the BSA and the Anti-Counterfeiting Policy in numerous ways. Among other things, Defendants Huttronics and Hutton's conduct constitutes infringement and misuse of the IP rights of Uber and Lyft.

114.     Defendants Huttronics and Hutton's breaches have caused significant harm to Amazon, and Amazon is entitled to damages in an amount to be determined.

### VI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for the following relief:

A.     That the Court enter an order permanently enjoining Defendants, their officers, agents, representatives, servants, employees, successors, and assigns, and all others in active concert or participation with them, from:

(i)     selling products in Amazon's stores;

(ii)     selling products to Amazon or any affiliate;

(iii)     opening or attempting to open any Amazon selling accounts;

---

[3] For the Sixth Claim only, "Amazon" shall refer to Amazon.com Services LLC only.

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF - 29

(iv)    importing, manufacturing, producing, distributing, circulating, offering to sell, or selling, advertising, promoting, or displaying any product or service using any simulation, reproduction, counterfeit, copy, or colorable imitation of Uber's or Lyft's brand or trademarks, or which otherwise infringes Uber's or Lyft's IP, on any platform or in any medium;

(v)    using any false designation of origin or false description or performing any act which is likely to lead members of the trade or public to believe that any service or product offered, distributed, or sold by Defendants is in any manner associated or connected with Uber or Lyft, or is sold, manufactured, licensed, sponsored, approved, or authorized by Uber or Lyft;

(vi)    assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (i) through (v) above;

B.    That the Court enter judgment in Plaintiffs' favor on all claims brought by them;

C.    That the Court enter an order pursuant to 15 U.S.C. § 1118 impounding and permitting destruction of all counterfeit and infringing products bearing the Uber Trademarks and/or Lyft Trademarks or that otherwise infringe Uber's or Lyft's IP, and any related materials, including business records and materials used to reproduce any infringing products, in Defendants' possession or under their control;

D.    That the Court enter an order requiring Defendants to provide Plaintiffs a full and complete accounting of all amounts due and owing to Plaintiffs as a result of Defendants' unlawful activities;

E.    That the Court enter an order requiring Defendant Huttronics and the Doe Defendants pay all general, special, and actual damages which Uber and Lyft have sustained, or will sustain as a consequence of Defendant Huttronics' and the Doe Defendants' unlawful acts, plus Defendant Huttronics' and the Doe Defendants' profits from the unlawful conduct described

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF - 30

herein, together with Uber's and Lyft's statutory damages, and that Uber's and Lyft's damages be enhanced, doubled, or trebled as provided for by 15 U.S.C. § 1117, RCW 19.86.020, or otherwise allowed by law, and that Amazon's damages, plus Defendants' profits, related to Defendants' activities involving the sale of counterfeit products be enhanced, doubled, or trebled as provided for by 15 U.S.C. § 1117, RCW 19.86.020 or otherwise allowed by law;

F.      That the Court enter an order requiring Defendants to pay the maximum amount of prejudgment interest authorized by law;

G.      That the Court enter an order requiring Defendants to pay the costs of this action and Plaintiffs' reasonable attorneys' fees incurred in prosecuting this action, as provided for by 15 U.S.C. § 1117, RCW 19.86.020, or otherwise allowed by law;

H.      That the Court enter an order requiring that identified financial institutions restrain and transfer to Plaintiffs all amounts arising from Defendants' unlawful counterfeiting activities as set forth in this lawsuit, up to a total amount necessary to satisfy monetary judgment in this case; and

I.      That the Court grant Plaintiffs such other, further, and additional relief as the Court deems just and equitable.

DATED this 26th day of June, 2023.

DAVIS WRIGHT TREMAINE LLP
*Attorneys for Plaintiffs*

*s/ Scott R. Commerson*
Scott R. Commerson, WSBA #58085
865 South Figueroa Street, Suite 2400
Los Angeles, CA 90017-2566
Tel: (213) 633-6800
Fax: (213) 633-6899
Email: scottcommerson@dwt.com

*s/ Lauren Rainwater*
Lauren Rainwater, WSBA #43625
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1604
Tel: (206) 622-3150
Fax: (206) 757-7700
Email: laurenrainwater@dwt.com

Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1640
206.622.3150 main · 206.757.7700 fax

# EXHIBIT A

# United States of America

## United States Patent and Trademark Office

# UBER

**Reg. No. 5,860,001**

**Registered Sep. 17, 2019**

**Int. Cl.: 9**

**Trademark**

**Principal Register**

Uber Technologies, Inc. (DELAWARE CORPORATION)
1455 Market Street, 4th Floor
San Francisco, CALIFORNIA 94103

CLASS 9: Signaling device comprised of receivers and transmitters of electronic signals for matching drivers to passengers

FIRST USE 12-00-2016; IN COMMERCE 12-00-2016

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR

OWNER OF U.S. REG. NO. 5042023, 3977893, 4837495

SER. NO. 87-980,887, FILED 12-02-2016



Director of the United States
Patent and Trademark Office

# United States of America

## United States Patent and Trademark Office

# UBER

**Reg. No. 6,584,142**
**Registered Dec. 07, 2021**
**Corrected Jan. 10, 2023**
**Int. Cl.: 11**
**Trademark**
**Principal Register**

Uber Technologies, Inc.  (DELAWARE CORPORATION)
1515 3rd Street
San Francisco, CALIFORNIA 94158

CLASS 11: lighting apparatus and installations, namely, luminous tubes for lighting, searchlights, vehicle reflectors, lights for vehicles; safety lamps; [ tanning apparatus being tanning beds; ] vehicle lights for assisting rideshare passengers to locate vehicles; spot lights; lights for vehicles; directional lights for bicycles; light bulbs for directional signals for vehicles; solar-powered all-weather lights; lights for use in illuminating signs and displays; LED and HID light assemblies for vehicles; LED lighting assemblies for illuminated signs; light reflectors; lighting apparatus and installations for vehicles; light panels for vehicles, namely, cars, motorcars, automobiles, trucks, vans, SUVs, bicycles, motor scooters, two wheeled motorized scooters, self-balancing scooters, hovering boards, mopeds, skateboards, self-balancing boards, electric bicycles, electric assist bicycles, electric pedal assist bicycles, electric motor scooters, electrically-powered motor scooters, electric two wheeled motorized scooters, electric self-balancing scooters, self-balancing two-wheeled electric scooters, self-balancing one-wheeled electric scooters, electric hovering boards, electric mopeds, electric self-balancing skateboards, electric motorized self-balancing boards, semi-tractor trailer trucks and semi-tractor trailers, boats, watercraft, tractors and tractor trailers, helicopters, airplanes, aircraft, drones, vertical takeoff and landing aircraft (VTOL); light bars for vehicles, namely, cars, motorcars, automobiles, trucks, vans, SUVs, bicycles, motor scooters, two wheeled motorized scooters, self-balancing scooters, hovering boards, mopeds, skateboards, self-balancing boards, electric bicycles, electric assist bicycles, electric pedal assist bicycles, electric motor scooters, electrically-powered motor scooters, electric two wheeled motorized scooters, electric self-balancing scooters, self-balancing two-wheeled electric scooters, self-balancing one-wheeled electric scooters, electric hovering boards, electric mopeds, electric motorized skateboards, electric motorized self-balancing boards, semi-tractor trailer trucks and semi-tractor trailers, boats, watercraft, tractors and tractor trailers, helicopters, airplanes, aircraft, drones, vertical takeoff and landing aircraft (VTOL)

FIRST USE 12-00-2016; IN COMMERCE 12-00-2016

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR

SER. NO. 88-728,614, FILED 12-16-2019





*Katherine Kelly Vidal*

Director of the United States
Patent and Trademark Office



# United States of America
## United States Patent and Trademark Office

# UBER

**Reg. No. 6,175,437**

**Registered Oct. 13, 2020**

**Int. Cl.: 16**

**Trademark**

**Principal Register**

Uber Technologies, Inc.  (DELAWARE CORPORATION)
1455 Market Street, 4th Floor
San Francisco, CALIFORNIA 94103

CLASS 16: Printed matter, namely, decals, stickers

FIRST USE 6-00-2016; IN COMMERCE 6-00-2016

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY
PARTICULAR FONT STYLE, SIZE OR COLOR

SER. NO. 88-976,712, FILED 03-06-2019



Director of the United States
Patent and Trademark Office



# United States of America

## United States Patent and Trademark Office

# UBER

**Reg. No. 3,977,893**

**Registered June 14, 2011**

**Int. Cls.: 9, 38, 39 and 42**

**TRADEMARK**

**SERVICE MARK**

**PRINCIPAL REGISTER**

UBERCAB INC. (DELAWARE CORPORATION)
#8
182 HOWARD STREET
SAN FRANCISCO, CA 94111

FOR: COMPUTER SOFTWARE FOR COORDINATING TRANSPORTATION SERVICES, NAMELY, SOFTWARE FOR THE AUTOMATED SCHEDULING AND DISPATCH OF MOTORIZED VEHICLES, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 10-28-2010, IN COMMERCE 10-28-2010.

FOR: TELECOMMUNICATIONS SERVICES, NAMELY, ROUTING CALLS, SMS MESSAGES, AND PUSH-NOTIFICATIONS TO LOCAL THIRD-PARTY MOTORIZED VEHICLE DISPATCHERS IN THE VICINITY OF THE CALLER USING MOBILE PHONES, IN CLASS 38 (U.S. CLS. 100, 101 AND 104).

FIRST USE 10-28-2010; IN COMMERCE 10-28-2010.

FOR: PROVIDING A WEBSITE FEATURING INFORMATION REGARDING TRANSPORTATION SERVICES AND BOOKINGS FOR TRANSPORTATION SERVICES, IN CLASS 39 (U.S. CLS. 100 AND 105).

FIRST USE 10-28-2010; IN COMMERCE 10-28-2010.

FOR: PROVIDING TEMPORARY USE OF ONLINE NON-DOWNLOADABLE SOFTWARE FOR PROVIDING TRANSPORTATION SERVICES, BOOKINGS FOR TRANSPORTATION SERVICES AND DISPATCHING MOTORIZED VEHICLES TO CUSTOMERS, IN CLASS 42 (U.S. CLS. 100 AND 101).

FIRST USE 10-28-2010; IN COMMERCE 10-28-2010.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NO. 3,842,416.

THE ENGLISH TRANSLATION OF UBER IN THE MARK IS OVER.

SER. NO. 85-170,655, FILED 11-5-2010.

JULIE VEPPUMTHARA, EXAMINING ATTORNEY



Director of the United States Patent and Trademark Office

# EXHIBIT B

# United States of America

## United States Patent and Trademark Office

# LYFT

**Reg. No. 4,686,618**

**Registered Feb. 17, 2015**

**Int. Cls.: 9 and 38**

**TRADEMARK**

**SERVICE MARK**

**PRINCIPAL REGISTER**

LYFT, INC. (DELAWARE CORPORATION)
548 MARKET STREET #68514
SAN FRANCISCO, CA 94104

FOR: COMPUTER SOFTWARE FOR COORDINATING TRANSPORTATION SERVICES, NAMELY, SOFTWARE FOR ELECTRONIC MESSAGE ALERTS FEATURING LEADS, OPTIMAL MATCHES, AND MATCHING POSTS FOR SERVICES, SCHEDULING, NAMELY, CONNECTING TRANSPORTATION PROVIDERS WITH INDIVIDUALS AND GROUPS NEEDING RIDES, THE ARRANGEMENT AND BOOKING OF TRANSPORTATION, THE SENDING AND RECEIVING OF ELECTRONIC MESSAGES, ENGAGING IN SOCIAL NETWORKING AND CREATING PROFILES, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 5-30-2012; IN COMMERCE 5-30-2012.

FOR: TELECOMMUNICATIONS SERVICES, NAMELY, ROUTING CALLS, MESSAGES, AND PUSH-NOTIFICATIONS TO TRANSPORTATION PROVIDERS AND RIDERS, IN CLASS 38 (U.S. CLS. 100, 101 AND 104).

FIRST USE 5-30-2012; IN COMMERCE 5-30-2012.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

SEC. 2(F).

SER. NO. 85-743,120, FILED 10-1-2012.

KATHLEEN M. VANSTON, EXAMINING ATTORNEY

**Deputy Director of the United States
Patent and Trademark Office**

# United States of America
## United States Patent and Trademark Office

# LYFT

**Reg. No. 6,170,586**

**Registered Oct. 06, 2020**

**Int. Cl.: 9, 11**

**Trademark**

**Principal Register**

Lyft, Inc. (DELAWARE CORPORATION)
185 Berry St., Suite 5000
San Francisco, CALIFORNIA 94107

CLASS 9: Luminous signs using light emitting diodes and electronic controllers to produce real-time and programmable messages and information displays; luminous signs using light emitting diodes and electronic controllers to project data from a mobile device; illuminating equipment for vehicles, namely, LED information displays

FIRST USE 1-00-2017; IN COMMERCE 1-00-2017

CLASS 11: Electric luminaries for vehicles; lighting installations, namely, vehicle lights; lights for use in illuminating signs and displays; illuminating equipment for vehicles, namely, electrical lamps

FIRST USE 1-00-2017; IN COMMERCE 1-00-2017

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR

OWNER OF U.S. REG. NO. 4686618, 5387239, 4698331

SER. NO. 88-503,693, FILED 07-08-2019





Director of the United States
Patent and Trademark Office

# United States of America
## United States Patent and Trademark Office



**Reg. No. 6,170,587**

**Registered Oct. 06, 2020**

**Int. Cl.: 9, 11**

**Trademark**

**Principal Register**

Lyft, Inc.  (DELAWARE CORPORATION)
185 Berry St., Suite 5000
San Francisco, CALIFORNIA 94107

CLASS 9: Luminous signs using light emitting diodes and electronic controllers to produce real-time and programmable messages and information displays; luminous signs using light emitting diodes and electronic controllers to project data from a mobile device; illuminating equipment for vehicles, namely, LED information displays

FIRST USE 1-00-2017; IN COMMERCE 1-00-2017

CLASS 11: Electric luminaries for vehicles; lighting installations, namely, vehicle lights; lights for use in illuminating signs and displays; illuminating equipment for vehicles, namely, electrical lamps

FIRST USE 1-00-2017; IN COMMERCE 1-00-2017

The mark consists of the term "LYFT" in stylized format.

OWNER OF U.S. REG. NO. 4686618, 5387239, 4698331

SER. NO. 88-503,721, FILED 07-08-2019





Director of the United States
Patent and Trademark Office

# United States of America
## United States Patent and Trademark Office

# LYFT

**Reg. No. 4,698,330**
**Registered Mar. 10, 2015**

**Int. Cl.: 39**

**SERVICE MARK**

**PRINCIPAL REGISTER**

LYFT, INC. (DELAWARE CORPORATION)
548 MARKET STREET, #68514
SAN FRANCISCO, CA 94104

FOR: TRANSPORTATION OF PASSENGERS BY MOTORIZED VEHICLE; TRANSPORTATION OF PASSENGERS BY VEHICLE THROUGH A NETWORK OF TRANSPORTATION PROVIDERS, IN CLASS 39 (U.S. CLS. 100 AND 105).

FIRST USE 5-30-2012; IN COMMERCE 5-30-2012.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

SEC. 2(F).

SER. NO. 86-183,891, FILED 2-4-2014.

PATRICIA EVANKO, EXAMINING ATTORNEY



**Deputy Director of the United States**
**Patent and Trademark Office**

# United States of America
## United States Patent and Trademark Office



**Reg. No. 4,698,331**
**Registered Mar. 10, 2015**

LYFT, INC. (DELAWARE CORPORATION)
548 MARKET STREET, #68514
SAN FRANCISCO, CA 94104

**Int. Cls.: 9, 38 and 39**

**TRADEMARK**

**SERVICE MARK**

**PRINCIPAL REGISTER**

FOR: COMPUTER SOFTWARE FOR COORDINATING TRANSPORTATION SERVICES, NAMELY, SOFTWARE FOR ELECTRONIC MESSAGE ALERTS FEATURING LEADS, OPTIMAL MATCHES, AND MATCHING POSTS FOR SERVICES, SCHEDULING, NAMELY, CONNECTING TRANSPORTATION PROVIDERS WITH INDIVIDUALS AND GROUPS NEEDING RIDES, THE ARRANGEMENT AND BOOKING OF TRANSPORTATION, ELECTRONIC MESSAGES, SOCIAL NETWORKING SERVICES AND PROFILES, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 5-30-2012; IN COMMERCE 5-30-2012.

FOR: TELECOMMUNICATIONS SERVICES, NAMELY, ROUTING CALLS, MESSAGES, AND PUSH-NOTIFICATIONS TO TRANSPORTATION PROVIDERS AND RIDERS , IN CLASS 38 (U.S. CLS. 100, 101 AND 104).

FIRST USE 5-30-2012; IN COMMERCE 5-30-2012.

FOR: TRANSPORTATION OF PASSENGERS BY MOTORIZED VEHICLE; TRANSPORTATION OF PASSENGERS BY VEHICLE THROUGH A NETWORK OF TRANSPORTATION PROVIDERS, IN CLASS 39 (U.S. CLS. 100 AND 105).

FIRST USE 5-30-2012; IN COMMERCE 5-30-2012.

THE MARK CONSISTS OF THE WORD "LYFT" IN LOWER CASE LETTERS.

SEC. 2(F).

SER. NO. 86-183,906, FILED 2-4-2014.

PATRICIA EVANKO, EXAMINING ATTORNEY



*Michelle K. Lee*

**Deputy Director of the United States**
**Patent and Trademark Office**

# EXHIBIT C

 amazon seller central

English ▾    Sign in    Sell on Amazon

This article applies to selling in: **United States**

Seller Central Help  ❯  Policies, agreements, and guidelines  ❯
Amazon Services Business Solutions Agreement

# Amazon Services Business Solutions Agreement

The version of this Agreement in English is the definitive legal version. A translation into Chinese is available for your ease of reference.

**General Terms**

Welcome to **Amazon Services Business Solutions**, a suite of optional services for sellers including: Selling on Amazon, Fulfillment by Amazon, Amazon Advertising, Transaction Processing Services, and the Selling Partner API.

THIS AMAZON SERVICES BUSINESS SOLUTIONS AGREEMENT (THE **"AGREEMENT"**) CONTAINS THE TERMS AND CONDITIONS THAT GOVERN YOUR ACCESS TO AND USE OF THE SERVICES AND IS AN AGREEMENT BETWEEN YOU OR THE BUSINESS YOU REPRESENT AND AMAZON. BY REGISTERING FOR OR USING THE SERVICES, YOU (ON BEHALF OF YOURSELF OR THE BUSINESS YOU REPRESENT) AGREE TO BE BOUND BY THE TERMS OF THIS AGREEMENT, INCLUDING THE SERVICE TERMS AND PROGRAM POLICIES THAT APPLY FOR EACH COUNTRY FOR WHICH YOU REGISTER OR ELECT TO USE A SERVICE (IN EACH CASE, THE **"ELECTED COUNTRY"**).

As used in this Agreement, **"we," "us,"** and **"Amazon"** means the applicable Amazon Contracting Party and any of its applicable Affiliates, and **"you"** means the applicant (if registering for or using a Service as an individual), or the business employing the applicant (if registering for or using a Service as a business) and any of its Affiliates. Capitalized terms have the meanings given to them in this Agreement. If there is any conflict between these General Terms and the applicable Service Terms and Program Policies, the General Terms will govern and the applicable Service Terms will prevail over the Program Policies.

1. **Enrollment.**

To begin the enrollment process, you must complete the registration process for one or more of the Services. Use of the Services is limited to parties that can lawfully enter into and form contracts under applicable Law (for example, the Elected Country may not allow minors to use the Services). As part of the application, you must provide us with your (or your business') legal name, address, phone number and e-mail address, as well as any other information we may request. Any personal data you provide to us will be handled in accordance with Amazon's Privacy Notice.

2. **Service Fee Payments; Receipt of Sales Proceeds.**

Fee details are described in the applicable Service Terms and Program Policies. You are responsible for all of your expenses in connection with this Agreement. To use a Service, you must provide us with valid credit card information from a credit card or credit cards acceptable by Amazon (**"Your Credit Card"**) as well as valid bank account information for a bank account or bank accounts acceptable by Amazon (conditions for acceptance may be modified or discontinued by us at any time without notice) (**"Your Bank Account"**). You will use only a name you are authorized to use in connection with a Service and will update all of the information you provide to us in connection with the Services as necessary to ensure that it at all times remains accurate, complete, and valid. You authorize us (and will provide us documentation evidencing your authorization upon our request) to verify your information (including any updated information), to obtain credit reports about you from time to time, to obtain credit authorizations from the issuer of Your Credit Card, and to charge Your Credit Card or debit Your Bank Account for any sums payable by you to us (in reimbursement or otherwise). All payments to you will be remitted to Your Bank Account through a banking network or by other means specified by us.

**If we determine that your actions or performance may result in returns, chargebacks, claims, disputes, violations of our terms or policies, or other risks to Amazon or third parties, then we may in our sole discretion withhold any payments to you for as long as we determine any related risks to Amazon or third parties persist. For any amounts that we determine you owe us, we may (a) charge Your Credit Card or any other payment instrument you provide to us; (b) offset any amounts that are payable by you to us (in reimbursement or otherwise) against any payments we may make to you or amounts we may owe you; (c) invoice you for amounts due to us, in which case you will pay the invoiced amounts upon receipt; (d) reverse any credits to Your Bank Account; or (e) collect payment or reimbursement from you by any other lawful means. If we determine that your account—or any other account you have operated— has been used to engage in deceptive, fraudulent, or illegal activity (including**

**the sale of counterfeit goods), or to repeatedly violate our Program Policies, then we may in our sole discretion permanently withhold any payments to you.** Except as provided otherwise, all amounts contemplated in this Agreement will be expressed and displayed in the Local Currency, and all payments contemplated by this Agreement will be made in the Local Currency.

In addition, we may require that you pay other amounts to secure the performance of your obligations under this Agreement or to mitigate the risk of returns, chargebacks, claims, disputes, violations of our terms or policies, or other risks to Amazon or third parties. These amounts may be refundable or nonrefundable in the manner we determine, and failure to comply with terms of this Agreement, including any applicable Program Policies, may result in their forfeiture.

As a security measure, we may, but are not required to, impose transaction limits on some or all customers and sellers relating to the value of any transaction or disbursement, the cumulative value of all transactions or disbursements during a period of time, or the number of transactions per day or other period of time. We will not be liable to you: (i) if we do not proceed with a transaction or disbursement that would exceed any limit established by us for a security reason, or (ii) if we permit a customer to withdraw from a transaction because an Amazon Site or Service is unavailable following the commencement of a transaction.

### 3. Term and Termination.

The term of this Agreement will start on the date of your completed registration for use of a Service and continue until terminated by us or you as provided below. You may at any time terminate your account or this Agreement immediately on notice to us via Seller Central, email, the Contact Us form, or similar means. We may terminate your account or this Agreement for convenience with 30 days' advance notice. We may suspend or terminate your account or this Agreement immediately if we determine that (a) you have materially breached the Agreement and failed to cure within 7 days of a cure notice unless your breach exposes us to liability toward a third party, in which case we are entitled to reduce, or waive, the aforementioned cure period at our reasonable discretion; (b) your account has been, or our controls identify that it may be used for deceptive or fraudulent, or illegal activity; (c) your use of the Services has harmed, or our controls identify that it might harm, other sellers, customers, or Amazon's legitimate interests; or (d) your Account Health Rating falls below our published threshold(s) for deactivation. We will promptly notify you of any such termination or suspension via email or similar means including Seller Central, indicating the reason and any options to appeal, except where we

have reason to believe that providing this information will hinder the investigation or prevention of deceptive, fraudulent, or illegal activity, or will enable you to circumvent our safeguards. On termination of this Agreement, all related rights and obligations under this Agreement immediately terminate, except that (d) you will remain responsible for performing all of your obligations in connection with transactions entered into before termination and for any liabilities that accrued before or as a result of termination, and (e) Sections 2, 3, 4, 5, 6, 7, 8, 9, 11, 14, 15, and 18 of these General Terms survive.

### 4. License.

You grant us a royalty-free, non-exclusive, worldwide right and license for the duration of your original and derivative intellectual property rights to use any and all of Your Materials for the Services or other Amazon product or service, and to sublicense the foregoing rights to our Affiliates and operators of Amazon Associated Properties; provided, however, that we will not alter any of Your Trademarks from the form provided by you (except to re-size trademarks to the extent necessary for presentation, so long as the relative proportions of such trademarks remain the same) and will comply with your removal requests as to specific uses of Your Materials (provided you are unable to do so using standard functionality made available to you via the applicable Amazon Site or Service); provided further, however, that nothing in this Agreement will prevent or impair our right to use Your Materials without your consent to the extent that such use is allowable without a license from you or your Affiliates under applicable Law (e.g., fair use under United States copyright law, referential use under trademark law, or valid license from a third party).

### 5. Representations.

Each party represents and warrants that: (a) if it is a business, it is duly organized, validly existing and in good standing under the Laws of the country in which the business is registered and that you are registering for the Service(s) within such country; (b) it has all requisite right, power, and authority to enter into this Agreement, perform its obligations, and grant the rights, licenses, and authorizations in this Agreement; (c) any information provided or made available by one party to the other party or its Affiliates is at all times accurate and complete; (d) it is not subject to sanctions or otherwise designated on any list of prohibited or restricted parties or owned or controlled by such a party, including but not limited to the lists maintained by the United Nations Security Council, the US Government (e.g., the US Department of Treasury's Specially Designated Nationals list and Foreign Sanctions Evaders list and the US Department of Commerce's Entity List), the European Union or its member states, or other applicable government authority; and (e) it will comply with all applicable Laws in performance of its obligations and exercise of its rights under this Agreement.

6. **Indemnification.**

**6.1 Your indemnification obligations**. You will defend, indemnify, and hold harmless Amazon, and our officers, directors, employees, and agents, against any third-party claim, loss, damage, settlement, cost, expense, or other liability (including, without limitation, attorneys' fees) (each, a "Claim") arising from or related to (a) your non-compliance with applicable Laws; (b) Your Products, including the offer, sale, fulfillment (except to the extent attributable to the FBA service), refund, cancellation, return, or adjustments thereof, Your Materials, any actual or alleged infringement of any Intellectual Property Rights by any of the foregoing, and any personal injury, death (to the extent the injury or death is not caused by Amazon), or property damage related thereto; (c) Your Taxes and duties or the collection, payment, or failure to collect or pay Your Taxes or duties, or the failure to meet tax registration obligations or duties; or (d) actual or alleged breach of any representations you have made.

**6.2 Amazon's indemnification obligations**. Amazon will defend, indemnify, and hold harmless you and your officers, directors, employees, and agents against any third-party Claim arising from or related to: (a) Amazon's non-compliance with applicable Laws; or (b) allegations that the operation of an Amazon Site infringes or misappropriates that third party's intellectual property rights.

**6.3 Process**. If any indemnified Claim might adversely affect us, we may, to the extent permitted by applicable Law, voluntarily intervene in the proceedings at our expense. No party may consent to the entry of any judgment or enter into any settlement of an indemnified Claim without the prior written consent of the other party, which may not be unreasonably withheld; except that a party may settle any claim that is exclusively directed at and exclusively affects that party.

7. **Disclaimer & General Release.**

**a.** THE AMAZON SITES AND THE SERVICES, INCLUDING ALL CONTENT, SOFTWARE, FUNCTIONS, MATERIALS, AND INFORMATION MADE AVAILABLE ON OR PROVIDED IN CONNECTION WITH THE SERVICES, ARE PROVIDED "AS-IS." AS A USER OF THE SERVICES, YOU USE THE AMAZON SITES, THE SERVICES, AND SELLER CENTRAL AT YOUR OWN RISK. EXCEPT THOSE SET FORTH IN SECTION 5 ABOVE, TO THE FULLEST EXTENT PERMISSIBLE BY LAW, WE AND OUR AFFILIATES DISCLAIM: (i) ANY REPRESENTATIONS OR WARRANTIES REGARDING THIS AGREEMENT, THE SERVICES OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT; (ii) IMPLIED WARRANTIES ARISING OUT OF COURSE OF DEALING, COURSE OF PERFORMANCE, OR USAGE OF TRADE; AND (iii) ANY OBLIGATION, LIABILITY, RIGHT, CLAIM, OR REMEDY IN TORT, WHETHER OR NOT

ARISING FROM OUR NEGLIGENCE. WE DO NOT WARRANT THAT THE FUNCTIONS CONTAINED IN THE AMAZON SITES AND THE SERVICES WILL MEET YOUR REQUIREMENTS OR BE AVAILABLE, TIMELY, SECURE, UNINTERRUPTED, OR ERROR FREE, AND WE WILL NOT BE LIABLE FOR ANY SERVICE INTERRUPTIONS, INCLUDING BUT NOT LIMITED TO SYSTEM FAILURES OR OTHER INTERRUPTIONS THAT MAY AFFECT THE RECEIPT, PROCESSING, ACCEPTANCE, COMPLETION, OR SETTLEMENT OF ANY TRANSACTIONS.

**b.** BECAUSE AMAZON IS NOT INVOLVED IN TRANSACTIONS BETWEEN CUSTOMERS AND SELLERS OR OTHER PARTICIPANT DEALINGS, IF A DISPUTE ARISES BETWEEN ONE OR MORE PARTICIPANTS, EACH PARTICIPANT RELEASES AMAZON (AND ITS AGENTS AND EMPLOYEES) FROM CLAIMS, DEMANDS, AND DAMAGES (ACTUAL AND CONSEQUENTIAL) OF EVERY KIND AND NATURE, KNOWN AND UNKNOWN, SUSPECTED AND UNSUSPECTED, DISCLOSED AND UNDISCLOSED, ARISING OUT OF OR IN ANY WAY CONNECTED WITH SUCH DISPUTES.

8. **Limitation of Liability.**

WE WILL NOT BE LIABLE (WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE, PRODUCT LIABILITY, OR OTHER THEORY), OR OTHERWISE) TO YOU OR ANY OTHER PERSON FOR COST OF COVER, RECOVERY, OR RECOUPMENT OF ANY INVESTMENT MADE BY YOU OR YOUR AFFILIATES IN CONNECTION WITH THIS AGREEMENT, OR FOR ANY LOSS OF PROFIT, REVENUE, BUSINESS, OR DATA OR PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR RELATING TO THIS AGREEMENT, EVEN IF AMAZON HAS BEEN ADVISED OF THE POSSIBILITY OF THOSE COSTS OR DAMAGES. FURTHER, OUR AGGREGATE LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED WILL NOT EXCEED AT ANY TIME THE TOTAL AMOUNTS DURING THE PRIOR SIX MONTH PERIOD PAID BY YOU TO AMAZON IN CONNECTION WITH THE PARTICULAR SERVICE GIVING RISE TO THE CLAIM.

9. **Insurance.**

If the gross proceeds from Your Transactions exceed the applicable Insurance Threshold during any month if the Elected Country is the United States, or each month over any period of three (3) consecutive months if the Elected Country is Canada or Mexico, or otherwise if requested by us, then within thirty (30) days thereafter, you will maintain at your expense throughout the remainder of the Term for each applicable Elected Country commercial general, umbrella or excess liability insurance with the Insurance Limits per occurrence and in aggregate covering liabilities caused by or occurring in conjunction with the operation of your business, including products, products/completed operations and bodily

injury, with policy(ies) naming Amazon and its assignees as additional insureds. At our request, you will provide to us certificates of insurance, the full insurance policy, or other documents we may request for the coverage to the following address: c/o Amazon, P.O. Box 81226, Seattle, WA 98108-1226, Attention: Risk Management.

10. **Tax Matters.**

As between the parties, you will be responsible for the collection, reporting, and payment of any and all of Your Taxes, except to the extent that (i) Amazon automatically calculates, collects, or remits taxes on your behalf according to applicable law; or (ii) Amazon expressly agrees to receive taxes or other transaction-based charges on your behalf in connection with tax calculation services made available by Amazon and used by you. You agree to and will comply with the Tax Policies. All fees and payments payable by you to Amazon under this Agreement or the applicable Service Terms are exclusive of any applicable taxes, deductions or withholding (including but not limited to cross-border withholding taxes), and you will be responsible for paying Amazon any of Your Taxes imposed on such fees and any deduction or withholding required on any payment.

11. **Confidentiality and Personal Data.**

During the course of your use of the Services, you may receive Confidential Information. You agree that for the term of the Agreement and 5 years after termination: (a) all Confidential Information will remain Amazon's exclusive property; (b) you will use Confidential Information only as is reasonably necessary for your participation in the Services; (c) you will not otherwise disclose Confidential Information to any other Person except as required to comply with the Law; (d) you will take all reasonable measures to protect the Confidential Information against any use or disclosure that is not expressly permitted in this Agreement; and (e) you will retain Confidential Information only for so long as its use is necessary for participation in the Services or to fulfill your statutory obligations (e.g. tax) and in all cases will delete such information upon termination or as soon as no longer required for the fulfillment of statutory obligations. The foregoing sentence does not restrict your right to share Confidential Information with a governmental entity that has jurisdiction over you, provided that you limit the disclosure to the minimum necessary and explicitly indicate the confidential nature of the shared information to the governmental entity. You may not issue any press release or make any public statement related to the Services, or use our name, trademarks, or logo, in any way (including in promotional material) without our advance written permission, or misrepresent or embellish the relationship between us in any way. You may only use the "Available at Amazon" badge as defined in and according to the

Trademark Usage Guidelines available in Seller Central; you may not use our name, trademarks, or logos in any way (including in promotional material) not covered by the Trademark Usage Guidelines without our advance written permission.

Generally, you may not use customer personal data in any way inconsistent with applicable Law. You must keep customer personal data confidential at all times (the above 5 years' term limit does not apply to customer personal data).

12. **Force Majeure.**

We will not be liable for any delay or failure to perform any of our obligations under this Agreement by reasons, events or other matters beyond our reasonable control.

13. **Relationship of Parties.**

Subject to the Transaction Processing Service Terms (if the Elected Country for a Service is the United States), you and we are independent contractors, and nothing in this Agreement will create any partnership, joint venture, agency, franchise, sales representative, or employment relationship between us. You will have no authority to make or accept any offers or representations on our behalf. This Agreement will not create an exclusive relationship between you and us. Nothing expressed or mentioned in or implied from this Agreement is intended or will be construed to give to any person other than the parties to this Agreement any legal or equitable right, remedy, or claim under or in respect to this Agreement. This Agreement and all of the representations, warranties, covenants, conditions, and provisions in this Agreement are intended to be and are for the sole and exclusive benefit of Amazon, you, and customers. As between you and us, you will be solely responsible for all obligations associated with the use of any third party service or feature that you permit us to use on your behalf, including compliance with any applicable terms of use. You will not make any statement, whether on your site or otherwise, that would contradict anything in this section.

14. **Suggestions and Other Information.**

If you or any of your Affiliates elect to provide or make available suggestions, comments, ideas, improvements, or other feedback or materials to us in connection with or related to any Amazon Site or Service (including any related Technology), we will be free to use, disclose, reproduce, modify, license, transfer and otherwise distribute, and exploit any of the foregoing information or materials in any manner. In order to cooperate with governmental requests, to protect our systems and customers, or to ensure the integrity and operation of

our business and systems, we may access and disclose any information we consider necessary or appropriate, including but not limited to user contact details, IP addresses and traffic information, usage history, and posted content. If we make suggestions on using the Services, you are responsible for any actions you take based on our suggestions.

15. **Modification.**

15.1. We will provide at least 15 days' advance notice in accordance with Section 18 for changes to the Agreement.

15.2 However, we may change or modify the Agreement at any time with immediate effect (a) for legal, regulatory, fraud and abuse prevention, or security reasons; (b) to change existing features or add additional features to the Services (where this does not materially adversely affect your use of the Services); or (c) to restrict products or activities that we deem unsafe, inappropriate, or offensive. We will notify you about any change or modification in accordance with Section 18.

15.3 Your continued use of the Services after the effective date of any change to this Agreement in accordance with this Section 15 will constitute your acceptance of that change. If any change is unacceptable to you, you agree not to use the Services and to end the Agreement as described in Section 3.

16. **Password Security.**

Any password we provide to you may be used only during the Term to access Seller Central (or other tools we provide, as applicable) to use the Services, electronically accept Your Transactions, and review your completed transactions. You are solely responsible for maintaining the security of your password. You may not disclose your password to any third party (other than third parties authorized by you to use your account in accordance with this Agreement) and are solely responsible for any use of or action taken under your password. If your password is compromised, you must immediately change your password.

17. **Export.**

You will not directly or indirectly export, re-export, transmit, or cause to be exported, re-exported or transmitted, any commodities, software or technology to any country, individual, corporation, organization, or entity to which such export, re-export, or transmission is restricted or prohibited, including any country, individual, corporation, organization, or entity under sanctions or embargoes administered by the United Nations, US Departments of State,

Treasury or Commerce, the European Union, or any other applicable government authority.

18. **Miscellaneous.**

The Governing Laws will govern this Agreement, without reference to rules governing choice of laws or the Convention on Contracts for the International Sale of Goods. If the Elected Country is the United States, Canada, or Mexico, **Amazon and you both consent that any dispute with Amazon or its Affiliates or claim relating in any way to this Agreement or your use of the Services will be resolved by binding arbitration as described in this paragraph, rather than in court**, except that (i) either party may elect to proceed in a small claims court that is a Governing Court if your claims qualify; (ii) you or we may bring suit in the Governing Courts, submitting to the jurisdiction of the Governing Courts and waiving our respective rights to any other jurisdiction, to enjoin infringement or other misuse of intellectual property rights; and (iii) we may bring any claims related to your sale of counterfeit products on the Amazon Site in the Governing Courts and seek any remedy available under law related to those claims. **There is no judge or jury in arbitration, and court review of an arbitration award is limited. However, an arbitrator can award the same damages and relief as a court (including injunctive and declaratory relief or statutory damages), and must follow the terms of this Agreement as a court would.** Before you may begin an arbitration proceeding, you must send a letter notifying us of your intent to pursue arbitration and describing your claim to our registered agent, CSC 300 Deschutes Way SW, Suite 208 MC-CSC1, Tumwater, WA 98501. The arbitration will be conducted by the American Arbitration Association (AAA) under its commercial rules. The expedited procedures of the AAA's rules will apply only in cases seeking exclusively monetary relief under $50,000, and in such cases the hearing will be scheduled to take place within 90 days of the arbitrator's appointment. For all cases, the AAA commercial fee schedule governs the payment of all filing, administration and arbitrator fees. The underlying award in the arbitration may be appealed pursuant to the AAA's Optional Appellate Arbitration Rules. **Amazon and you each agree that any dispute resolution proceedings will be conducted only on an individual basis and not in a class, consolidated or representative action.** If for any reason a claim proceeds in court rather than in arbitration **Amazon and you each waive any right to a jury trial**.

You may not assign this Agreement, by operation of law or otherwise, without our prior written consent. Any attempt to assign or otherwise transfer in violation of this section is void; provided, however, that upon notice to Amazon, you may assign or transfer this Agreement, in whole or in part, to any of your Affiliates as long as you remain liable for your obligations that arose prior to the

effective date of the assignment or transfer under this Agreement. You agree that we may assign or transfer our rights and obligations under this Agreement: (a) in connection with a merger, consolidation, acquisition or sale of all or substantially all of our assets or similar transaction; or (b) to any Affiliate or as part of a corporate reorganization; and effective upon such assignment, the assignee is deemed substituted for Amazon as the party to this Agreement. Subject to that restriction, this Agreement will be binding on, inure to, and be enforceable against the parties and their respective successors and assigns. We may perform any of our obligations or exercise any of our rights under this Agreement through one or more of our Affiliates. Amazon retains the right to immediately halt any of Your Transactions, prevent or restrict access to the Services or take any other action to restrict access to or availability of any inaccurate listing, any inappropriately categorized items, any unlawful items, or any items otherwise prohibited by applicable Program Policies. Because Amazon is not your agent (except for the limited purpose set out in the Transaction Processing Service Terms (if the Elected Country for a Service is the United States)), or the customer's agent for any purpose, Amazon will not act as either party's agent in connection with resolving any disputes between participants related to or arising out of any transaction.

Amazon will provide notice to you under this Agreement by posting changes to Seller Central or to the applicable Amazon Services site to which the changes relate (such as the Developer Site accessible through your account), by sending you an email notification, or by similar means. You must send all notices and other communications relating to Amazon to our Selling Partner Support team via Seller Central, email, the Contact Us form, or similar means. We may also communicate with you electronically and in other media, and you consent to such communications. You may change your e-mail addresses and certain other information in Seller Central, as applicable. You will ensure that all of your information is up to date and accurate at all times.

If any provision of this Agreement is deemed unlawful, void, or for any reason unenforceable, then that provision will be deemed severable from these terms and conditions and will not affect the validity and enforceability of any remaining provisions. If the Elected Country is Canada, then it is the express wish of the parties that this Agreement and the applicable Service Terms and Program Policies have been drafted in English. (The following is a French translation of the preceding sentence: Si le pays de service est le Canada, les parties conviennent que la présente autorisation et tous les termes et conditions applicables s'y rattachant soient rédigés en anglais.) We may make available translations to this Agreement and the applicable Service Terms and Program Policies, but the English version will control. This Agreement represents the entire agreement between the parties with respect to the Services and related

subject matter and supersedes any previous or contemporaneous oral or written agreements and understandings.

**Definitions**

As used in this Agreement, the following terms have the following meanings:

**"Affiliate"** means, with respect to any entity, any other entity that directly or indirectly controls, is controlled by, or is under common control with that entity.

**"Amazon Associated Properties"** means any website or other online point of presence, mobile application, service or feature, other than an Amazon Site, through which any Amazon Site, or products or services available on any of them, are syndicated, offered, merchandised, advertised, or described.

**"Amazon Contracting Party"** means the party outlined below.

- If the Elected Country is Canada:

| Service | Amazon Contracting Party |
|---|---|
| Selling on Amazon | Amazon.com.ca, Inc. |
| Selling on Amazon (if your account is enabled to list Optional Coverage Plans) | Amazon.com.ca, Inc. |
| Fulfillment by Amazon | Amazon.com.ca, Inc. |
| Amazon Advertising | Amazon Advertising Canada, Inc. |

- If the Elected Country is Mexico:

| Service | Amazon Contracting Party |
|---|---|
| Selling on Amazon | Servicios Comerciales Amazon México S. de R.L. de C.V. |
| Fulfillment by Amazon | Servicios Comerciales Amazon México S. de R.L. de C.V. |
| Amazon Advertising | Servicios Comerciales Amazon México S. de R.L. de C.V. |

- If the Elected Country is the United States:

| Service | Amazon Contracting Party |
|---|---|
| Selling on Amazon | Amazon.com Services LLC |
| Selling on Amazon (if your account is enabled to list Optional Coverage Plans) | Amazon.com Services LLC |
| Fulfillment by Amazon | Amazon.com Services LLC |
| Amazon Advertising | Amazon.com Services LLC |
| Transaction Processing Services | Amazon Payments, Inc., Amazon Capital Services, Inc., or Amazon.com Services LLC, according to the Transaction Processing Services Terms |

If you register for or use the Selling Partner API, the Amazon Contracting Party is the Contracting Party that provides the applicable Service you use in connection with the Selling Partner API.

"**Amazon Site**" means, as applicable, the CA Amazon Site, the MX Amazon Site, or the US Amazon Site.

"**CA Amazon Site**" means the website, the primary home page of which is identified by the url www.amazon.ca, and any successor or replacement of such website.

"**Confidential Information**" means information relating to us, to the Services, or Amazon customers that is not known to the general public including, but not limited to, any information identifying or unique to specific customers; reports, insights, and other information about the Services; data derived from the Services except for data (other than customer personal data) arising from the sale of your products comprising of products sold, prices, sales, volumes and time of the transaction; and technical or operational specifications relating to the Services. For the purposes of this Agreement, customer personal data constitutes Confidential Information at all times.

"**Content**" means copyrightable works under applicable Law and content protected by database rights under applicable Law.

"**Excluded Products**" means the items described on the applicable Restricted Products pages in Seller Central, any other applicable Program Policy, or any

other information made available to you by Amazon.

**"Governing Courts"** means the applicable one of the following:

- the state or Federal court in King County, Washington (if the Elected Country is Canada, Mexico, or the United States),

**"Governing Laws"** means the applicable one of the following:

- the laws of the State of Washington, United States together with the Federal Arbitration Act and other applicable federal law (if the Elected Country is Canada, Mexico, or the United States),

**"Insurance Limits"** means the applicable one of the following:

- One Million Canadian Dollars ($1,000,000) (if the Elected Country is Canada),
- Ten Million Mexican Pesos ($10,000,000) (if the Elected Country is Mexico),
- One Million U.S. Dollars ($1,000,000) (if the Elected Country is the United States).

**"Insurance Threshold"** means the applicable one of the following:

- Ten Thousand Canadian Dollars ($10,000) (if the Elected Country is Canada),
- One Hundred Thousand Mexican Pesos ($100,000) (if the Elected Country is Mexico),
- Ten Thousand U.S. Dollars ($10,000) (if the Elected Country is the United States).

**"Intellectual Property Right"** means any patent, copyright, Trademark, domain name, moral right, trade secret right, or any other intellectual property right arising under any Laws and all ancillary and related rights, including all rights of registration and renewal and causes of action for violation, misappropriation or infringement of any of the foregoing.

**"Law"** means any law, ordinance, rule, regulation, order, license, permit, judgment, decision, or other requirement, now or in the future in effect, of any governmental authority (e.g., on a federal, state, or provincial level, as applicable) of competent jurisdiction.

**"Local Currency"** means the applicable one of the following:

- U.S. Dollars (if the Elected Country is the United States),
- Canadian Dollars (if the Elected Country is Canada),
- Mexican Pesos (if the Elected Country is Mexico),

**"MX Amazon Site"** means the website, the primary home page of which is identified by the url www.amazon.com.mx, and any successor or replacement of such website.

14/44

**"Optional Coverage Plans"** means warranties, extended service plans and related offerings, in each case as determined by us, that you offer.

**"Order Information"** means, with respect to any of Your Products ordered through an Amazon Site, the order information and shipping information that we provide or make available to you.

**"Person"** means any individual, corporation, partnership, limited liability company, governmental authority, association, joint venture, division, or other cognizable entity, whether or not having distinct legal existence.

**"Program Policies"** means all policies and program terms provided on the Program Policies page.

**"Sales Proceeds"** means the gross proceeds from any of Your Transactions, including (a) all shipping and handling, gift wrap and other charges; (b) taxes and customs duties to the extent specified in the applicable Tax Policies; and (c) in the case of invoiced orders, any amounts that customers fail to pay to us or our Affiliates on or before the applicable invoice due date.

**"Seller Central"** means the online portal and tools made available by Amazon to you, for your use in managing your orders, inventory, and presence on a particular Amazon Site or any other online point of presence.

**"Service"** means each of the following services: Selling on Amazon, Fulfillment by Amazon, Amazon Advertising (including Amazon Sponsored Products), the Selling Partner APIs, and, if the Elected Country for a Service is the United States, the Transaction Processing Services, together in each case with any related services and materials we make available.

**"Service Terms"** means the service terms applicable to each Service, which are made part of this Agreement upon the date you elect to register for or use the applicable Service, and any subsequent modifications we make to those terms.

**"Technology"** means any: (a) ideas, procedures, processes, systems, methods of operation, concepts, principles, and discoveries protected or protectable under the Laws of any jurisdiction; (b) interfaces, protocols, glossaries, libraries, structured XML formats, specifications, grammars, data formats, or other similar materials; and (c) software, hardware, code, technology, or other functional item.

**"Trademark"** means any trademark, service mark, trade dress (including any proprietary "look and feel"), trade name, other proprietary logo or insignia, or

any other source or business identifier, protected or protectable under any Laws.

**"US Amazon Site"** means that website, the primary home page of which is identified by the URL www.amazon.com, and any successor or replacement of such website.

**"Your Materials"** means all Technology, Your Trademarks, Content, Your Product information, data, materials, and other items or information provided or made available by you or your Affiliates to Amazon or its Affiliates.

**"Your Personnel"** means any third party warranting, administering or otherwise involved in the offer, sale, performance, or fulfillment of Your Products, including any of your employees, representatives, agents, contractors, or subcontractors.

**"Your Product"** means any product or service (including Optional Coverage Plans) that you: (a) have offered through the Selling on Amazon Service; (b) have made available for advertising through the Amazon Advertising Service; or (c) have fulfilled or otherwise processed through the Fulfillment by Amazon Service.

**"Your Sales Channels"** means all sales channels and other means through which you or any of your Affiliates offers products or services, other than physical stores.

**"Your Taxes"** means any and all sales, goods and services, use, excise, premium, import, export, value added, consumption, and other taxes, regulatory fees, levies (specifically including environmental levies), or charges and duties assessed, incurred, or required to be collected or paid for any reason (a) in connection with any advertisement, offer or sale of products or services by you on or through or in connection with the Services; (b) in connection with any products or services provided for which Your Products are, directly or indirectly, involved as a form of payment or exchange; or (c) otherwise in connection with any action, inaction, or omission of you or your Affiliates, or any Persons providing products or services, or your or their respective employees, agents, contractors, or representatives, for which Your Products are, directly or indirectly, involved as a form of payment or exchange. Also, if the Elected Country is the United States, Mexico, or Canada as it is used in the Fulfillment by Amazon Service Terms, this defined term also means any of the types of taxes, duties, levies, or fees mentioned above that are imposed on or collectible by Amazon or any of its Affiliates in connection with or as a result of fulfillment services including the storage of inventory or packaging of Your Products and other materials owned by you and stored by Amazon, shipping, gift wrapping, or other

actions by Amazon in relation to Your Products pursuant to the Fulfillment by Amazon Service Terms.

**"Your Trademarks"** means Trademarks of yours that you provide to us: (a) in non-text form for branding purposes; and (b) separate from (and not embedded or otherwise incorporated in) any product specific information or materials.

**"Your Transaction"** means any sale of Your Product(s) through an Amazon Site.

**Selling on Amazon Service Terms**

The Selling on Amazon Service (**"Selling on Amazon"**) is a Service that allows you to offer certain products and services directly on the Amazon Sites.

These Selling on Amazon Service Terms are part of the Agreement, but, unless specifically provided otherwise, concern and apply only to your participation in Selling on Amazon. BY REGISTERING FOR OR USING THE SELLING ON AMAZON SERVICE, YOU (ON BEHALF OF YOURSELF OR THE BUSINESS YOU REPRESENT) AGREE TO BE BOUND BY THE AGREEMENT, INCLUDING THESE SELLING ON AMAZON SERVICE TERMS. **NOTWITHSTANDING THE PREVIOUS SENTENCE, IF YOU HAVE ENTERED INTO A SEPARATE AGREEMENT THAT PERMITS YOU TO OFFER YOUR PRODUCTS THROUGH A PARTICULAR AMAZON SITE (E.G., A MERCHANTS@ AMAZON.COM PROGRAM AGREEMENT, MERCHANTS @AMAZON.CO.JP PROGRAM AGREEMENT OR ANY PREDECESSOR OF THOSE AGREEMENTS), THEN TO THE EXTENT THAT YOU CONTINUE TO LIST AND SELL YOUR PRODUCTS ON THAT AMAZON SITE PURSUANT TO SUCH SEPARATE AGREEMENT, TRANSACTIONS OF YOUR PRODUCTS ON THAT AMAZON SITE AND ANY TAX SERVICES WE MAKE AVAILABLE UNDER THAT AGREEMENT ARE GOVERNED BY THE TERMS OF THAT AGREEMENT AND NOT BY THESE SELLING ON AMAZON SERVICE TERMS.**

**S-1 Your Product Listings and Orders.**

**S-1.1 Products and Product Information.** You will provide accurate and complete Required Product Information for each product or service that you offer through any Amazon Site and promptly update that information as necessary to ensure it at all times remains accurate and complete. You will also ensure that Your Materials, Your Products (including packaging) and your offer and subsequent sale of any of the same on any Amazon Site comply with all applicable Laws (including all minimum age, marking and labeling requirements) and do not contain any sexually explicit (except to the extent expressly permitted under our applicable Program Policies), defamatory or obscene materials. You may not provide any information for, or otherwise seek to offer any Excluded

Products on any Amazon Sites; or provide any URL Marks for use, or request that any URL Marks be used, on any Amazon Site. If you offer a product for sale on an Amazon Site that requires a warning under California Health & Safety Code Section 25249.6 (a "Proposition 65 Warning") you (a) will provide us with such warning in the manner specified in our Program Policies, (b) agree that our display of a Proposition 65 Warning on a product detail page is confirmation of our receipt of that warning, and (c) will only revise or remove a Proposition 65 Warning for a product when the prior warning is no longer legally required.

**S-1.2 Product Listing; Merchandising; Order Processing.** We will enable you to list Your Products on a particular Amazon Site, and conduct merchandising and promote Your Products in accordance with the Agreement (including via the Amazon Associated Properties or any other functions, features, advertising, or programs on or in connection with the applicable Amazon Site). We may use mechanisms that rate, or allow shoppers to rate, Your Products and your performance as a seller and Amazon may make these ratings and feedback publicly available. We will provide Order Information to you for each order of Your Products through the applicable Amazon Site. We will also receive all Sales Proceeds on your behalf for each of these transactions and will have exclusive rights to do so, and will remit them to you in accordance with these Selling on Amazon Service Terms. We may permit certain customers to place invoiced orders for Your Products, in which case remittance of Sales Proceeds may be delayed according to each customer's invoicing terms. You will accept and fulfill invoiced orders in the same manner as you accept and fulfill non-invoiced orders, except as otherwise provided in this Agreement.

**S-1.3 Shipping and Handling Charges.** For Your Products ordered by customers on or through an Amazon Site that are not fulfilled using Fulfillment by Amazon, you will determine the shipping and handling charges subject to our Program Policies and standard functionality (including any category-based shipping and handling charges we determine, such as for products offered by sellers on the Individual selling plan and BMVD Products generally). When we determine the shipping and handling charges, you will accept them as payment in full for your shipping and handling. Please refer to the Fulfillment by Amazon Service Terms for Your Products that are fulfilled using Fulfillment by Amazon.

**S-1.4 Credit Card Fraud and Unpaid Invoices.** We will bear the risk of (a) credit card fraud (i.e., a fraudulent purchase arising from the theft and unauthorized use of a third party's credit card information) occurring in connection with Your Transactions, and (b) late payments or defaults by customers in connection with invoiced orders for Your Products, except, in each case, in connection with Seller-Fulfilled Products that are not fulfilled strictly in accordance with the Order

Information and Shipment Information. You will bear all other risk of fraud or loss.

**S-2 Sale and Fulfillment; Refunds and Returns.**

**S-2.1 Sale and Fulfillment.** Other than as described in the Fulfillment by Amazon Service Terms for each Amazon Site for which you decide to register or use the Selling on Amazon Service, you will: (a) source, offer, sell, and fulfill your Seller-Fulfilled Products, and source, offer, and sell your Amazon-Fulfilled Products, in each case in accordance with the terms of the applicable Order Information, this Agreement, and all terms provided by you or us and displayed on the applicable Amazon Site at the time of the order and be solely responsible for and bear all risk for those activities; (b) package each of Your Products in a commercially reasonable manner complying with all applicable packaging and labeling requirements, including any warnings or instructions necessary to safely use Your Products, and ship each of Your Products on or before its Expected Ship Date; (c) retrieve Order Information at least once each business day; (d) only cancel Your Transactions as permitted pursuant to your terms and conditions appearing on the applicable Amazon Site at the time of the applicable order or as may be required under this Agreement; (e) fulfill Your Products throughout the Elected Country (except to the extent prohibited by Law or this Agreement); (f) provide to Amazon information regarding fulfillment and order status and tracking (to the extent available), in each case as requested by us using the processes designated by us, and we may make any of this information publicly available; (g) comply with all Street Date instructions; (h) ensure that you are the seller of each of Your Products; (i) include an order-specific packing slip, and, if applicable, any tax invoices, within each shipment of Your Products; (j) identify yourself as the seller of each of Your Products on all packing slips or other information included or provided in connection with Your Products and as the Person to which a customer may return the applicable product; and (k) not send customers emails confirming orders or fulfillment of Your Products. If any of Your Products are fulfilled using Fulfillment by Amazon, the Fulfillment by Amazon Service Terms for the applicable Amazon Site will apply to the storage, fulfillment, and delivery of such Amazon-Fulfilled Products.

**S-2.2 Cancellations, Returns, and Refunds.** The Amazon Refund Policies for the applicable Amazon Site will apply to Your Products. Subject to Section F-6, for any of Your Products fulfilled using Fulfillment by Amazon, you will promptly accept, calculate, and process cancellations, returns, refunds, and adjustments in accordance with this Agreement and the Amazon Refund Policies for the applicable Amazon Site, using functionality we enable for your account. Without limiting your obligations, we may in our sole discretion accept, calculate, and process cancellations, returns, refunds, and adjustments for the benefit of

customers. You will route any payments to customers in connection with Your Transactions through Amazon. We will make any payments to customers in the manner we determine, and you will reimburse us for all amounts we pay.

**S-3 Problems with Your Products.**

**S-3.1 Delivery Errors and Nonconformities; Recalls.** You are responsible for any non-performance, non-delivery, misdelivery, theft, or other mistake or act in connection with the fulfillment of Your Products, except to the extent caused by: (a) credit card fraud for which we are responsible under Section S-1.4; or (b) our failure to make available to you Order Information as it was received by us or resulting from address verification. Notwithstanding the previous sentence, for those of Your Products that are fulfilled using Fulfillment by Amazon, if any, the Fulfillment by Amazon Service Terms for the applicable Amazon Site will apply to non-delivery, misdelivery, theft, or other mistake or act in connection with the fulfillment of those of Your Products. You are also responsible for any non-conformity or defect in, any public or private recall of, or safety alert of any of Your Products or other products provided in connection with Your Products. You will notify us promptly as soon as you have knowledge of any public or private recalls, or safety alerts of Your Products or other products provided in connection with Your Products.

**S-3.2 A-to-z Guarantee and Chargebacks if the Elected Country is Canada or Mexico.** If we inform you that we have received or initiated a claim under the "A-to-z Guarantee" offered on a particular Amazon Site or other dispute relating to the offer, sale or fulfillment of Your Products (other than a chargeback), concerning one of Your Transactions, you will have 30 days to appeal our decision of the claim. If we find that a claim, chargeback, or dispute is your responsibility, you (a) will not take recourse against the customer, and (b) are responsible for reimbursing us in accordance with the Service Fee Payments section of this Agreement for the amount paid by the customer (including taxes and shipping and handling charges, but excluding any Referral Fees that we retained as defined in Section S-4), and all other fees and expenses associated with the original transaction (such as credit card, bank, payment processing, re-presentment, or penalty fees) and any related chargebacks or refunds, to the extent payable by us.

**S-3.3 A-to-z Guarantee, A-to-z Claims Process, and Chargebacks if the Elected Country is the United States.** Claims that we receive or initiate under the "A-to-z Guarantee" or the "A-to-z Claims Process for Property Damage and Personal Injury" will be governed by the Program Policy for such claims.

If we find that any claim, chargeback, or dispute is your responsibility, (i) you will not take recourse against the customer, and (ii) if Amazon resolves the claim directly with the customer and does not waive its right of indemnification, you will reimburse us in accordance with Section 2 of this Agreement to the extent of your responsibility (not to exceed the amount paid by Amazon to resolve the claim), including taxes and shipping and handling charges (but excluding any Referral Fees that we retained as defined in Section S-4), and all other fees and expenses associated with the original transaction (such as credit card, bank, payment processing, re-presentment, or penalty fees) and any related chargebacks or refunds.

**S-4 Compensation.**

You will pay us: (a) the applicable Referral Fees; (b) any applicable Variable Closing Fee; (c) the non-refundable Selling on Amazon Subscription Fee in advance each month; and (d) any other applicable fees described in this Agreement (including any applicable Program Policies). **"Selling on Amazon Subscription Fee"** means the fee specified as such on the Selling on Amazon Fee Schedule for the applicable Amazon Site at the time such fee is payable. With respect to each of Your Transactions: (i) **"Sales Proceeds"** has the meaning set out in this Agreement; (ii) **"Variable Closing Fee"** means the applicable fee, if any, as specified on the Variable Closing Fee Schedule for the applicable Amazon Site; and (iii) **"Referral Fee"** means the applicable fee based on the Sales Proceeds from Your Transaction through the applicable Amazon Site specified on the Selling on Amazon Fee Schedule for that Amazon Site at the time of Your Transaction, based on the categorization by Amazon of the type of product that is the subject of Your Transaction; provided, however, that Sales Proceeds will not include any shipping charges set by us in the case of Your Transactions that consist solely of products fulfilled using Fulfillment by Amazon.

**S-5 Remittance of Sales Proceeds & Refunds.**

Except as otherwise stated in this Agreement, we will remit to you your available balance on a bi-weekly (14 day) (or at our option, more frequent) basis, which may vary for each Elected Country. For each remittance, your available balance is equal to any Sales Proceeds not previously remitted to you as of the applicable Remittance Calculation Date (which you will accept as payment in full for Your Transactions), less: (a) the Referral Fees; (b) the applicable Variable Closing Fee; (c) any Selling on Amazon Subscription Fees; (d) any other applicable fees described in this Agreement (including any applicable Program Policies); (e) any amounts we require you to maintain in your account balance pursuant to this Agreement (including payments withheld pursuant to Section 2 of the General Terms, Section S-1.4, Section S-3.2, Section S-3.3, and applicable Program

Policies); and (f) any taxes that Amazon automatically calculates, collects and remits to a tax authority according to applicable law, as specified in the Tax Policies.

We may establish a reserve on your account based on our assessment of risks to Amazon or third parties posed by your actions or performance, and we may modify the amount of the reserve from time to time at our sole discretion.

When you either initially provide or later change Your Bank Account information, the Remittance Calculation Date may be deferred by up to 14 days. For sellers that registered after October 30, 2011 and are on the Individual selling plan, the remittance amount will not include Sales Proceeds from the 14-day period before the date of remittance. If you refund money to a customer in connection with one of Your Transactions, and the refund is routed through us (or our Affiliate), on the next available Remittance Calculation Date we will refund to you the amount of the Referral Fee paid by you to us attributable to the amount of the customer refund (including refunded taxes and customs duties only to the extent specified in the applicable Tax Policies), less the Refund Administration Fee for each of Your Products refunded that is not a BMVD Product, which amount we may retain as an administrative fee; provided, however, that in the case of a complete refund of Sales Proceeds for a Media Product, we will refund to you the full amount of any Variable Closing Fee paid by you to us (and in the case of a partial refund of Sales Proceeds for a Media Product, we will not refund to you any portion of any Variable Closing Fee paid by you to us). We will remit any amounts to be refunded by us pursuant to this subsection from time to time together with the next remittance to be made by us to you. **"Refund Administration Fee"** means the applicable fee described on the Refund Administration Fee Schedule for the applicable Amazon Site.

Net Sales Proceeds from non-invoiced orders will be credited to your available balance when they are received by us or our Affiliates. Sales Proceeds from invoiced orders will be credited to your available balance: (a) if you have elected in advance to pay a fee to accelerate remittance of Sales Proceeds from invoiced orders, on the day all of Your Products included in an invoiced orders are shipped; or (b) otherwise, no later than the seventh day following the date that an invoiced order becomes due.

**S-6 Amazon's Websites and Services.**

Amazon has the right to determine, the design, content, functionality, availability and appropriateness of its websites, selection, and any product or listing in the Amazon Stores, and all aspects of each Service, including your use of the same. Amazon may assign any of these rights or delegate any of its responsibilities.

**S-7 Continuing Guarantees**

Guarantees. We require the following continuing guarantees from you.

S-7.1 Pesticides. If any of Your Products is a "pesticide" being offered or sold in the United States or other product regulated under the US Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") or its implementing regulations, then you provide to us the following continuing guaranty that: (a) you are a resident of the United States; and (b) with respect to each such product, the pesticides and other FIFRA regulated products comprising each sale, shipment, or other delivery made previously or hereafter are: (i) lawfully registered with the US Environmental Protection Agency at the time of sale, shipment, or delivery, or fully qualified for a specific exemption from the FIFRA registration requirements at the time of sale, shipment, or delivery, (ii) compliant with all requirements of FIFRA and its implementing regulations at the time of sale, shipment, or delivery, and (iii) provided by you in the original, unbroken packaging.

S-7.2 Foods, Drugs, Medical Devices, and Cosmetics. If any of Your Products is a "food", "drug", "medical device", or "cosmetic" being offered or sold in the United States or other product regulated under the U.S. Federal Food, Drug, and Cosmetic Act ("FFDCA") or its implementing regulations, then you provide us with the following continuing guaranty that with respect to all such products comprising each sale, shipment, or other delivery made previously or hereafter are: (i) not adulterated or misbranded within the meaning of the FFDCA, (ii) compliant with all requirements of FFDCA and its implementing regulations at the time of sale, shipment, or delivery, and (iii) provided by you in the original, unbroken packaging.

**Selling on Amazon Definitions**

**"Amazon-Fulfilled Products"** means any of Your Products that are fulfilled using the Fulfillment by Amazon Service.

**"Amazon Refund Policies"** means the return and refund policies published on the applicable Amazon Site and applicable to products and services offered via that Amazon Site.

**"BMVD Product"** means any book, magazine or other publication, sound recording, video recording, and/or other media product in any format, including any subscription, in each case excluding any software product, computer game, and/or video game.

**"Excluded Offer"** means any discount, rebate, promotional offer, or other term of offer and/or sale that you: (a) have attempted to make available through a particular Amazon Site but that we do not honor or support (but only until such time as we honor or support the same on such Amazon Site); or (b) make available solely to third parties that either (i) purchase products solely for resale and who are not end users of such products (i.e., wholesale purchasers), or (ii) if the Elected Country is Canada, Mexico, or the United States, have affirmatively elected and opted-in to participate in your or one of your Affiliates' membership-based customer loyalty or customer incentive programs.

**"Expected Ship Date"** means, with respect to any of Your Products, either: (a) the end of the shipping availability period (which begins as of the date on which the relevant order is placed by the customer), or the shipping availability date, as applicable, specified by you in the relevant inventory/product data feed for Your Product; or (b) if you do not specify shipping availability information in such inventory/product data feed or that Your Product is in a product category that Amazon designates as requiring shipment within two (2) business days, two (2) business days after the date on which the relevant order is placed by the customer.

**"Media Product"** means any book, magazine or other publication, sound recording, video recording, software product, computer game, videogame, or other media product in any format, including any related subscription, offered through an Amazon Site.

**"Purchase Price"** means the total amount payable or paid for Your Product (including taxes and shipping and handling charges only to the extent specified in the applicable Tax Policies).

**"Remittance Calculation Date"** is the date that is two (2) business days prior to the date of remittance (the **"Remittance Calculation Date"**).

**"Required Product Information"** means, with respect to each of Your Products in connection with a particular Amazon Site, the following (except to the extent expressly not required under the applicable Program Policies): (a) description, including as applicable, location-specific availability and options, scheduling guidelines and service cancellation policies; (b) SKU and UPC/EAN/JAN numbers, and other identifying information as Amazon may reasonably request; (c) information regarding in-stock status and availability, shipping limitations or requirements, and Shipment Information (in each case, in accordance with any categorizations prescribed by Amazon from time to time); (d) categorization within each Amazon product category and browse structure as prescribed by Amazon from time to time; (e) digitized image that accurately depicts only Your

Product, complies with all Amazon image guidelines, and does not include any additional logos, text or other markings; (f) Purchase Price; (g) shipping and handling charge (in accordance with our standard functionality); (h) any text, disclaimers, warnings, notices, labels, warranties, or other content required by applicable Law to be displayed, or that are necessary for the safe use of Your Product, in connection with the offer, merchandising, advertising, or sale of Your Product; (i) any vendor requirements, restocking fees or other terms and conditions applicable to such product that a customer should be aware of prior to purchasing the product; (j) brand; (k) model; (l) product dimensions; (m) weight; (n) a delimited list of technical specifications; (o) SKU and UPC/EAN/JAN numbers (and other identifying information as we may reasonably request) for accessories related to Your Product that is available in our catalog; (p) the state or country Your Product ships from; and (q) any other information reasonably requested by us (e.g., the condition of used or refurbished products; and invoices and other documentation demonstrating the safety and authenticity of Your Products).

**"Seller-Fulfilled Products"** means any of Your Products that are not fulfilled using the Fulfillment by Amazon Service.

**"Shipment Information"** means, with respect to any of Your Products, the estimated or promised shipment and delivery date.

**"Street Date"** means the date(s), if any, specified by the manufacturer, distributor, and/or licensor of a product as the date before which specified information regarding such product (e.g., title of a book) should not be disclosed publicly, or such product should not be delivered or otherwise made available to customers.

**"URL Marks"** means any Trademark, or any other logo, name, phrase, identifier, or character string, that contains or incorporates any top level domain (e.g., .com, .edu, .ca, .fr, .jp) or any variation of a top level domain (e.g., dot com, dotcom, net, or com).

**"Your Transaction"** is defined in the General Terms of this Agreement; however, as used in these Selling on Amazon Service Terms, it means any and all such transactions through Selling on Amazon only.

**Fulfillment by Amazon Service Terms**

Fulfillment by Amazon (**"FBA"**) provides fulfillment and associated services for Your Products.

These FBA Service Terms are part of the Agreement, and, unless specifically provided otherwise, concern and apply only to your participation in FBA. BY REGISTERING FOR OR USING FBA, YOU (ON BEHALF OF YOURSELF OR THE BUSINESS YOU REPRESENT) AGREE TO BE BOUND BY THE AGREEMENT, INCLUDING THESE FBA SERVICE TERMS. You expressly agree that Amazon may engage its Affiliate(s) or a third party in order to complete one or more of the fulfillment and associated services outlined below.

**Fulfillment Services**

**F-1 Your Products**

Once you are accepted into FBA, you must apply to register each product you offer that you wish to include in the FBA program. We may refuse registration in FBA of any product, including on the basis that it is an FBA Excluded Product or that it violates applicable Program Policies. You may at any time withdraw registration of any of Your Products from FBA.

**F-2 Product and Shipping Information**

You will, in accordance with applicable Program Policies, provide accurate and complete information about Your Products registered in FBA, and will provide Fulfillment Requests for any Units fulfilled using FBA that are not sold through an Amazon Site (**"Multi-Channel Fulfillment Units"**). You will promptly update any information about Your Products in accordance with our requirements and as necessary so that the information is at all times accurate and complete.

**F-3 Shipping to Amazon**

**F-3.1** Except as otherwise provided in Section F-3.4 and Section F-5, FBA is limited to Units that are shipped to and from fulfillment centers located within the applicable Elected Country, to be delivered to customers in the same Elected Country only. You will ship Units to us in accordance with applicable Program Policies. You will be responsible for all costs incurred to ship the Units to the shipping destination (including costs of freight and transit insurance) and Amazon will not pay any shipping costs. You are responsible for payment of all customs, duties, taxes, and other charges. In the case of any improperly packaged or labeled Unit, we may return the Unit to you at your expense (pursuant to Section F-7) or re-package or re-label the Unit and charge you an administrative fee.

**F-3.2** You will not deliver to us any Unsuitable Unit; we may reject any shipment of Your Products.

**F-3.3** We may, at our option, allow you to ship Units at your expense (as described in Section F-9.2) to fulfillment centers using discounted shipping rates that we may make available to you for certain carriers. In such event, you will use the processes and supply the information that we require for you to obtain such discounted rates. You also must comply with standard operating procedures, weight and size restrictions, and other shipping requirements of the applicable carriers. If we provide you with the estimated shipping costs prior to shipment, you acknowledge and agree that actual shipping costs may vary from such estimates. In addition, if the weight of the Unit, as determined by the applicable carrier, differs from that submitted by you to us for purposes of determining the estimated shipping costs, then: (a) you may be charged more than the estimated shipping costs if the carrier determines that such Unit weighs more than as submitted by you; or (b) you may be charged the full amount of the estimated shipping costs even if the carrier determines the weight to be less than that submitted by you. You will not use carrier account information (e.g., carrier account number, amount of shipping rates, etc.) for any purpose, nor disclose such information to any third party, and you will protect such information as Amazon's confidential information in accordance with Section 11 of the General Terms of this Agreement. As between you, us, and the applicable carrier, you will be the shipper of record, and we will make payment to the carrier with respect to the shipment of all Units using such discounted rates. Title and risk of loss for any Unit shipped using discounted rates provided by us under this Section will remain with you, and our provision of such shipping rates will not create any liability or responsibility for us with respect to any delay, damage, or loss incurred during shipment. You authorize the applicable carrier to provide us with all shipment tracking information.

**F-3.4** If you ship Units from outside the applicable Elected Country to fulfillment centers, you will list yourself as the importer/consignee and nominate a customs broker. If Amazon is listed on any import documentation, Amazon reserves the right to refuse to accept the Units covered by the import documents and any costs assessed against or incurred by Amazon will be collected from Your Bank Account, deducted from amounts payable to you, or by other method at our election.

**F-4 Storage**

We will provide storage services as described in these FBA Service Terms once we confirm receipt of delivery. We will keep electronic records that track inventory of Units by identifying the number of Units stored in any fulfillment center. We will not be required to physically mark or segregate Units from other inventory units (e.g., products with the same Amazon standard identification number) owned by us, our Affiliates or third parties in the applicable fulfillment center(s). If we elect

to commingle Units with such other inventory units, both parties agree that our records will be sufficient to identify which products are Units. We may move Units among facilities. If there is a loss of or damage to any Units while they are being stored, we will, compensate you in accordance with the FBA Guidelines, and you will, at our request, provide us a valid tax invoice for the compensation paid to you. If we compensate you for a Unit, we will be entitled to dispose of the Unit pursuant to Section F-7. At all other times, you will be solely responsible for any loss of, or damage to, any Units. Our confirmed receipt of delivery does not: (a) indicate or imply that any Unit has been delivered free of loss or damage, or that any loss or damage to any Unit later discovered occurred after confirmed receipt of delivery; (b) indicate or imply that we actually received the number of Units of Your Product(s) specified by you for such shipment; or (c) waive, limit, or reduce any of our rights under this Agreement. We reserve the right to change scheduling restrictions and volume limitations on the delivery and storage of your inventory in fulfillment centers in accordance with Section 15 of the General Terms, and you will comply with any of these restrictions or limitations.

**F-5 Fulfillment**

As part of our fulfillment services, we will ship Units from our inventory of Your Products to the shipping addresses in the Elected Country included in valid customer orders, or submitted by you as part of a Fulfillment Request. We may ship Units together with products purchased from other merchants, including any of our Affiliates. We also may ship Units separately that are included in a single Fulfillment Request. If you participate in our export fulfillment services, we will also ship Your Products that we determine to be eligible (each, a **"Foreign-Eligible Product"**) to Foreign Addresses within countries we determine to be eligible for foreign shipments, subject to the additional terms on foreign shipments in the applicable FBA Guidelines.

**F-6 Customer Returns**

**F-6.1** You will be responsible for and will accept and process returns of, and provide refunds and adjustments for, any Multi-Channel Fulfillment Units in accordance with the Agreement (including the applicable Program Policies).

**F-6.2** We will receive and process returns of any Amazon Fulfillment Units that were shipped to addresses within the Elected Country in accordance with the terms of your Seller Agreement, these FBA Service Terms, and the Program Policies. Any Sellable Units that are also Amazon Fulfillment Units and that are properly returned will be placed back into the inventory of Your Products in the FBA Program. We may fulfill customer orders for Your Products with any

returned Amazon Fulfillment Units. Except as provided in <u>Section F-7</u>, you will retake title of all Units that are returned by customers.

**F-6.3** Subject to <u>Section F-7</u>, we will, at your direction, either return or dispose of any Unit that is returned to us by a customer and that we determine is an Unsuitable Unit.

**F-6.4** If Amazon receives a customer return of a Multi-Channel Fulfillment Unit, you will direct us to return or dispose of the Unit at your own cost failing which we may dispose of the Unit as provided in <u>Section F-7</u>.

**F-7 Returns to You and Disposal**

**F-7.1** You may, at any time, request that Units be returned to you or that we dispose of Units.

**F-7.2** We may with notice return Units to you, including upon termination of these FBA Service Terms. Returned Units will be sent to your designated shipping address. However, if (a) the designated shipping address we have for you is outdated or incorrect, (b) you have not provided or, upon our request, confirmed a designated shipping address in the Elected Country, or (c) we cannot make arrangements for you to pay for the return shipment, then the Unit(s) will be deemed abandoned and we may elect to dispose of them as appropriate based on the inventory (e.g., by selling, recycling, donating, or destroying it) and retain any proceeds we may receive from the disposal.

We may dispose of any Unsuitable Unit (and you will be deemed to have consented to our action): (d) immediately if we determine that (i) the Unit creates a safety, health, or liability risk to Amazon, our personnel, or any third party; (ii) you have engaged in fraudulent or illegal activity; or (iii) we have cause to terminate your use of Services with immediate effect pursuant to Section 3 and are exposed to liability towards a third party; (e) if you fail to direct us to return or dispose of any Unsuitable Unit within thirty (30) days after we notify you that the Unit has been recalled; or (f) if you fail to direct us to return or dispose of any Unsuitable Unit within thirty (30) days (or as otherwise specified in the applicable Program Policies) after we notify you that its removal is required, for instance because your use of FBA is suspended or terminated or your seller account is suspended, terminated or closed. In addition, you will reimburse us for expenses we incur in connection with any Unsuitable Units.

We may dispose of any Unit we are entitled to dispose of (including any Unsuitable Units) in the manner we deem appropriate (e.g., by selling, recycling,

donating, or destroying it) and retain any proceeds we may receive from the disposal.

**F-7.3** You may, at any time, request that we dispose of Units. In this case, we may dispose of these Units as appropriate based on the inventory (e.g., by selling, recycling, donating, or destroying it) and retain any proceeds we may receive from the disposal. Title to each disposed Unit will transfer to us (or a third party we select such as a charity) at no cost, free and clear of any liens, claims, security interests or other encumbrances to the extent required to dispose of the Unit, and we may retain any proceeds, we may receive from the disposal.

**F-7.4** You will promptly notify us of any recalls or potential recalls, or safety alerts of any of Your Products and cooperate and assist us in connection with any recalls or safety alerts, including by initiating the procedures for returning items to you under our standard processes. You will be responsible for all costs and expenses you, we or any of our or your Affiliates incur in connection with any recall or potential recall or safety alerts of any of Your Products (including the costs to return, store, repair, liquidate, or deliver to you or any vendor any of these products).

**F-8 Customer Service**

**F-8.1** For Multi-Channel Fulfillment Units we will have no customer service obligations other than to pass any inquiries to your attention at the contact you provide, and to make available a reasonable amount of information regarding the status of the fulfillment of Your Products if you request it and if and to the extent we possess the requested information. You will ensure that all of your policies and messaging to your customers regarding shipping of Your Products and other fulfillment-related matters, reflect our policies and requirements, including with regard to shipping methods, returns, and customer service; and, you will conspicuously display on your website(s), in emails or in other media or communications any specific disclosures, messaging, notices, and policies we require.

**F-8.2** We will be responsible for all customer service issues relating to packaging, handling and shipment, and customer returns, refunds, and adjustments related to Amazon Fulfillment Units. We will determine whether a customer will receive a refund, adjustment or replacement for any Amazon Fulfillment Unit and we will require you to reimburse us where we determine you have responsibility in accordance with the Agreement (including these FBA Service Terms and the Program Policies). We will promptly notify you when you are responsible for a customer refund. You may appeal if you disagree with our finding within thirty (30) days after our notification, in addition to your right to request that Units be

returned to you under Section F-7.1. Except as provided in this <u>Section F-8</u> regarding any Amazon Fulfillment Units, customer service will be handled in accordance with your Seller Agreement.

**F-8.3** In situations relating to Amazon Fulfillment Units where the wrong item was delivered or the item was damaged or lost or is missing, unless we determine that the basis for such request is caused by you or any of your employees, agents, or contractors, we will, at our option: (a) for any Amazon Fulfillment Unit, (i) ship a replacement Unit to the customer and reimburse you in accordance with the FBA Guidelines for the replacement Unit, or (ii) process a refund to the customer and reimburse you in accordance with the FBA Guidelines for the Unit; or (b) for any Multi-Channel Fulfillment Unit, reimburse you in accordance with the FBA Guidelines for the Unit (and you will, at our request, provide us a valid tax invoice for the compensation paid to you). Any customer refund will be processed in accordance with the Selling on Amazon and the Transaction Processing Service Terms (if the Elected Country for a Service is the United States). Notwithstanding the Selling on Amazon Service Terms, we will be entitled to retain the applicable fees payable to us under the Selling on Amazon Service Terms and these FBA Service Terms, respectively. Except as expressly provided in this Section F-8.3, you will be responsible for all costs associated with any replacement or return.

**F-8.4** If we provide a replacement Unit or refund as described in <u>Section F-8.3</u> to a customer and that customer returns the original Unit to us, we will be entitled to dispose of the Unit pursuant to <u>Section F-7</u>, or, if it is a Sellable Unit, we may, at our option, place such Unit back into your inventory in accordance with <u>Section F-6</u>. If we do put a Unit back into your inventory, you will reimburse us for the applicable Replacement Value (as described in the FBA Guidelines) of the returned Unit. Any replacement Unit shipped by us under these FBA Service Terms will be deemed to be, and will be treated in the same manner as, an order and sale of such Unit from you to the customer via the applicable Amazon Site or Service in accordance with, and subject to, the terms and conditions of this Agreement and your Seller Agreement.

**F-9 Compensation for Fulfillment Services**

**F-9.1 Handling and Storage Fees.** You will pay us the applicable fees described in the applicable Fulfillment by Amazon Fee Schedule. You will be charged the Storage Fees beginning on the day (up to midnight) that the Unit arrives at a fulfillment center and is available for fulfillment by Amazon (or in the case of any Unsuitable Unit, the arrival day (up to midnight)), until the earlier of: (a) the day (up to midnight) we receive a valid customer order for such product or a request from you to return or dispose of the Unit; or (b) the day (up to midnight) we actually ship the Unit to your designated return location or dispose of the Unit.

**F-9.2 Shipping and Gift Wrap.** For any Amazon Fulfillment Units we will determine the amounts charged to the customer for shipping and gift wrap services for the Units that we fulfill through the FBA Program. As between you and us, these charges will be your charges to the customer, and we will report them to you. We will charge you (and you will pay us) a fee equal to the amount of such charges to the customer. In the case of shipments of Units sold through the Amazon Site that qualify for the "Free Shipping" promotion, the amounts charged to the customer for shipping the Selling on Amazon Units that Amazon fulfills will first be charged to the customer and will next be deducted from the total charges to the customer as your promotion and Amazon will not charge you the fee described above. If you ship Units to us using the shipping rates that we may make available pursuant to Section F-3.3, you will reimburse us for the actual amounts charged to us by the applicable carrier for such shipments.

**F-9.3 Proceeds.** We may as appropriate keep part of or all proceeds of any Units that we are entitled to dispose of pursuant to F-7 above, or to which title transfers, including returned, damaged, or abandoned Units. You will have no security interest, lien, or other claim to the proceeds that we receive in connection with the sale, fulfillment, and/or shipment of these Units.

**F-10 Indemnity**

In addition to your obligations under Section 6 of the General Terms of this Agreement, you also agree to indemnify, defend, and hold harmless us, our Affiliates, and our and their respective officers, directors, employees, representatives, and agents against any Claim that arises from or relates to: (a) the Units (whether or not title has transferred to us, and including any Unit that we identify as yours pursuant to Section F-4), including any personal injury, death, or property damage; (b) any of Your Taxes or the collection, payment, or failure to collect or pay Your Taxes; and, if applicable (c) any sales, use, value added, personal property, gross receipts, excise, franchise, business, or other taxes or fees, or any customs, duties, or similar assessments (including penalties, fines, or interest on any of the foregoing) imposed by any government or other taxing authority in connection with the shipment of Foreign-Eligible Products to Foreign Addresses (collectively, **"Foreign Shipment Taxes"**).

**F-11 Release**

You, on behalf of yourself and any successors, subsidiaries, Affiliates, officers, directors, shareholders, employees, assigns, and any other person or entity claiming by, through, under, or in concert with them (collectively, the **"Releasing Parties"**), irrevocably acknowledge full and complete satisfaction of and unconditionally and irrevocably release and forever fully discharge Amazon and

each of our Affiliates, and any and all of our and their predecessors, successors, and Affiliates, past and present, as well as each of our and their partners, officers, directors, shareholders, agents, employees, representatives, attorneys, and assigns, past and present, and each of them and all Persons acting by, through, under, or in concert with any of them (collectively, the **"Released Parties"**), from any and all claims, obligations, demands, causes of action, suits, damages, losses, debts, or rights of any kind or nature, whether known or unknown, suspected or unsuspected, absolute or contingent, accrued or unaccrued, determined or speculative (collectively, **"Losses"**) which the Releasing Parties now own or hold or at any time have owned or held or in the future may hold or own against the Released Parties, or any of them, arising out of, resulting from, or in any way related to the shipment, export, or delivery of Your Products to Foreign Addresses, including any tax registration or collection obligations. You, on behalf of yourself and all other Releasing Parties, recognize that you, and each of them, may have some Losses, whether in tort, product liability, contract, warranty, or otherwise, against the Released Parties of which you, or any of them, are totally unaware and unsuspecting, or which may arise or accrue after the date you register for or use FBA, which the Releasing Parties are giving up by agreeing to these FBA Service Terms. It is your intention in agreeing to these FBA Service Terms that these FBA Service Terms will deprive the Releasing Parties of each and all such Losses and prevent the Releasing Party from asserting any such Losses against the Released Parties, or any of them. In addition to the foregoing, you acknowledge, on behalf of yourself and all other Releasing Parties that you are familiar with Section 1542 of the Civil Code of the State of California, as follows:

**"A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."**

You, on behalf of yourself and all other Releasing Parties, expressly waive and relinquish any rights that you had or may have under Section 1542 of the Civil Code of the State of California or any similar provision of the law of any other jurisdiction, to the full extent that you may lawfully waive all such rights pertaining to the subject matter of these FBA Service Terms.

**F-12 Disclaimer**

IN ADDITION TO THE DISCLAIMER IN SECTION 7 OF THE GENERAL TERMS OF THIS AGREEMENT, WE DISCLAIM ANY DUTIES OF A BAILEE OR WAREHOUSEMAN, AND YOU WAIVE ALL RIGHTS AND REMEDIES OF A BAILOR (WHETHER ARISING UNDER COMMON LAW OR STATUTE OR OTHERWISE),

RELATED TO OR ARISING OUT OF ANY POSSESSION, STORAGE, OR SHIPMENT OF YOUR PRODUCTS BY US OR OUR AFFILIATES OR ANY OF OUR OR THEIR CONTRACTORS OR AGENTS.

**F-13 Effect of Termination**

Your termination rights are set forth in Section 3 of this Agreement. Following any termination of the Agreement or these FBA Service Terms in connection with a particular Elected Country, we will, as directed by you, return to you or dispose of the Units held in that Elected Country as provided in Section F-7. If you fail to direct us to return or dispose of the Units within thirty (30) days (or as otherwise specified in the applicable Program Policies) after termination, then we may elect to return and/or dispose of the Units in whole or in part, as provided in Section F-7, and you agree to such actions. Upon any termination of these FBA Service Terms in connection with a particular Elected Country, all rights and obligations of the parties under these FBA Service Terms in connection with such Elected Country will be extinguished, except that the rights and obligations of the parties under Sections F-1, F-2, F-3, F-4, F-5, F-6, F-7, F-8, F-9, F-11, F-12, and F-13 with respect to Units received or stored by Amazon as of the date of termination will survive the termination.

**F-14 Tax Matters**

You understand and acknowledge that storing Units at fulfillment centers may create tax nexus for you in any country, state, province, or other localities in which your Units are stored, and you will be solely responsible for any taxes owed as a result of such storage. If any Foreign Shipment Taxes or Your Taxes are assessed against us as a result of performing services for you in connection with the FBA Program or otherwise pursuant to these FBA Service Terms, you will be responsible for such Foreign Shipment Taxes and Your Taxes and you will indemnify and hold Amazon harmless from such Foreign Shipment Taxes and Your Taxes as provided in Section F-10 of these FBA Service Terms.

**F-15 Additional Representation**

In addition to your representations and warranties in Section 5 of the General Terms of this Agreement, you represent and warrant to us that: (a) you have valid legal title to all Units and all necessary rights to distribute the Units and to perform under these FBA Service Terms; (b) you will deliver all Units to us in new condition (or in such condition otherwise described by you in the applicable Your Product listing) and in a merchantable condition; (c) all Units and their packaging will comply with all applicable marking, labeling, and other requirements required by Law; (d) no Unit is or will be produced or manufactured, in whole or

in part, by child labor or by convict or forced labor; (e) you and all of your subcontractors, agents, and suppliers involved in producing or delivering Units will strictly adhere to all applicable Laws of the Elected Country, its territories, and all other countries where Units are produced or delivered, regarding the operation of their facilities and their business and labor practices, including working conditions, wages, hours, and minimum ages of workers; and (f) that all Foreign-Eligible Products (i) can be lawfully exported from Canada, Mexico, or the United States, as applicable, without any license or other authorization; and (ii) can be lawfully imported into, and comply with all applicable Laws of, any eligible country.

**FBA Definitions**

**"Amazon Fulfillment Units"** means Units fulfilled using FBA that are sold through an Amazon Site. For avoidance of doubt, if you have successfully registered for or used both the FBA and Selling on Amazon Services, then the term "Amazon Fulfillment Units" and the defined term "Amazon Fulfilled Products" in the Selling on Amazon Service Terms both refer to the same items.

**"FBA Excluded Product"** means any Unit that is an Excluded Product or is otherwise prohibited by the applicable Program Policies.

**"Foreign Address"** means (a) if the Elected Country is the United States, any mailing address that is not (i) within the fifty states of the United States or Puerto Rico, or (ii) an APO/FPO address; and (b) if the Elected Country is not the United States, any mailing address that is not within the Elected Country.

**"Fulfillment Request"** means a request that you submit to us (in accordance with the standard methods for submission prescribed by us) to fulfill one or more Multi-Channel Fulfillment Units.

**"Multi-Channel Fulfillment Units"** has the meaning in Section F-2.

**"Sellable Unit"** means a Unit that is not an Unsuitable Unit.

**"Seller Agreement"** means the Selling on Amazon Service Terms, the Merchants@ Program Agreement, the Marketplace Participation Agreement, any successor to any of these agreements, or any other similar agreement (as determined by Amazon) between you and us that permits you to offer products and services via a particular Amazon Site.

**"Shipping Information"** means with respect to any purchased Unit(s), the following information: the name of the recipient, the shipping address, the quantity of Units to be shipped, and any other shipping-related information we may reasonably request.

**"Unit"** means a unit of Your Product that you deliver to Amazon in connection with the FBA Program.

**"Unsuitable Unit"** means a Unit: (a) that is defective, damaged, unfit for a particular purpose, or lacking required label(s); (b) the labels for which were not properly registered with Amazon before shipment or do not match the product that was registered; (c) that is an FBA Excluded Product or does not comply with the Agreement (including applicable Service Terms and Program Policies); (d) that Amazon determines is unsellable or unfulfillable; or (e) that Amazon determines is otherwise unsuitable.

**Amazon Advertising Service Terms**

The Amazon Advertising Service Terms govern your use of Amazon Advertising, a Service that allows you to advertise your products. The Amazon Advertising Service Terms apply to your use of the Ad Services.

Your use of the Ad Services (as defined in the Amazon Advertising Agreement) is governed by the Amazon Advertising Agreement. You accept the Amazon Advertising Agreement, which may be updated from time to time by Amazon in accordance with its terms. The Amazon Advertising Agreement is available at https://advertising.amazon.com/terms. In the event of any conflict between the General Terms or Program Policies and the Amazon Advertising Agreement with respect to the Ad Services, the Amazon Advertising Agreement will prevail to the extent of the conflict. If the Amazon Advertising Agreement is deemed unlawful, void, or for any reason unenforceable, then the General Terms will govern your access to and use of the Ad Services.

**Transaction Processing Service Terms**

BY REGISTERING FOR OR USING ANY SERVICE OTHER THAN AMAZON ADVERTISING FOR WHICH THE ELECTED COUNTRY IS THE UNITED STATES, YOU (ON BEHALF OF YOURSELF OR THE BUSINESS YOU REPRESENT) AGREE TO BE BOUND BY THESE TRANSACTION PROCESSING SERVICE TERMS FOR THAT SERVICE. **NOTWITHSTANDING THE FOREGOING, IF A SEPARATE AGREEMENT GOVERNS THE OFFER, SALE OR FULFILLMENT OF YOUR PRODUCTS ON THE US AMAZON SITE, THE TERMS OF THAT AGREEMENT WILL CONTINUE TO**

GOVERN THE PROCESSING OF YOUR TRANSACTIONS TO THE EXTENT
DESCRIBED IN THAT AGREEMENT.

**P-1 Payments Processing Agency Appointment**

For non-invoiced orders, you authorize Amazon Payments, Inc. to act as your
agent for purposes of processing payments, refunds and adjustments for Your
Transactions, receiving and holding Sales Proceeds on your behalf, remitting
Sales Proceeds to Your Bank Account, charging your Credit Card, and paying
Amazon and its Affiliates amounts you owe in accordance with this Agreement or
other agreements you may have with Amazon Affiliates. For invoiced orders, you
authorize: (a) Amazon Capital Services, Inc. to act as your agent for purposes of
processing payments, refunds and adjustments for Your Transactions, and
receiving and holding Sales Proceeds on your behalf; and (b) Amazon.com
Services LLC to act as your agent for purposes of remitting Sales Proceeds to
Your Bank Account, charging your Credit Card, and paying Amazon and its
Affiliates amounts you owe in accordance with this Agreement or other
agreements you may have with Amazon Affiliates. Amazon Payments, Inc.,
Amazon Capital Services, Inc., and Amazon.com Services LLC are each an
**"Amazon Payments Agent"**. The applicable Amazon Payments Agents provide
the services described in these Transaction Processing Service Terms and the
related services described in Sections S-1.4, S-2.2, S-5, and F-8.3 of the
Agreement (collectively, the **"Transaction Processing Services"**).

When a buyer instructs us to pay you, you agree that the buyer authorizes and
orders us to commit the buyer's payment (less any applicable fees or other
amounts we may collect under this Agreement) to you. You agree that buyers
satisfy their obligations to you for Your Transactions when we receive the Sales
Proceeds. We will remit funds to you in accordance with this Agreement.

**P-2 Remittance**

Subject to Section 2 of the General Terms of this Agreement, the applicable
Amazon Payments Agents will remit funds to you in accordance with Section S-5
of the Agreement and these Transaction Processing Service Terms. Each
applicable Amazon Payments Agent's obligation to remit funds collected or
received by it or otherwise credited to your available balance in connection with
Your Transactions is limited to funds in your available balance that have become
available in accordance with this Agreement less amounts owed to Amazon and
any taxes that Amazon automatically calculates, collects and remits to a tax
authority according to applicable law, as specified in the Tax Policies, subject to
chargeback or reversal or withheld for anticipated claims in accordance with this
Agreement. Without limiting Amazon's rights to collect any amounts you owe,

the applicable Amazon Payments Agent's receipt of Sales Proceeds or crediting of Sales Proceeds to your available balance discharges your obligation to pay applicable fees and other amounts under this Agreement to the extent the Sales Proceeds received or credited equal or exceed the fees and other amounts you owe and the Sales Proceeds are applied to the payment of those fees and amounts.

**P-3 Your Funds**

Your Sales Proceeds will be held in an account with the applicable Amazon Payments Agent (a **"Seller Account"**) and will represent an unsecured claim against that Amazon Payments Agent. Your Sales Proceeds are not insured by the Federal Deposit Insurance Corporation, nor do you have any right or entitlement to collect Sales Proceeds directly from any customer. Prior to disbursing funds to you, an Amazon Payments Agent may combine Sales Proceeds held with the funds of other users of the Services, invest them, or use them for other purposes permitted by applicable Laws. You will not receive interest or any other earnings on any Sale Proceeds. To the extent required by applicable Laws, an Amazon Payments Agent will not use any funds held on your behalf for its corporate purposes, will not voluntarily make such funds available to its creditors in the event of bankruptcy or for any other purpose, and will not knowingly permit its creditors to attach such funds.

**P-4 Verification**

We may at any time require you to provide any financial, business or personal information we request to verify your identity. You authorize us to obtain from time to time consumer credit reports to establish or update your Seller Account or in the event of a dispute relating to this Agreement or the activity under your Seller Account. You agree to update all Seller Account information promptly upon any change. The Amazon Payments Privacy Notice applies to transactions processed by Amazon Payments, Inc.

**P-5 Dormant Accounts**

If there is no activity (as determined by us) in connection with your Seller Account for the period of time set forth in applicable unclaimed property laws and we hold Sales Proceeds on your behalf, we will notify you by means designated by us and provide you the option of keeping your Seller Account open and maintaining the Sales Proceeds in your Seller Account. If you do not respond to our notice(s) within the time period we specify, we will send the Sales Proceeds in your Seller Account to your state of residency, as determined by us based on the information in your Seller Account. If we are unable to determine

your state of residency or your Seller Account is associated with a foreign country, your funds may be sent to the State of Delaware.

**Selling Partner API Terms**

**API-1 Description of the Selling Partner APIs**

The "Selling Partner APIs" enable your systems to interface with certain features or functionality we make available to you. These Selling Partner API Terms concern and apply only to your use of the Selling Partner APIs unless specifically provided otherwise. Under the Selling Partner API Terms, you may authorize parties who (a) develop Applications to support you using the Selling Partner APIs or the API Materials, (b) have registered with us as Developers, and (c) who have agreed to the Marketplace Developer Agreement ("Developers") to access Confidential Information and Your Materials via the Selling Partner APIs provided, in each case, that where Confidential Information is disclosed to Developers, you shall remain liable for the acts or omissions of such Developers as if such acts or omissions were your own. If you wish to use the Selling Partner APIs directly or develop software or a website that interfaces with the Selling Partner APIs or the API Materials (an "Application"), you must register as a Developer.

We may make available Selling Partner APIs (including the Marketplace Web Services APIs) and software, data, text, audio, video, images, or other content we make available in connection with the Selling Partner APIs, including related documentation, software libraries, and other supporting materials, regardless of format (collectively the "API Materials") that permit your systems to interface with certain features or functionality available to you. You may authorize Developers to access Confidential Information and Your Materials via the Selling Partner APIs solely for the purpose of supporting your business on Amazon and provided, in each case, that where Confidential Information is disclosed to Developers, you shall remain liable for the acts or omissions of such Developers as if such act or omissions were your own. All terms and conditions applicable to the Selling Partner APIs and the API Materials in this Agreement are solely between you and us. API Materials that are public or open source software ("Public Software") may be provided to you under a separate license, in which case, notwithstanding any other provision of this Agreement, that license will govern your use of those API Materials. For the avoidance of doubt, except to the extent expressly prohibited by the license governing any API Materials that are Public Software, all of the non-license provisions of this Agreement will apply.

**API-2 License and Related Requirements**

**API-2.1 Generally.**

We grant you a limited, revocable, non-exclusive, non-sublicenseable, nontransferable license during the term of the Agreement to allow Developers to access and use Confidential Information and Your Materials through the Selling Partner APIs and the API Materials solely in support of your use of the Services covered by this Agreement. As between you and us, we or our licensors own all right, title, and interest in and to the Confidential Information, the Selling Partner APIs, the API Materials, any technical and operational specifications, security protocols and other documentation or policies provided or made available by us with respect to the Selling Partner APIs or the API Materials (the "Selling Partner API Specifications"), and our internal data center facilities, servers, networking equipment, and host software systems that are within our or their reasonable control and are used to provide the Selling Partner APIs or the API Materials (the "Amazon Network").

**API-2.2 License Restrictions.**

You may authorize Developers to access Confidential Information and Your Materials through the Selling Partner APIs and the API Materials only through APIs documented and communicated by us in accordance with any applicable Selling Partner API Specifications. You may not authorize any other party to do any of the following with the Confidential Information, the Selling Partner APIs and the API Materials: (a) reverse engineer, decompile, or disassemble them; (b) modify or create derivative works based upon them in whole or in part; (c) distribute copies of them; (d) remove any proprietary notices or labels on them; (e) use any Public Software in any manner that requires, pursuant to the license applicable to such Public Software, that the Confidential Information, the Selling Partner APIs and the API Materials be disclosed, licensed, distributed, or otherwise made available to anyone; (f) resell, lease, rent, transfer, sublicense, or otherwise transfer rights to them; (g) access or use them in a way intended to avoid incurring any applicable fees or exceeding usage limits or quotas; (h) access or use them for any purpose unrelated to your use of Services; or (i) access or use them for fraudulent or illegal activities or activities that violate our policies or are otherwise harmful to us or any third parties. The limitations regarding Data Use in Section 11 above apply to any information you disclose or receive by the direct or indirect use of the Selling Partner APIs.

**API-2.3 No License for Direct Access.**

For the avoidance of doubt, these Selling Partner API Terms do not provide you a license to directly access or use the Selling Partner APIs, or install, copy, use, or

distribute API Materials. Direct use of the Selling Partner APIs may only be licensed to Developers.

**API-2.4 Account Identifiers and Credentials.**

You must use the account IDs and any unique public key/private key pair issued by us to provide access to your data via the Selling Partner APIs ("Account Identifiers and Credentials") in accordance with these Selling Partner API Terms to authorize Developers to access the Selling Partner APIs on your behalf. You may only authorize access to Confidential Information and Your Materials via the Selling Partner APIs in the way that we prescribe. Your Account Identifiers and Credentials are for your personal use only and you must maintain their secrecy and security. You are solely responsible for all activities that occur using your Account Identifiers and Credentials, regardless of whether the activities are undertaken by you or a third party (including your employees, contractors, or agents). You will provide us with notice immediately if you believe an unauthorized third party may be using your Account Identifiers and Credentials or if your Account Identifiers and Credentials are lost or stolen. We are not responsible for unauthorized use of your Account Identifiers and Credentials.

**API-2.5 Security of Your Materials and Confidential Information.**

You are solely responsible for authorizing others to access the Selling Partner APIs on your behalf and taking your own steps to maintain appropriate security, protection, and backup of the Confidential Information and Your Materials processed pursuant to your access to the Selling Partner APIs and the API Materials, including any Confidential Information you have disclosed to Developers in accordance with this Agreement. We are not responsible for any unauthorized access to, alteration of, or deletion, destruction, damage, loss, or failure to store any of the Confidential Information or Your Materials in connection with the Selling Partner APIs (including as a result of your or any third party's errors, acts, or omissions). If you believe (acting reasonably) that a personal data breach has occurred in relation to any customer personal data in your possession or otherwise under your control (including in the possession of a Developer), you shall immediately notify Amazon of such personal data breach (in sufficient detail) for information purposes, and promptly take any actions (or require a Developer take such actions, if relevant) as applicable to you under data privacy Laws.

**API-3 Termination**

**API-3.1 Termination of Your Access to the Selling Partner APIs and the API Materials.**

Without limiting the parties' rights and obligations under this Agreement, the Amazon Marketplace Developer Agreement, or the Amazon Marketplace API License Agreement, we may limit, suspend, or terminate your access to the Selling Partner APIs and the API Materials for convenience with 30 days' notice. We may terminate immediately if (a) we determine that you have materially breached this Agreement and failed to cure within 7 days of a cure notice; (b) you or your account have been engaged in deceptive, fraudulent, or illegal activity; or (c) your use of the Selling Partner APIs and the API Materials may harm our customers.

Upon any suspension or termination of your access to the Selling Partner APIs and the API Materials, you will immediately cease authorizing others to use the Selling Partner APIs and the API Materials. Upon any termination of your access to the Selling Partner APIs and the API Materials, you will also immediately destroy all API Materials. Upon any suspension or termination of your access to the Selling Partner APIs and the API Materials, we may cause your Account Identifiers and Credentials to cease to be recognized by the Amazon Network for the purposes of the Selling Partner APIs and the API Materials.

**API-4 Modifications to the Selling Partner APIs and the API Materials**

We may change or discontinue the Selling Partner APIs or the API Materials (including by changing or removing features or functionality of the Selling Partner APIs or the API Materials) from time to time. For any material changes that will negatively affect your business, we will provide notice under Section 18.

**API-5 Disclaimers**

THE SELLING PARTNER APIS AND THE API MATERIALS ARE PROVIDED "AS IS". WE AND OUR AFFILIATE COMPANIES AND LICENSORS MAKE NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE REGARDING THE SELLING PARTNER APIS OR THE API MATERIALS, INCLUDING ANY WARRANTY THAT THE SELLING PARTNER APIS OR THE API MATERIALS WILL BE UNINTERRUPTED, ERROR FREE, OR FREE OF HARMFUL COMPONENTS, OR THAT ANY MATERIALS OR DATA YOU ACCESS, USE, STORE, RETRIEVE, OR TRANSMIT IN CONNECTION WITH THE SELLING PARTNER APIS, INCLUDING YOUR MATERIALS, WILL BE SECURE OR NOT OTHERWISE LOST OR DAMAGED. EXCEPT TO THE EXTENT PROHIBITED BY LAW, WE AND OUR AFFILIATE COMPANIES AND LICENSORS DISCLAIM ALL WARRANTIES, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, OR QUIET ENJOYMENT, AND ANY WARRANTIES ARISING OUT OF ANY COURSE OF DEALING OR USAGE OF TRADE. FURTHER, NEITHER WE

NOR ANY OF OUR AFFILIATE COMPANIES OR LICENSORS WILL BE RESPONSIBLE FOR ANY COMPENSATION, REIMBURSEMENT, OR DAMAGES ARISING IN CONNECTION WITH: (A) THE INABILITY TO USE THE SELLING PARTNER APIS OR THE API MATERIALS FOR ANY REASON; (B) THE COST OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES; OR (C) ANY INVESTMENTS, EXPENDITURES, OR COMMITMENTS BY YOU IN CONNECTION WITH THIS AGREEMENT OR YOUR USE OF OR ACCESS TO THE SELLING PARTNER APIS OR THE API MATERIALS.

## Related articles

Changes to the Amazon Services Business Solutions Agreement

Program Policies

Changes to program policies

Intellectual Property for Rights Owners

International selling agreements

Additional Guidelines

About seller facial data

## Need more help?

Visit Seller Forums

See more on Seller Central



**Reach Hundreds of Millions of Customers**

Start Selling On Amazon

© 1999-2023, Amazon.com, Inc. or its affiliates

# EXHIBIT D

# Amazon Anti-Counterfeiting Policy

**Published 6/16/20**

**Products offered for sale on Amazon must be authentic. The sale of counterfeit products is strictly prohibited. Failure to abide by this policy may result in loss of selling privileges, funds being withheld, and disposal of inventory in our possession.**

It is each seller's and supplier's responsibility to source, sell, and fulfill only authentic products. Prohibited products include bootlegs, fakes, or pirated copies of products or content; products that have been illegally replicated, reproduced, or manufactured; and products that infringe another party's intellectual property rights. If you sell or supply inauthentic products, we may immediately suspend or terminate your Amazon selling account (and any related accounts) and dispose of any inauthentic products in our fulfillment centers at your expense. In addition, we do not pay sellers until we are confident our customers have received the authentic products they ordered. We may withhold payments if we determine that an Amazon account has been used to sell inauthentic goods, commit fraud, or engage in other illegal activity.

We work with manufacturers, rights holders, content owners, vendors, and sellers to improve the ways we detect and prevent inauthentic products from reaching our customers. As a result, we remove suspect listings based on our own review of products. We also work with rights holders and law enforcement worldwide to take and support legal action against sellers and suppliers that knowingly violate this policy and harm our customers. In addition to criminal fines and imprisonment, sellers and suppliers of inauthentic products may face civil penalties including the loss of any amounts received from the sale of inauthentic products, the damage or harm sustained by the rights holders, statutory and other damages, and attorney's fees.

Amazon strives to ensure a trustworthy shopping experience for our customers. By selling on Amazon, you agree that:

- The sale of counterfeit products is strictly prohibited.
- You may not sell any products that are not legal for sale, such as products that have been illegally replicated, reproduced, or manufactured
- You must provide records about the authenticity of your products if Amazon requests that documentation

Failure to abide by this policy may result in loss of selling privileges, funds being withheld, destruction of inventory in our fulfilment centers, and other legal consequences.

# More information

- Sell Only Authentic and Legal Products. It is your responsibility to source, sell, and fulfill only authentic products that are legal for sale. Examples of prohibited products include:
  - Bootlegs, fakes, or pirated copies of products or content
  - Products that have been illegally replicated, reproduced, or manufactured
  - Products that infringe another party's intellectual property rights
- Maintain and Provide Inventory Records. Amazon may request that you provide documentation (such as invoices) showing the authenticity of your products or your authorization to list them for sale. You may remove pricing information from these documents, but providing documents that have been edited in any other way or that are misleading is a violation of this policy and will lead to enforcement against your account.
- Consequences of Selling Inauthentic Products. If you sell inauthentic products, we may immediately suspend or terminate your Amazon selling account (and any related accounts),

destroy any inauthentic products in our fulfillment centers at your expense, and/or withhold payments to you.

- Amazon Takes Action to Protect Customers and Rights Owners. Amazon also works with manufacturers, rights holders, content owners, vendors, and sellers to improve the ways we detect and prevent inauthentic products from reaching our customers. As a result of our detection and enforcement activities, Amazon may:
  - o Remove suspect listings.
  - o Take legal action against parties who knowingly violate this policy and harm our customers. In addition to criminal fines and imprisonment, sellers and suppliers of inauthentic products may face civil penalties including the loss of any amounts received from the sale of inauthentic products, the damage or harm sustained by the rights holders, statutory and other damages, and attorney's fees.
- Reporting Inauthentic Products. We stand behind the products sold on our site with our A-to-z Guarantee, and we encourage rights owners who have product authenticity concerns to notify us. We will promptly investigate and take all appropriate actions to protect customers, sellers, and rights holders. You may view counterfeit complaints on the Account Health page in Seller Central.

# EXHIBIT E

*Platform Access Agreement*

*Updated as of January 1, 2022*

This Platform Access Agreement (this "*PAA*") is by and among you and your company/business ("*you*") and the following entity as applicable, based on the region specified: Uber Technologies, Inc. in California; Rasier-PA, LLC in Pennsylvania; Rasier-DC, LLC in Florida; Rasier- MT, LLC in Montana; Rasier-NY, LLC in New York; and Rasier, LLC in all other U.S. states, territories and possessions (collectively, "*Uber*"). This PAA governs your access to our Platform (defined below) which facilitates your provision of rideshare or peer-to-peer transportation service (collectively, "P2P Service") to account holders seeking to access certain types of P2P Service ("*Riders*") for themselves and/or their guests. For the sake of clarity and depending on the context, references to "Uber," "*we*," "*our*" and "*us*" may also refer to the appropriate Uber- affiliated contracting entity accordingly or Uber collectively.

Access to our technology platform includes access to our technology application (the "*Driver App*") that, amongst other things, facilitates P2P Service between you and Riders; as well as websites and all other associated services, including payment and support services, provided by Uber, its affiliates or third parties (collectively, our "*Platform*").

Your access to our Platform is also governed by the applicable terms found on our website, including without limitation, the Community Guidelines, Referral Policies, other applicable Uber standards and policies (including, without limitation, Uber's safety standards, the accessibility policies and U.S. Service Animal Policy) and, except as provided in Section 12.9 below, any other agreements you have with us (including those related to how you choose to interact with our Platform, the services you choose to provide and where you chose to provide them) (collectively with this PAA, this "*Agreement*"), which are incorporated by reference into this Agreement. By accepting this Agreement, you confirm that you have read, understand and accept the provisions of this Agreement and intend to be bound by this Agreement. This Agreement is effective as of the date and time you accept it.

1.    **Relationship with Uber**

   **1.1.    Contracting Parties.** The relationship between the parties is solely as independent business enterprises, each of whom operates a separate and distinct business enterprise that provides a service outside the usual course of business of the other. This is not an employment agreement and you are not an employee. You confirm the existence and nature of that contractual relationship each time you access our Platform. We are not hiring or engaging you to provide any service; you are engaging us to provide you access to our Platform. Nothing in this Agreement creates, will create, or is intended to create, any

employment, partnership, joint venture, franchise or sales representative relationship between you and us. The parties do not share in any profits or losses. You have no authority to make or accept any offers or representations on our behalf. You are not our agent and you have no authority to act on behalf of Uber.

**1.2.    Your Choice to Provide P2P Service to Riders.** We do not, and have no right to, direct or control you. Subject to Platform availability, you decide when, where and whether (a) you want to offer P2P Service facilitated by our Platform and (b) you want to accept, decline, ignore or cancel a Ride (defined below) request; provided, in each case, that you agree not to discriminate against any potential Rider in violation of the Requirements (defined below). Subject to your compliance with this Agreement, you are not required to accept any minimum number of Rides in order to access our Platform and it is entirely your choice whether to provide P2P Service to Riders directly, using our Platform, or using any other method to connect with Riders, including, but not limited to other platforms and applications in addition to, or instead of, ours. You understand, however, that your Riders' experiences with your Rides, as determined by Rider input, may affect your ability to access our Platform or provide Rides.

**2.    Our Platform**

**2.1.    General**. While using our Driver App, you may receive lead generation and other technology-based services that enable those operating independent business enterprises like you to provide P2P Service requested by Riders ("*Rides*"). Subject to the terms and conditions of this Agreement, Uber hereby grants you a non-exclusive, non-transferable, non-sublicensable, non-assignable license, during the term of this Agreement, to use our Platform (including the Driver App) solely for the purpose of providing Rides and accessing services associated with providing Rides.

**2.2.    Compliance.**

(a)    You are responsible for identifying, understanding, and complying with (i) all laws (including, but not limited to, the Americans with Disabilities Act and applicable laws governing your collection, use, disclosure, security, processing and transfer of data), rules and regulations that apply to your provision of Rides (including whether you are permitted to provide P2P Service at all) in the jurisdiction(s) in which you operate (your "*Region*") and (ii) this Agreement (collectively, the "*Requirements*"). Subject to applicable law, you are responsible for identifying and obtaining any required license (including driver's license), permit, or registration required to provide any P2P Service that you provide using our Platform. Notwithstanding anything to the contrary in this Agreement, for the avoidance of doubt, your ability to access and use our Platform is at all times subject to your compliance with the Requirements. You agree not to access or attempt to access our Platform if you are not in compliance with the Requirements.

(b)      The Americans with Disabilities Act imposes obligations including the obligation to transport Riders with service animals and does not contain exceptions for allergies or religious objections. We have the right to and you consent to the permanent deactivation of your Driver App account and the permanent termination of your contractual relationship with us if, based on the evidence, we conclude that you knowingly refused a Ride request from a Rider with a service animal, or if we receive plausible reports from Riders of more than one cancellation or refusal by you alleged to be on the basis of the presence of a Rider's service animal.

**2.3.      Your Provision of Transportation Services to Riders.** You represent, warrant and covenant that (a) you have all the necessary expertise and experience to provide Rides in compliance with the Requirements and standards applicable to the P2P Service, (b) your access and use of our Platform, and provision of P2P Service, in your Region is permitted by the Requirements (including any age requirements), and (c) all such access and use of our Platform will be in compliance with the Requirements. You are responsible for, and bear all costs of, providing all equipment, tools and other materials that you deem necessary or advisable and are solely responsible for any obligations or liabilities arising from the Rides you provide.

**2.4.      Accessing our Platform.**

(a)      To provide Rides you must create and register an account. All information you provide to us must be accurate, current and complete and you will maintain the accuracy and completeness of such information during the term of this Agreement. Unless otherwise permitted by us in writing, you agree to only possess one account for providing Rides. You are responsible for all activity conducted on your account. For account security and Rider safety purposes, you agree not to share or allow anyone to use your login credentials or other personal information used in connection with your account, including but not limited to photos of yourself, to access our Platform. If you think anyone has obtained improper access to your account, login credentials or personal information, you are required to notify us and to change your password immediately so that we may take appropriate steps to secure your account. You agree that Uber is not responsible for any losses arising from your sharing of account credentials with a third party, including without limitation phishing. You can visit help.uber.com for more information about securing your account.

(b)      You represent, warrant, and covenant that you have all required authority to accept and be bound by this Agreement. If you are accepting this Agreement on behalf of your company, entity, or organization, you represent and warrant that you are an authorized representative of that company, entity, or organization with the

authority to bind such party to this Agreement.

### 2.5. Background Checks and Licensing, Vehicle Standards.

(a)     During your account creation and registration, we will collect, and may verify, certain information about you and the vehicle(s) you use to provide Rides ("*your vehicle*").

(b)     You will also be required to pass various background, driving record and other checks both prior to the first time you access our Platform and from time to time thereafter during the term of this Agreement; these checks may be facilitated by third parties. You hereby authorize and instruct us to provide copies of such checks to insurance companies, relevant regulators and/or other governmental authorities as needed for safety or other reasons, as described in our Privacy Notice.

(c)     You agree that your vehicle will be properly registered, licensed and suitable to provide Rides in your Region. You represent that at all times during the provision of any Rides your vehicle will be in your lawful possession with valid authority to use your vehicle to provide Rides in your Region. You agree that your vehicle will be in safe operating condition, consistent with safety and maintenance standards for a vehicle of its type in the P2P Service industry. You agree to monitor for and repair any parts that are recalled by your vehicle's manufacturer (as well as anything else the Requirements applicable to your particular Region may require).

### 2.6. Accepting Ride Requests.

(a)     Ride requests may appear in the Driver App and you may attempt to accept, decline or ignore them. Accepting a Ride request creates a direct business relationship between you and your Rider in accordance with the terms of the transportation service the Rider has requested through our Platform. The mechanism for accepting or declining Rides may vary depending on your location and the type of Ride-request you accept. You acknowledge upon acceptance of a Ride request, you may incur Uber fees as described in an applicable fare addendum to this PAA.

(b)     You will choose the most effective, efficient, and safe manner to reach the destinations associated with a Ride. Any navigational directions offered in the Driver App are offered for your convenience only; you have no obligation to follow such navigational directions. You agree to transport Riders, or their guests, directly to their specified destination, as directed by the applicable person, without unauthorized interruption or unauthorized stops.

(c)     You may receive Rider information, including approximate pickup location, and you agree that your Rider may also be given identifying information about you, including your first name, photo, location, vehicle information, and certain other information you have voluntarily provided through the Driver App (collectively, "*User Information*"). Without a Rider's consent, you agree to not contact any Rider or otherwise use any of the Rider's User Information except solely in connection with the provision of Rides to that Rider. You agree to treat all Rider User Information as Confidential Information (defined below) received by you under this Agreement. You acknowledge that your violation of your confidentiality obligations may also violate certain laws and could result in civil or criminal penalties.

### 2.7.     Use of Uber Branded Materials.

(a)     Except to the extent necessary to comply with applicable law, you are not required to use, wear or display Uber's name or logo on your vehicle or clothing, or to use signaling lights, stickers, decals, or other such materials displaying Uber's name or logo (collectively "*Uber Branded Materials*").

(b)     Your authorized display of Uber Branded Materials may signify to Riders that your P2P Service is facilitated by our Platform. Uber grants you a limited license to use, wear, or display Uber Branded Materials provided directly to you by Uber ("*Authorized Uber Branded Materials*") when providing Rides solely for the purpose of identifying yourself and your vehicle to Riders as someone selling P2P Service facilitated by our Platform. You agree not to (i) use, wear, or display Uber-Branded Materials that are not Authorized Uber Branded Materials (ii) purchase, accept, offer to sell, sell or otherwise transfer Uber Branded Materials that are not Authorized Uber Branded Materials or (iii) offer to sell or sell, or otherwise transfer Authorized Uber Branded Materials, without Uber's prior written permission, or (iv) display Uber Branded Materials when you are not accessing the Platform.

(c)     The parties expressly agree that your access to, or use of, Uber Branded Materials, whether or not authorized, does not indicate an employment or other similar relationship between you and us. You further agree not to represent yourself as our employee, representative or agent for any purpose or otherwise misrepresent your relationship with us.

(d)     You agree to destroy and discard any Uber Branded Materials if your account is deactivated and/or if you lose access to the Platform.

### 2.8.     Crashes, Criminal Offenses, and Other Compliance Obligations. For the purpose of assisting us with our compliance and insurance obligations, you agree to notify

us within 24 hours and provide us with all reasonable information relating to any incident (including any crash involving your vehicle) that occurs during your provision of a Ride and you agree to cooperate with any investigation and attempted resolution of such incident. Additionally, you agree to notify us within 24 hours if you are arrested for, charged with, or convicted of a criminal offense, for Platform eligibility consideration.

**2.9.    Ratings**. Your Rider may be asked to comment on your services, and you may be asked to comment on your Rider. These comments can include star or other ratings and other feedback (collectively, "*Ratings*"), which we ask all parties to provide in good faith. Ratings are not confidential and you hereby authorize our use, distribution and display of your Ratings (and Ratings about you) as provided in our <u>Privacy Notice</u>, without attribution or further approval. We have no obligation to verify Ratings or their accuracy, and may remove them from our Platform in accordance with the standards in our <u>Community Guidelines</u>. You can find out more about Ratings and how they may affect your ability to access our Platform by visiting our <u>website</u>.

**2.10.    Location Based Technology Services; Communication Consents.**

(a)    Your device geo-location information is required for the proper functioning of our Platform, and you agree to not take any action to manipulate or falsify your device geo-location. You grant us the irrevocable right to obtain your geo-location information and to share your location with third parties, including your Riders, who will see the approximate location of your vehicle in the Rider app before and during their Ride. We may not and will not use this information to attempt to supervise, direct, or control you or your provision of Rides.

(b)    You agree that we may contact you by email, telephone or text message (including by an automatic telephone dialing system) at any of the phone numbers provided by you, or on your behalf, in connection with your account. You also understand that you may opt out of receiving text messages from us at any time, either by replying "STOP" or texting the word "STOP" to 89203 using the mobile device that is receiving the messages, or by contacting us at <u>help.uber.com</u>. Notwithstanding the foregoing, we may also contact you by any of the above means, including by SMS, in case of suspected fraud or unlawful activity by your or on your account.

**3.    Insurance**

**3.1.    Your Auto Liability Insurance for P2P Service.** You will maintain automobile liability insurance on your vehicle that provides protection against bodily injury and property damage to third parties at coverage levels that satisfy the minimum requirements to operate a vehicle on public roads wherever you use your vehicle. You must be listed as an insured or a

driver on your automobile liability insurance. You will provide us with a copy of the insurance policy, policy declarations, proof of insurance identification card and proof of premium payment for your policy, as well as copies of the same upon renewal. You will notify us in writing immediately if the policy you have is cancelled.

**3.2.     Limitations on Your Personal Insurance.** You understand that while you are providing P2P Service your personal automobile insurance policy may not afford liability, comprehensive, collision, medical payments, personal injury protection, uninsured motorist, underinsured motorist, or other coverage for you. If you have any questions or concerns about the scope or applicability of your own insurance coverage, it is your responsibility to resolve them with your insurer.

**3.3.     Your Other Insurance for P2P Service.** You will maintain workers' compensation insurance if it is required by applicable law. If allowed by applicable law, you can insure yourself against industrial injuries by maintaining occupational accident insurance in place of workers' compensation insurance (and it is at your own risk if you decide not to).

**3.4.     Your Other Insurance for P2P Service.** You will maintain workers' compensation insurance if it is required by applicable law. If allowed by applicable law, you can insure yourself against industrial injuries by maintaining occupational accident insurance in place of workers' compensation insurance (and it is at your own risk if you decide not to).

**3.5.     Uber Maintained Insurance.** We may, in our sole discretion, choose to maintain auto insurance related to your Rides, but we are not required to provide you with any specific coverage for loss to you or your vehicle, unless we specifically describe it in an addendum to this PAA. We can change, reduce or cancel insurance that is maintained by us, if any, at any time without notice to you or authorization from you.

**4.     Payments**

**4.1.     Instant Pay.**

(a)     **Eligibility for Instant Pay.** You must have a valid and active debit card issued in your name to use Instant Pay. Your ability to use Instant Pay is dependent upon your debit card's acceptance of fast funds; not all debit cards are eligible to accept fast funds, and the card's issuing bank may choose at any time to disable the acceptance of fast funds or enable restrictions. Certain users may not be eligible for Instant Pay, including users that access our vehicle solutions programs, users who are members of a fleet, and those who are subject to garnishments. Your use of Instant Pay may be subject to additional restrictions and fees; more information may be found on our Instant Pay website.

(b)      **Availability of Instant Pay**. We are not able to ensure that all payments are deposited instantly. The speed at which you receive payments will depend on your bank and other factors. If your bank rejects a payment, or it fails in our system, the entire amount available for cashout in your account will be routed to your regular bank account at vault.uber.com, and you will receive the payment typically 1-3 business days later. Any Instant Pay funds not cashed out by 4AM (Local time) on Mondays, or the time we identify, which may be subject to change, will be routed to your regular bank account at vault.uber.com. If you do not have access to Instant Pay, you will continue to receive payments as described in this addendum via direct deposit, provided we have your correct banking information. We are not responsible for any fees from your bank in association with your use of Instant Pay. We reserve the right to block access to Instant Pay at any time for any reason, including for improper use of our Platform, account investigation, deactivation, or further review of Rides completed.

(c)      **Third-Party Provider**. The Instant Pay functionality is facilitated by a third-party provider of payments services. By using Instant Pay, you are subject to any additional terms and conditions for payment imposed by the third-party provider, which we recommend you review.

4.2.      Payment terms, fare calculations and payment methods are described in a separate fare addendum, which shall form part of this Agreement.

5.      **Term and Termination; Effect; Survival**

5.1.      **Term**. This Agreement is effective as of the date and time you accept it and will continue until terminated by you or us.

5.2.      **Termination by You**. You may terminate this Agreement (a) without cause at any time upon seven (7) days' prior written notice to Uber; and (b) immediately, without notice for Uber's violation or alleged violation of a material provision of this Agreement. You can find out more about how to delete your account by navigating to help.uber.com.

5.3.      **Deactivation**. You consent to and we may temporarily deactivate your account without notice to investigate whether you have engaged in, or your account has been used in, activity that is deceptive, fraudulent, unsafe, illegal, harmful to our brand, business or reputation, or that violates this Agreement (including the policies incorporated herein by reference) (any of the foregoing, a "*Material Breach or Violation*"). You also consent to and we may terminate this Agreement or permanently deactivate your account without notice if we determine in our discretion that a Material Breach or Violation has occurred.

**5.4.**     **Effect of Termination and Survival**. Upon termination, each party will remain responsible for its respective liabilities or obligations that accrued before or as a result of such termination. Once the Agreement is terminated you will no longer access our Platform to provide Rides. You agree to use commercially reasonable efforts to return any Uber Branded Materials, but excluding promotional materials, to an Uber Greenlight Hub or destroy them. Sections 1, 2.7, 2.10(b), 4, 5.4, 6-9, 12 and 13 shall survive any termination or expiration of this Agreement.

**6.**     **DISCLAIMERS**

**6.1.**     WE PROVIDE OUR PLATFORM AND ANY ADDITIONAL PRODUCTS OR SERVICES "AS IS" AND "AS AVAILABLE," WITHOUT GUARANTEE OR WARRANTY OF ANY KIND, AND YOUR ACCESS TO OUR PLATFORM IS NOT GUARANTEED TO RESULT IN ANY RIDE REQUESTS. WE DO NOT WARRANT THAT OUR PLATFORM WILL BE ACCURATE, COMPLETE, RELIABLE, CURRENT, SECURE, UNINTERRUPTED, ALWAYS AVAILABLE, OR ERROR- FREE, OR WILL MEET YOUR REQUIREMENTS, THAT ANY DEFECTS WILL BE CORRECTED, THAT OUR TECHNOLOGY IS FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS. WE WILL NOT BE LIABLE FOR ANY SERVICE INTERRUPTIONS OR LOSSES RESULTING FROM SERVICE INTERRUPTIONS, INCLUDING BUT NOT LIMITED TO SYSTEM FAILURES OR OTHER INTERRUPTIONS THAT MAY AFFECT YOUR ACCESS TO OUR PLATFORM.

**6.2.**     WE PROVIDE LEAD GENERATION AND RELATED SERVICES ONLY, AND MAKE NO REPRESENTATIONS, WARRANTIES OR GUARANTEES AS TO THE ACTIONS OR INACTIONS OF THE RIDERS WHO MAY REQUEST OR ACTUALLY RECEIVE RIDES FROM YOU. WE DO NOT SCREEN OR EVALUATE THESE RIDERS. SOME JURISDICTIONS PROVIDE FOR CERTAIN WARRANTIES, SUCH AS THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, ACCURACY, AVAILABILITY, SAFETY, SECURITY, AND NON-INFRINGEMENT. WE EXCLUDE ALL WARRANTIES TO THE EXTENT THOSE REGULATIONS ALLOW.

**6.3.**     IF A DISPUTE ARISES BETWEEN YOU AND YOUR RIDERS OR ANY OTHER THIRD PARTY, YOU RELEASE US FROM LOSSES OF EVERY KIND AND NATURE, KNOWN AND UNKNOWN, SUSPECTED AND UNSUSPECTED, DISCLOSED AND UNDISCLOSED, ARISING OUT OF OR IN ANY WAY CONNECTED WITH SUCH DISPUTES.

**6.4.**     WE MAY USE ALGORITHMS IN AN ATTEMPT TO FACILITATE RIDES AND IMPROVE THE: EXPERIENCE OF USERS AND THE SECURITY AND SAFETY OF OUR PLATFORM; ANY SUCH USE DOES NOT CONSTITUTE A GUARANTEE OR WARRANTY OF ANY KIND, EXPRESSED OR IMPLIED.

7. **Information**

We may collect and disclose information from or about you when you create an account, interact with our Platform or provide Rides and as otherwise described in our Privacy Notice. Notwithstanding anything herein to the contrary (a) the collection, use, and disclosure of such information will be made in accordance with our Privacy Notice and (b) if you elect to provide or make available suggestions, comments, ideas, improvements, or other feedback or materials to us in connection with, or related to, us or our Platform, we will be free to use, disclose, reproduce, modify, license, transfer and otherwise distribute, and exploit any of the foregoing information or materials in any manner.

8. **Confidentiality**

8.1. **Confidential Information**. Each party acknowledges and agrees that in the performance of this Agreement it may have access to or may be exposed to, directly or indirectly, confidential information of the other party or third parties ("*Confidential Information*"). Confidential Information includes Rider User Information and the transportation volume, marketing and business plans, business, financial, technical, operational and such other, non-public information of each party (whether disclosed in writing or verbally) that such party designates as being proprietary or confidential or of which the other party should reasonably know that it should be treated as confidential. Confidential Information does not include any information that: (a) was in the receiving party's lawful possession prior to the disclosure, as clearly and convincingly corroborated by written records, and had not been obtained by the receiving party either directly or indirectly from the disclosing party; (b) is lawfully disclosed to the receiving party by a third party without actual, implied or intended restriction on disclosure through the chain of possession, or (c) is independently developed by the receiving party without the use of or access to the Confidential Information, as clearly and convincingly corroborated by written records.

8.2. **Obligations**. Each party acknowledges and agrees that: (a) all Confidential Information shall remain the exclusive property of the disclosing party; (b) it shall not use Confidential Information of the other party for any purpose except in furtherance of this Agreement; (c) it shall not disclose Confidential Information of the other party to any third-party, except to its employees, officers, contractors, agents and service providers ("*Permitted Persons*") as necessary to perform their obligations under this Agreement, provided Permitted Persons are bound in writing to obligations of confidentiality and non-use of Confidential Information no less protective than the terms hereof; and (d) it shall return or destroy all Confidential Information of the disclosing party, upon the termination of this Agreement or at the request of the other party; subject to applicable law and our internal record-keeping requirements.

**8.3.     Remedies.** The unauthorized use or disclosure of any Confidential Information would cause irreparable harm and significant damages, the degree of which may be difficult to ascertain. Accordingly, the parties have the right to obtain immediate equitable relief to enjoin any unauthorized use or disclosure of Confidential Information disclosed by the other party, in addition to any other rights or remedies described in Section 13, applicable law or otherwise.

## 9.     Intellectual Property

We reserve all rights not expressly granted in this Agreement. The Driver App, our Platform, and all data gathered through our Platform, including all intellectual property rights therein (the "*Platform IP*"), are and remain our property and/or that of our licensors, as applicable. Neither this Agreement nor your use of Uber's or our licensors' company names, logos, products or service names, trademarks, service marks, trade dress, other indicia of ownership, or copyrights ("*Uber Names, Marks, or Works*") or the Platform IP conveys or grants to you any rights in or related to the Platform IP, or related intellectual property rights, including Uber's Names, Marks, or Works, except for the limited license granted above. You shall not, and shall not allow any other party to: (a) license, sublicense, copy, modify, distribute, create, sell, resell, transfer, or lease any part of the Platform IP or Authorized Uber-Branded Materials; (b) reverse engineer or attempt to extract the source code of our software, except as allowed under law; (c) use, display, or manipulate any of Uber Names, Marks, or Works for any purpose other than to provide Rides; (d) create or register any (i) businesses, (ii) URLs, (iii) domain names, (iv) software application names or titles, or (v) social media handles or profiles that include Uber Names, Marks, or Works or any confusingly or substantially similar mark, name, title, or work; (e) use Uber Names, Marks, or Works as your social media profile picture or wallpaper; (f) purchase keywords (including, but not limited to Google AdWords) that contain any Uber Names, Marks, or Works; (g) apply to register, reference, use, copy, and/or claim ownership in Uber's Names, Marks, or Works, or in any confusingly or substantially similar name, mark, title, or work, in any manner for any purposes, alone or in combination with other letters, punctuation, words, symbols, designs, and/or any creative works, except as may be permitted in the limited license granted above; (h) cause or launch any programs or scripts for the purpose of scraping, indexing, surveying, or otherwise data mining any part of our Platform or data; or (i) aggregate Uber's data with competitors'.

## 10.     Third-Party Services

From time to time we may permit third parties to offer their services to users of our Platform. Third-party services may be subject to additional terms (including pricing) that apply between you and the party(ies) providing such services. If you choose to access the third-party services you understand that the providers of the third-party services are solely responsible for

liabilities arising in connection with the access and use of such third-party services. While we may allow users to access such services through our Platform and we may collect information about our users' use of such services, we may not investigate, monitor or check such third-party services for accuracy or completeness.

### 11. Termination of Prior Agreements

**11.1.    Prior TSA.** This Section 11 only applies if you were a party to an effective technology services agreement (a "*Prior Agreement*") with Uber immediately prior to your acceptance of this Agreement. Except as provided in Sections 11.2 and 13 below, you and Uber hereby terminate your Prior Agreement (except as provided in the survival provision of such agreement) and the Deprecated Documents (defined below)(collectively, "*Prior Documents*"), effective as of your acceptance of this Agreement. The parties, respectively, hereby waive any applicable notice requirements with respect to their termination of the Prior Documents.

**11.2.    Other Agreements.** Notwithstanding the termination of your Prior Documents, you hereby (a) ratify, assume and confirm your obligations under any supplements or addenda, except those that are no longer required by the Requirements or applicable to your provision of P2P Service ("*Deprecated Documents*"), accepted in connection with your Prior Agreement that are not expressly superseded by this PAA or documents accepted in connection with the acceptance of this PAA, with such changes as may be required to effectuate the foregoing ("*Continuing Documents*") and (b) acknowledge and agree that as of your acceptance of this Agreement such Continuing Documents are incorporated by reference and form a part of this Agreement. We hereby ratify, assume and confirm our obligations under such Continuing Documents.

### 12. Miscellaneous

**12.1.    Modification**. You will only be bound by modifications or supplements to this PAA on your acceptance, but if you do not agree to them, you may not be allowed to access our Platform. Such modifications or supplements may be provided to you only via electronic means. From time to time we may modify information hyperlinked in this PAA (or the addresses where such information may be found) and such modifications shall be effective when posted.

**12.2.    Severability**. Invalidity of any provision of this Agreement does not affect the rest of this Agreement. The parties shall replace the invalid or non-binding provision with provision(s) that are valid and binding and that have, to the greatest extent possible, a similar effect as the invalid or non-binding provision, given the contents and purpose of this Agreement.

**12.3.   Assignment**. We may freely assign or transfer this Agreement or any of our rights or obligations in them, in whole or in part, without your prior consent. You agree not to assign this Agreement, in whole or in part, without our prior written consent, and any attempted assignment without such consent is void.

**12.4.   Conflicts**. Except with respect to the Arbitration Provision, if there is a conflict between this PAA and any supplemental terms between you and us, those supplemental terms will prevail with respect to the specific conflict if explicitly provided therein, and is in addition to, and a part of, this Agreement.

**12.5.   Interpretation**. In this Agreement, "including" and "include" mean "including, but not limited to."

**12.6.   Notice**. Except as explicitly stated otherwise, any notices to us shall be given by certified mail, postage prepaid and return receipt requested to Uber Technologies, Inc., 1515 3rd Street, San Francisco, CA 94158, Attn: Legal Department. All notices to you may be provided electronically including through our Platform or by other means.

**12.7.   Governing Law**. Except as specifically provided in this PAA, this PAA is governed by the applicable law of the state where you reside (or where your entity is domiciled) when you accepted this PAA (the "*Governing Law*"). The Governing Law shall apply without reference to the choice-of-law principles that would result in the application of the laws of a different jurisdiction.

**12.8.   Entire Agreement**. Except as specifically set forth in Section 12.4 or the Arbitration Provision, this Agreement, constitutes the entire agreement and understanding with respect to the subject matter expressly contemplated herein and therein, and supersedes all prior or contemporaneous agreements or undertakings on this subject matter.

**12.9.   No Incorporation.** Notwithstanding anything herein to the contrary, no agreement, term or other provision relating to your indemnification obligations to us will be considered incorporated by reference, or otherwise a part of, this Agreement.

**12.10.   Existing Documents.** Defined terms in documents accepted in connection with your acceptance of this Agreement that reference a technology services agreement shall be deemed amended to reference analogous terms defined in this Agreement,

including by replacing the term "Technology Services Agreement" with "Platform Access Agreement".

**12.11. Questions**. If you have questions about our Platform, you may contact us by logging on to drivers.uber.com and navigating to the "Contact Us" section.

### 13.    Arbitration Provision

**IMPORTANT: PLEASE REVIEW THIS ARBITRATION PROVISION CAREFULLY, AS IT WILL REQUIRE YOU TO RESOLVE DISPUTES WITH US ON AN INDIVIDUAL BASIS THROUGH FINAL AND BINDING ARBITRATION, EXCEPT AS PROVIDED BELOW. YOU MAY OPT OUT OF THIS ARBITRATION PROVISION BY FOLLOWING THE INSTRUCTIONS BELOW. THERE ARE AND/OR MAY BE LAWSUITS ALLEGING CLASS, COLLECTIVE, COORDINATED, CONSOLIDATED, AND/OR REPRESENTATIVE CLAIMS ON YOUR BEHALF AGAINST US. IF YOU DO NOT OPT OUT OF THIS ARBITRATION PROVISION AND THEREFORE AGREE TO ARBITRATION WITH US, YOU ARE AGREEING IN ADVANCE, EXCEPT AS OTHERWISE PROVIDED BELOW, THAT YOU WILL NOT PARTICIPATE IN AND, THEREFORE, WILL NOT SEEK OR BE ELIGIBLE TO RECOVER MONETARY OR OTHER RELIEF IN CONNECTION WITH, ANY SUCH CLASS, COLLECTIVE, COORDINATED, CONSOLIDATED, AND/OR REPRESENTATIVE LAWSUIT. THIS ARBITRATION PROVISION, HOWEVER, WILL ALLOW YOU TO BRING INDIVIDUAL CLAIMS IN ARBITRATION ON YOUR OWN BEHALF.**

**13.1.    How This Arbitration Provision Applies.**

(a)    This Arbitration Provision is a contract governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq., and evidences a transaction involving commerce, and you agree that this is not a contract of employment involving any class of workers engaged in foreign or interstate commerce within the meaning of Section 1 of the Federal Arbitration Act. If notwithstanding the foregoing, the Federal Arbitration Act does not apply to this Arbitration Provision, the law pertaining to arbitration agreements of the state where you reside when you entered into this Agreement shall apply.  Except as it otherwise provides, this Arbitration Provision applies to any legal dispute, past, present or future, arising out of or related to your relationship with us or relationship with any of our agents, employees, executives, officers, investors, shareholders, affiliates, successors, assigns, subsidiaries, or parent companies (each of which may enforce this Arbitration Provision as third party beneficiaries), and termination of that relationship, and survives after the relationship terminates.

(b)    This Arbitration Provision applies to all claims whether brought by you or us, except as provided below.  This Arbitration Provision requires all such claims to be resolved only by an arbitrator through final and binding individual arbitration and not by

way of court or jury trial.  Except as provided below regarding the Class Action Waiver and Representative Action Waiver, such disputes include without limitation disputes arising out of or relating to the interpretation, application, formation, scope, enforceability, waiver, applicability, revocability or validity of this Arbitration Provision or any portion of this Arbitration Provision.

(c)     Except as it otherwise provides, this Arbitration Provision also applies, without limitation, to disputes between you and us, or between you and any other entity or individual, arising out of or related to your application for and use of an account to use our Platform and Driver App as a driver, the P2P Service that you provide, background checks, your privacy, your contractual relationship with us or the termination of that relationship (including post-relationship defamation or retaliation claims), the nature of your relationship with us (including, but not limited to, any claim that you are our employee), trade secrets, workplace safety and health, unfair competition, compensation, minimum wage, expense reimbursement, overtime, breaks and rest periods, retaliation, discrimination, or harassment, and claims arising under the Telephone Consumer Protection Act, Fair Credit Reporting Act, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, 8 U.S.C. § 1324b (unfair immigration related practices), Americans With Disabilities Act, Age Discrimination in Employment Act, Fair Labor Standards Act, Worker Adjustment and Retraining Notification Act, Older Workers Benefits Protection Act of 1990, Occupational Safety and Health Act, Consolidated Omnibus Budget Reconciliation Act of 1985, federal, state or local statutes or regulations addressing the same or similar subject matters, and all other federal, state or local statutory, common law and legal claims (including without limitation, torts) arising out of or relating to your relationship with us or the termination of that relationship.  This Arbitration Provision also applies to all incidents or accidents resulting in personal injury to you or anyone else that you allege occurred in connection with your use of our Platform and Driver App, regardless whether the dispute, claim, or controversy occurred or accrued before or after the date you agreed to this Agreement, and regardless whether you allege that the personal injury was experienced by you or anyone.

**13.2.     Limitations On How This Arbitration Provision Applies.**

(a)     To the extent required by applicable law not preempted by the Federal Arbitration Act, nothing in this Arbitration Provision prevents you from making a report to or filing a claim or charge with the Equal Employment Opportunity Commission, U.S. Department of Labor, U.S. Securities and Exchange Commission, National Labor Relations Board, or Office of Federal Contract Compliance Programs.  Likewise, to the extent required by applicable law not preempted by the Federal Arbitration Act, nothing in this Arbitration Provision prevents the investigation by a government agency of any report, claim or charge otherwise covered by this Arbitration Provision.  To the extent required by applicable law not preempted by the Federal Arbitration Act, this Arbitration Provision also

does not prevent federal administrative agencies from adjudicating claims and awarding remedies based on those claims, even if the claims would otherwise be covered by this Arbitration Provision.

(b)    Where you allege claims of sexual assault or sexual harassment, you may elect to bring those claims on an individual basis in a court of competent jurisdiction instead of arbitration. We agree to honor your election of forum with respect to your individual sexual harassment or sexual assault claim but in so doing do not waive the enforceability of this Arbitration Provision as to any other provision (including but not limited to Section 13.4—Class Action Waiver—which will continue to apply in court and arbitration), controversy, claim or dispute.

(c)    To the extent an Act of Congress or applicable federal law not preempted by the Federal Arbitration Act provides that a particular claim or dispute may not be subject to arbitration, such claim or dispute is excluded from the coverage of this Arbitration Provision.  Likewise, if the Federal Arbitration Act does not apply to a claim or dispute, any claims or disputes that may not be subject to arbitration under applicable state arbitration law will be excluded from the coverage of this Arbitration Provision.

(d)    _Impact on Pending Litigation_: This Arbitration Provision shall not affect your standing with respect to any litigation against us brought by you or on your behalf that is pending in a state or federal court or arbitration as of the date of your receipt of this Arbitration Provision ("_pending litigation_").  Therefore:

- If you are or previously were a driver authorized to use our Platform and Driver App, and at the time of your receipt of this Agreement you were not bound by an existing arbitration agreement with us, you shall remain eligible to participate in any pending litigation to which you were a party or putative class, collective or representative action member regardless of whether you opt out of this Arbitration Provision.

- If, at the time of your receipt of this Agreement, you were bound by an existing arbitration agreement with us, that arbitration agreement will continue to apply to any pending litigation, even if you opt out of this Arbitration Provision.

- If, at the time of your receipt of this Agreement, you were not previously a driver authorized to use our Platform and Driver App, then this Arbitration Provision will apply to covered

claims and any pending litigation unless you opt out of this Arbitration Provision as provided below.

(e)     Either party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief on the ground that without such relief the arbitration provided in this Arbitration Provision may be rendered ineffectual.

**13.3.     Governing Rules, Starting The Arbitration, And Selecting The Arbitrator.**

(a)     For claims involving use of the Platform and Driver App in California: The ADR Services, Inc. Arbitration Rules ("*ADR Rules*") will apply to arbitration under this Arbitration Provision; however, if there is a conflict between the ADR Rules and this Arbitration Provision, including but not limited to whether any arbitration may proceed on an individual basis, this Arbitration Provision shall govern. The ADR Rules are available by, for example, searching Google.com to locate "ADR Services, Inc. Rules," or by clicking here: https://www.adrservices.com/services/arbitration-rules/. If, for any reason, ADR Services, Inc. will not administer the arbitration and the parties cannot mutually agree on a neutral arbitration provider, either party may invoke 9 U.S.C. § 5 to request that a court of competent jurisdiction appoint an arbitration provider with operations in California. Any arbitration provider appointed by a court under 9 U.S.C. § 5 shall conduct arbitration solely on an individualized basis. Once an arbitration provider is appointed under 9 U.S.C. § 5, or the parties mutually agree upon a neutral arbitration provider, the ensuing arbitration shall commence pursuant to the rules of the designated arbitration provider; however, if there is a conflict between the rules of the designated arbitration provider and this Arbitration Provision, including but not limited to whether any arbitration may proceed on an individual basis, this Arbitration Provision shall govern.

(b)     For claims involving use of the Platform and Driver App outside California:  The parties shall be required to meet and confer to select a neutral arbitration provider. Such an arbitration provider shall have operations in the state in which the dispute arises. If the parties are unable to mutually agree upon an arbitration provider, then either party may invoke 9 U.S.C. § 5 to request that a court of competent jurisdiction appoint an arbitration provider with operations in the state in which the dispute arises.  Any arbitration provider appointed by a court under 9 U.S.C. § 5 shall conduct arbitration solely on an individualized basis. Once the parties mutually agree upon a neutral arbitration provider, or an arbitration provider is appointed under 9 U.S.C. § 5, the ensuing arbitration shall commence pursuant to the rules of the designated arbitration provider; however, if there is a conflict between the rules of the designated arbitration provider and this Arbitration Provision, including but not limited to whether any arbitration may proceed on an individual basis, this Arbitration Provision shall govern.

(c)     Prior to commencing arbitration with the applicable arbitration provider, the party bringing the claim in arbitration must first demand arbitration in writing within the applicable statute of limitations period.  The demand for arbitration shall include identification of the parties (including, if you are bringing the claim, the phone number and email address associated with your driver account, and the city in which you reside), a statement of the legal and factual basis of the claim(s), and a specification of the remedy sought and the amount in controversy.  Any demand for arbitration made to us shall be sent to Uber Technologies, Inc., Attn: Legal Department, 1515 3rd Street, San Francisco, CA 94158, or served upon Uber's registered agent for service of process, c/o Uber Technologies, Inc. (the name and current contact information for the registered agent in each state are available online here).  Any demand for arbitration made to you shall be sent via electronic email to the email address associated with your driver account.

(d)     The parties agree that good-faith informal efforts to resolve disputes often can result in a prompt, low-cost, and mutually beneficial outcome.  The parties therefore agree that, before the arbitration demand is submitted to the applicable arbitration provider, the party bringing the claim shall first attempt to informally negotiate with the other party, in good faith, a resolution of the dispute, claim or controversy between the parties for a period of 60 days ("*negotiation period*"), unless extended by mutual agreement of the parties.  During the negotiation period, any otherwise applicable statute of limitations shall be tolled.  In connection with informal negotiations during the negotiation period, the parties shall participate telephonically or in person in at least one informal dispute resolution conference. All informal dispute resolution conferences shall be individualized such that a separate conference must be held each time either party intends to commence individual arbitration; multiple individuals initiating claims cannot participate in the same informal dispute resolution conference.  If either party is represented by counsel, that party's counsel may participate in the informal dispute resolution conference, but the party also must appear at and participate in the conference.  Engaging in an informal dispute resolution conference is a condition precedent that must be fulfilled before commencing individual arbitration.  If the parties cannot reach an agreement to resolve the dispute, claim or controversy within the negotiation period, the party bringing the claim shall submit the arbitration demand to the applicable arbitration provider.

(e)     To commence arbitration following the conclusion of the informal dispute resolution process required by Section 13.3(d), the party bringing the claim must file the written demand for arbitration with the applicable arbitration provider and serve a copy of the demand for arbitration on Uber as set forth in Section 13.3(c) and by email to any counsel who represented Uber in the informal dispute resolution process.  By filing the arbitration demand with the applicable arbitration provider, the party bringing the claim in arbitration certifies that the demand complies with Rule 11 of the Federal

Rules of Civil Procedure and any applicable state law equivalent.

(f)     If the parties reach agreement on an arbitrator not affiliated with the applicable arbitration provider or to use procedures either not specified in or in lieu of the applicable arbitration provider's rules (as modified by this Arbitration Provision), any such agreement shall be memorialized in writing before arbitration is commenced. If the parties are unable to agree upon an arbitrator after a good faith meet and confer effort, then the applicable arbitration provider will appoint the arbitrator in accordance with its rules. The arbitrator will be selected from the applicable arbitration provider's roster of arbitrators. Any arbitrator selected must be either (1) a retired judge or (2) an attorney licensed to practice law in the state where the arbitration is conducted with experience in the law underlying the dispute.

(g)     Delivering a written arbitration demand to the other party will not relieve the party bringing the claim of the obligation to commence arbitration as described above. It shall always be the obligation of the party bringing the claim to commence arbitration.

(h)     <u>Mass arbitration dispute procedure</u>: If 20 or more arbitration demands of a substantially similar nature are initiated against you or us within a 180-day period by the same law firm or collection of law firms that represents the other party ("*mass arbitration demands*"), the following procedure shall apply. At the request of either party, an arbitrator shall be selected pursuant to the applicable arbitration provider's rules for selection of an arbitrator to act as a special master ("*Special Master*") to resolve threshold disputes regarding the propriety of some or all the mass arbitration demands. These threshold disputes may include, but are not limited to:

  (1) any dispute regarding filing fees owed with respect to the mass arbitration demands, including whether claimants have submitted valid fee waivers;

  (2) any dispute regarding whether the applicable arbitration provider has complied with the Arbitration Provision with respect to processing and administering the mass arbitration demands;

  (3) any dispute regarding whether the mass arbitration demands meet the requirements set forth in Section 13.3(c) or (e) above;

  (4) any dispute regarding whether the demands have complied with all conditions precedent to commencing arbitration, including compliance with the informal dispute resolution

process described in Section 13.3(d) above;

(5) any dispute regarding whether claimants have ever had a driver account;

(6) any dispute regarding whether claimants are barred from proceeding with their claims based on a prior settlement agreement or expiration of the statute of limitations;

(7) any dispute relating to representation of the same claimant by multiple law firms;

(8) any dispute regarding whether the mass arbitration demands were filed with the correct arbitration provider;

(9) any dispute regarding whether the mass arbitration demands violate Rule 11 of the Federal Rules of Civil Procedure and/or any applicable state law equivalent; and

(10) any other dispute or issue regarding the equitable and efficient initial case management of the mass arbitration demands, including, but not limited to, the timing and/or sequence of payment of any remaining filing or administrative fees or costs related to the mass arbitration demands.

Any request to appoint a Special Master pursuant to this procedure must be submitted in writing to the applicable arbitration provider, with a copy to the other party, within fifteen (15) days after filing and service (as described in Section 13.3(e)) of any arbitration demand that qualifies as part of the same group of mass arbitration demands within the meaning of this Section 13.3(h) (i.e., 20 or more arbitration demands of a substantially similar nature initiated within a 180 day period by the same law firm or collection of law firms. Mass arbitration demands initiated by a different law firm or collection of law firms shall be considered a separate group of mass arbitration demands and shall be administered separately). For the sake of clarity, the request to appoint a Special Master need not be submitted in response to the first arbitration demand that triggers the mass arbitration dispute procedure (i.e., the 20th demand), and the request is subject only to the limitations set forth in this Section 13.3(h).

Except as provided below, during the fifteen (15) day period following the filing and service of any arbitration demand that qualifies as part of the same group of mass arbitration demands, the arbitration provider shall refrain from further processing of any demands that are part of the same group of mass arbitration demands, and no further payment (i.e., other than amounts required to be paid by the party initiating arbitration at the time the arbitration demand is filed) for filing fees, administrative fees or costs, or Arbitrator fees shall be deemed due with respect to those demands. A party's

decision not to invoke this procedure in response to a particular arbitration demand shall not constitute a waiver of any defense to any arbitration demand. Likewise, a party's decision not to invoke this procedure in response to a particular demand will not preclude the same party from later invoking this procedure in response to any other arbitration demand, including one that qualifies as part of the same group of mass arbitration demands as an earlier-filed demand.

The written request to appoint a Special Master must specify the arbitration demands and threshold disputes that will be submitted to the Special Master.

Upon the request of either party to appoint a Special Master to resolve the foregoing issues, the applicable arbitration provider shall refrain from further processing any of the mass arbitration demands as to which a dispute has been raised. Except for the filing fees, administrative fees or costs, or arbitrator fees that have already been assessed by the arbitration provider at the time the request to appoint a Special Master is made, no payment for filing fees, administrative fees or costs, or arbitrator fees shall be deemed due with respect to any of the mass arbitration demands as to which a dispute has been raised until after the dispute(s) has/have been resolved by the Special Master. Notwithstanding the foregoing, Uber shall be responsible for and agrees to pay the applicable arbitration provider's and Special Master's fees and costs related to the proceedings before the Special Master.

If timely requested by either party, any arbitration demand that is part of the same group of mass arbitration demands and to which a dispute has been raised shall be included as part of the same Special Master matter, even if a Special Master matter is already pending at the time that arbitration demand is filed, except that (i) a demand cannot be included if an arbitrator has already been selected for that individual demand as provided in Section 13.3(f); and (ii) a demand that might otherwise be considered part of the same group of mass arbitration demands that is filed after proceedings before a Special Master have concluded shall be considered part of a different group of mass arbitration demands.

A Special Master appointed pursuant to this procedure may award any party any appropriate remedy to which that party is entitled under applicable law (including, but not limited to, as set forth in Section 13.7) with respect to the issues presented to and decided by the Special Master, but shall have no authority to consolidate cases or decide issues related to the merits of the dispute or any other issue except as specified above. After proceedings before the Special Master have concluded, to the extent any of the mass arbitration demands are permitted to proceed, all such demands shall proceed on an individual basis only, and the applicable arbitration provider must administer

them individually in accordance with the applicable arbitration provider's rules and this Arbitration Provision.

(i)     All claims in arbitration are subject to the same statutes of limitation that would apply in court.  The arbitrator (which includes the Special Master, as applicable) shall resolve all disputes regarding the timeliness or propriety of the demand for arbitration, except that the statute of limitations and any filing fee deadlines shall be tolled while the parties engage in the informal dispute resolution process required by Section 13.3(d).

(j)     Only an arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute arising out of or relating to the interpretation, applicability, enforceability, or formation of this Arbitration Provision, including without limitation any claim that all or part of this Arbitration Provision is void or voidable.  An arbitrator shall also have exclusive authority to resolve all threshold arbitrability issues.  However, only a court of competent jurisdiction, and not an arbitrator, shall have exclusive authority to resolve any and all disputes arising out of or relating to the Class Action Waiver and/or Representative Action Waiver—including, but not limited to, any claim that all or part of the Class Action Waiver and/or Representative Action Waiver is unenforceable, unconscionable, illegal, void, or voidable, or that a breach of either such Waiver has occurred.

### 13.4.   Class Action Waiver.

(a)     **This Arbitration Provision affects your ability to participate in class, collective, coordinated, or consolidated actions.**  Both Uber and you agree that any and all disputes or claims between the parties shall be resolved only in individual arbitration, and not on a class, collective, coordinated, or consolidated basis on behalf of others.  There will be no right or authority for any dispute (whether brought by you or us, or on your or our behalf) to be brought, heard, administered, resolved, or arbitrated as a class, collective, coordinated, or consolidated action, or for you or us to participate as a member in any such class, collective, coordinated, or consolidated proceeding.  Neither an arbitrator nor an arbitration provider shall have authority to hear, arbitrate, or administer any class, collective, coordinated, or consolidated action, or to award relief to anyone but the individual in arbitration.

(b)     Notwithstanding any other provision of this Arbitration Provision or the applicable arbitration provider's rules, this Class Action Waiver does not prevent you or us from participating in a classwide, collective, coordinated, or consolidated settlement of claims.

(c)     This Class Action Waiver does not and shall not be construed to preclude the mass arbitration dispute procedure set forth in Section 13.3(h).

(d)     The parties further agree that if for any reason a claim does not proceed in arbitration, this Class Action Waiver shall remain in effect, and a court may not preside over any action joining or consolidating the claims of multiple individuals against Uber in a single proceeding.  If there is a final judicial determination that any portion of this Class Action Waiver is unenforceable or unlawful for any reason, (1) any class, collective, coordinated, or consolidated action subject to the enforceable or unlawful portion(s) shall proceed in a court of competent jurisdiction; (2) the portion of the Class Action Waiver that is enforceable shall be enforced in arbitration; (3) the unenforceable or unlawful portion(s) shall be severed from this Arbitration Provision; and (4) the severance of the unenforceable or unlawful portion(s) shall have no impact whatsoever on the enforceability, applicability, or validity of the Arbitration Provision or the arbitrability of any remaining claims asserted by you or us.

**13.5.     Representative Action Waiver.**

(a)     **This Arbitration Provision affects your ability to participate in representative actions.**  To the maximum extent provided by law, both Uber and you agree that any and all disputes or claims between the parties shall be resolved only in individual arbitration, and not on a representative basis.  The parties expressly waive their right to have any dispute or claim brought, heard, administered, resolved, or arbitrated as a representative action, or to participate in any representative action, including but not limited to claims brought under any state's Private Attorneys General Act.  The parties also expressly waive their right to seek, recover, or obtain any non-individual relief.  There will be no right or authority for any dispute (whether brought by you or us, or on your or our behalf) to be brought, heard, administered, or arbitrated as a representative action, or for you or us to participate as a member in any such representative proceeding.

(b)     Notwithstanding any other provision of this Arbitration Provision or the applicable arbitration provider's rules, this Representative Action Waiver does not prevent you or us from participating in a representative settlement of claims.

(c)     This Representative Action Waiver does not and shall not be construed to preclude the mass arbitration dispute procedure set forth in Section 13.3(h).

(d)     If there is a final judicial determination that any portion of this Representative Action Waiver is unenforceable or unlawful for any reason, (1) any

representative claim subject to the enforceable or unlawful portion(s) shall proceed in a court of competent jurisdiction; (2) the portion of the Representative Action Waiver that is enforceable shall be enforced in arbitration; (3) the unenforceable or unlawful portion(s) shall be severed from this Arbitration Provision; and (4) the severance of the unenforceable or unlawful portion(s) shall have no impact whatsoever on the enforceability, applicability, or validity of the Arbitration Provision or the arbitrability of any remaining claims asserted by you or us.

(e)     Disputes regarding the nature of your relationship with us (including, but not limited to, any claim that you are an employee of us), as well as any claim you bring on your own behalf as an aggrieved worker for recovery of underpaid wages or other individualized relief (as opposed to a representative claim for civil penalties) are arbitrable and must be brought in arbitration on an individual basis only, as required by this Arbitration Provision.  You agree that any representative claim that is permitted to proceed in a civil court of competent jurisdiction must be stayed pending the arbitration of your dispute regarding the nature of your relationship with us and any claim you bring on your own behalf for individualized relief.

**13.6.     Paying For The Arbitration.**

(a)     Except in the case of offers of judgment (such as under Federal Rule of Civil Procedure 68 or any applicable state law equivalents, which apply to arbitrations under this Arbitration Provision as set forth in Section 13.6(d) below), each party will pay the fees for its, his or her own attorneys and any costs that are common to both court and arbitration proceedings (such as court reporter costs and transcript fees), subject to any remedies to which that party may later be entitled under applicable law.

(b)     Each party shall follow the applicable arbitration provider's rules applicable to initial arbitration filing fees, except that your portion of any initial arbitration filing fee shall not exceed the amount you would be required to pay to initiate a lawsuit in federal court in the jurisdiction where the arbitration will be conducted. To the extent a fee waiver is sought, it must include all information and be submitted in the appropriate form required by applicable law. Except as specified in the mass arbitration dispute procedure set forth in Section 13.3(h), after (and only after) you have paid your portion of any initial arbitration filing fee, we will make up the difference, if any, between the fee you have paid and the amount required by the applicable arbitration provider's rules.

(c)     In all cases where required by applicable law not preempted by the FAA, we will pay the arbitrator's fees, as well as all fees and costs uniquely

associated with arbitration (such as room rental).  Otherwise, such fee(s) will be apportioned between the parties in accordance with said applicable law and this Arbitration Provision, and any disputes in that regard will be resolved by the arbitrator (which includes the Special Master, as applicable).  You agree to not oppose any negotiations between the applicable arbitration provider and Uber relating only to our fees.

(d)     At least 10 days before the date set for the arbitration hearing, any party may serve an offer in writing upon the other party to allow judgment on specified terms.  If the offer is accepted, the offer with proof of acceptance shall be submitted to the arbitrator, who shall enter judgment accordingly.  If the offer is not accepted prior to the arbitration hearing or within 30 days after it is made, whichever occurs first, it shall be deemed withdrawn, and cannot be given in evidence upon the arbitration.  If an offer made by Uber is not accepted by you, and you fail to obtain a more favorable award, you shall not recover your post-offer costs and shall pay Uber's costs from the time of the offer.

### 13.7.   The Arbitration Hearing And Award.

(a)     Within 30 days of the close of the arbitration hearing, any party will have the right to prepare, serve on the other party and file with the arbitrator a brief. The arbitrator may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the arbitrator.

(b)     The arbitrator shall apply applicable controlling law and will issue a decision or award in writing, stating the essential findings of fact and conclusions of law.

(c)     Under no circumstances is the arbitrator bound by decisions reached in separate arbitrations.  The arbitrator's decision, including any decision by a Special Master (as applicable), shall be binding only upon the parties to the arbitration that are the subject of the decision.

(d)     The arbitrator shall award reasonable costs incurred in the arbitration to the prevailing party in accordance with the law(s) that applies to the case.

(e)     The arbitrator shall be authorized to afford any relief or impose any sanctions available under Federal Rule of Civil Procedure 11 or any applicable state law

equivalent.

(f)     A court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration.  The arbitrator's findings of fact and conclusions of law shall not be binding or have any preclusive effect on any other arbitration, except as specified in and limited by Section 13.3(h).

**13.8.     Your Right To Opt Out Of This Arbitration Provision**

(a)     Agreeing to this Arbitration Provision is not a mandatory condition of your contractual relationship with us.  If you do not want to be subject to this Arbitration Provision, you may opt out of this Arbitration Provision (subject to the pending litigation provision in Section 13.2, and the limitations set forth in this Section 13.8).  To do so, within 30 days of the date that this Agreement is electronically accepted by you, you must send an electronic email from the email address associated with your driver account to optout@uber.com, stating your intent to opt out of this Arbitration Provision, as well as your name, the phone number associated with your driver account, and the city in which you reside.

(b)     An email sent by your agent or representative (including your counsel) shall not be effective.  Your email may opt out yourself only, and any email that purports to opt out anyone other than yourself shall be void as to any others.  Should you not opt out of this Arbitration Provision within the 30-day period, you and Uber shall be bound by the terms of this Arbitration Provision.  You will not be subject to retaliation if you exercise your right to opt out of this Arbitration Provision.

(c)     Any opt out of this Arbitration Provision does not affect the validity of any other arbitration agreement between you and us. If you opt out of this Arbitration Provision and at the time of your receipt of this Agreement you were bound by an existing agreement to arbitrate disputes arising out of or related to your use of our Platform and Driver App, that existing arbitration agreement will remain in full force and effect.

(d)     Neither your acceptance of this Agreement nor your decision to opt out of this Arbitration Provision will affect any obligation you have to arbitrate disputes not specified in this Arbitration Provision pursuant to any other agreement you have with us or any of our subsidiaries or affiliate entities.  Likewise, your acceptance of or decision to opt out of any other arbitration agreement you have with us or any of our subsidiaries or affiliate entities shall not affect any obligation you have to arbitrate claims pursuant to this Arbitration Provision.

**13.9.   Enforcement Of This Arbitration Provision**. You have the right to consult with counsel of your choice concerning this Arbitration Provision and to be represented by counsel at any stage during the arbitration process.  Except as provided in Sections 13.2 and 13.8 of this Arbitration Provision, and/or unless this Arbitration Provision is deemed invalid, unenforceable, or inapplicable, this Arbitration Provision replaces prior agreements regarding the arbitration of disputes and is the full and complete agreement relating to the formal resolution of disputes covered by this Arbitration Provision.  In the event any portion of this Arbitration Provision is deemed unenforceable, the remainder of this Arbitration Provision will be enforceable.  This Arbitration Provision will survive the termination of your relationship with us, and it will continue to apply if your relationship with us is ended but later renewed.

**By clicking "Yes, I agree," I expressly acknowledge that I have read, understood, and considered the consequences of this Agreement, that I agree to be bound by the terms of this Agreement, and that I am legally competent to enter into this Agreement with Uber.**

# EXHIBIT F

# Lyft Terms of Service

Last Updated: December 12, 2022

These Terms of Service constitute a legally binding agreement (the "Agreement" between you and Lyft, Inc., its parents, subsidiaries, representatives, affiliates, officers and directors (collectively, "Lyft," "we," "us" or "our") governing your use of the Lyft applications, websites, technology, facilities, and platform (collectively, the "Lyft Platform").

PLEASE BE ADVISED: THIS AGREEMENT CONTAINS PROVISIONS THAT GOVERN HOW CLAIMS BETWEEN YOU AND LYFT CAN BE BROUGHT (SEE SECTION 17 BELOW). **THESE PROVISIONS WILL, WITH LIMITED EXCEPTION, REQUIRE YOU TO: (1) WAIVE YOUR RIGHT TO A JURY TRIAL AND (2) SUBMIT CLAIMS YOU HAVE AGAINST LYFT TO BINDING AND FINAL ARBITRATION ON AN INDIVIDUAL BASIS, NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY CLASS, GROUP OR REPRESENTATIVE ACTION OR PROCEEDING.** AS A DRIVER OR DRIVER APPLICANT, YOU HAVE AN OPPORTUNITY TO OPT OUT OF ARBITRATION WITH RESPECT TO CERTAIN CLAIMS AS PROVIDED IN SECTION 17.

By entering into this Agreement, and/or by using or accessing the Lyft Platform, you expressly acknowledge that you understand this Agreement (including the dispute resolution and arbitration provisions in Section 17) and accept all of its terms. IF YOU DO NOT AGREE TO BE BOUND BY THE TERMS AND CONDITIONS OF THIS AGREEMENT, YOU MAY NOT USE OR ACCESS THE LYFT PLATFORM OR ANY OF THE SERVICES PROVIDED THROUGH THE

LYFT PLATFORM. If you use the Lyft Platform in another country, you agree to be subject to Lyft's terms of service for that country. If you are accessing or using the Lyft Platform to access or use Lyft Business services on behalf of an organization contracted with Lyft, and you are not accessing or using the Lyft Platform as a Rider or Driver, your access and use is governed by the contract between Lyft and your organization.

When using the Lyft Platform, you also agree to conduct yourself in accordance with our Community Guidelines, which shall form part of this Agreement between you and Lyft.

# The Lyft Platform

The Lyft Platform provides a marketplace where, among other things, persons who seek transportation to certain destinations ("Riders") can be matched with transportation options to such destinations. One option for Riders is to request a ride from rideshare drivers who are driving to or through those destinations ("Drivers"). Drivers, Riders, and any other individuals, excluding any Excluded Individuals, using the Lyft Platform are collectively referred to herein as "Users," and the driving services provided by Drivers to Riders, and other transportation related services provided by Drivers in connection with the Lyft Platform, shall be referred to herein as "Rideshare Services." "Lyft Services" shall include any service provided by Lyft pursuant to the Lyft Platform (for clarity, Lyft Services does not include Rideshare Services or Third-Party Services). As a User, you authorize Lyft to match and/or re-match you with Drivers or Riders based on factors such as your location, the requested pickup location, the estimated time to pickup, your destination, User preferences, ride mode, driver mode, membership status, regulatory or other third-party requirements, user statistics, and platform efficiency, and to cancel an existing match based on the same or other considerations. Any decision by a User to offer or accept Rideshare Services is a decision made in such User's sole discretion. A separate agreement is formed between Drivers and Riders when the Rider accepts the Rideshare Services offered by the Driver. As used herein, "Excluded Individuals" means any individual who is registering to use the Lyft Platform or whose use of the Lyft Platform is on behalf of an organization contracted with Lyft, except as a Rider or Driver.

In certain markets, Riders may have the option to rent transportation modalities (e.g., bikes, scooters, cars, etc.) or be offered other services through the Lyft Platform. In some markets, some of these rental programs and/or other services are owned and operated by Lyft. In other

markets, some of these rental programs and/or other services are owned or operated by third parties.

In any case, your use of Lyft Services through the Lyft Platform may be subject to additional agreements between you and Lyft as applicable to the particular service in the particular market ("Supplemental Agreements"). Please review any applicable Supplemental Agreements carefully. IF YOU DO NOT AGREE TO BE BOUND BY THE TERMS AND CONDITIONS OF A SUPPLEMENTAL AGREEMENT, YOU MAY NOT RENT OR USE LYFT SERVICES IN SUCH MARKET. In the event of any conflict between this Agreement and the terms and conditions of any Supplemental Agreement, the terms of this Agreement shall control, unless such Supplemental Agreement specifically states otherwise.

# Modification to the Agreement

Lyft reserves the right to modify the terms and conditions of this Agreement, and such modifications shall be binding on you only upon your acceptance of the modified Agreement. Lyft reserves the right to modify any information on pages referenced in the hyperlinks from this Agreement from time to time, and such modifications shall become effective upon posting. Continued use of the Lyft Platform after any such changes shall constitute your acceptance of such changes. Unless material changes are made to the arbitration provisions herein, you agree that modification of this Agreement does not create a renewed opportunity to opt out of arbitration (if applicable).

# Eligibility

The Lyft Platform may only be used by individuals who have the right and authority to enter into this Agreement and are fully able and competent to satisfy the terms, conditions, and obligations herein. The Lyft Platform is not available to Users who have had their User account temporarily or permanently deactivated. You may not allow other persons to use your User account, you agree that you are the sole authorized user of your User account, and you may not use your User account on behalf of any third party, except as otherwise expressly permitted by Lyft. To use the Lyft Platform, each User shall create a User account. Each person may only create one User account, and Lyft reserves the right to deactivate any additional or duplicate accounts. Your participation in certain Lyft programs and use of certain Lyft services may be subject to additional eligibility requirements as determined by Lyft.

By becoming a User, you represent and warrant that you are at least 18 years old. Notwithstanding the foregoing, if you are the parent or legal guardian of a 16 or 17-year old minor you may create a User account for such minor to use the Lyft Platform subject to the

following requirements and restrictions: (a) you ensure that the minor's use of the Lyft Platform is limited solely to accessing and using Lyft Services and/or Third-Party Services where expressly permitted under the Supplemental Agreement applicable to such Lyft Services and/o Third-Party Services, (b) you determine that the Lyft Services and/or Third-Party Services are suitable for the minor, (c) you ensure that the minor's use of the Lyft Platform and applicable Lyft Services and/or Third-Party Services is done in compliance and acknowledgement of all applicable safety instructions and warnings in this Agreement, any applicable Supplemental Agreements, and the Lyft Platform, (d) you ensure that the minor does not request or accept any Rideshare Services unless accompanied by you or an authorized guardian, and (e) you explain the terms of this Agreement to the minor. For clarity, no unaccompanied User under 18 years old may ride in an autonomous vehicle.

By creating a User account for such minor, you hereby give permission and consent to the Agreement on the minor's behalf, you expressly guarantee the minor's acceptance, and your own acceptance, of the terms of this Agreement, and you shall assume any and all responsibility and liability for the minor's use of the Lyft Platform as provided by the terms of this Agreement and any applicable Supplemental Agreements. You will be responsible for any breach of the above representations, warranties and/or this Agreement, and/or any attempt of the minor to disaffirm this Agreement. Furthermore, you hereby represent that you are fully authorized to execute this Agreement on behalf of yourself and all other parents or legal guardians of the minor rider.

# Charges

As a User, you understand that request or use of Rideshare Services, Lyft Services, or Third-Party Services may result in charges ("Charges") to you and/or to an organization, if applicable Charges to Riders and/or organizations, if applicable, for Rideshare Services include Fares (defined below) and other applicable fees, tolls, surcharges, and taxes, including as set forth on your market's Lyft Cities page ("Lyft Cities Page"), plus any tips to the Driver that you elect to pay. Lyft has the authority and reserves the right to determine and modify pricing by posting applicable pricing terms to your market's Lyft Cities Page or quoting you a price for a specific ride at the time you make a request. Pricing may vary based on the type of service you reques (e.g., shared, economy, extra seats, luxury) as described on your market's Lyft Cities Page or within the Lyft Platform. You are responsible for reviewing the applicable Lyft Cities Page or price quote within the Lyft Platform and shall be responsible for all Charges incurred under you User account regardless of your awareness of such Charges or the amounts thereof.

Rideshare Service Fares ("Fares"). There are two types of Fares, quoted and variable.

- **Quoted Fares**. When you make a ride request using the Lyft Platform, Lyft will quote you a Fare at the time of your request. The quote is subject to change until the ride request is

confirmed. If your final destination is not the same as the destination in your ride request, or the time or distance of your ride differs substantially from your quoted fare, or if you attempt to abuse the Lyft Platform, we may, at Lyft's sole discretion and determination, cancel the fare quote and charge you a variable fare as described below. Lyft does not guarantee that the quoted fare price will be equal to a variable fare for the same ride. Quoted fares may include the Rideshare Service Fees and Other Charges below, as applicable.

- **Variable Fares**. Variable fares consist of a base charge and incremental charges based on the time and distance of your ride. For particularly short rides, minimum fares may apply. Please note that we use GPS data from your Driver's phone to calculate the distance traveled on your ride. We cannot guarantee the availability or accuracy of GPS data. If we lose signal, we will calculate time and distance using available data from your ride. In addition to the variable fare, the total cost of your ride may include the Rideshare Service Fees and Other Charges below, as applicable.

Rideshare Service Fees and Other Charges.

- **Service Fee**. Lyft may charge a "Service Fee" for each ride, as set forth on the applicable Lyft Cities Page.
- **Prime Time**. At certain times, including times of high demand for Rideshare Services ("Prime Time"), you acknowledge that Charges may increase substantially. For quoted fares, we may factor Prime Time increases into the quoted price of the ride.
- **Priority Pickup and Wait & Save**. In some cases, you may be able to select an expected pick up that is faster or slower than standard for a higher or lower Fare, respectively.
- **Cancellation Fee**. After requesting a ride you may cancel it through the Lyft Platform, but note that in certain cases a cancellation fee may apply. Lyft may also charge a fee if you fail to show up after requesting a ride. Please check out our Help Center to learn more about Lyft's rider cancellation policy.
- **Damage Fee**. If a Driver reports that you have materially damaged the Driver's vehicle, you agree to pay a "Damage Fee" of up to $250 depending on the extent of the damage (as determined by Lyft in its sole discretion), towards vehicle repair or cleaning. Lyft reserves the right (but is not obligated) to verify or otherwise require documentation of damages prior to processing the Damage Fee.
- **Abuse Fee**. If we receive a credible report that you have misused or abused the Lyft Platform, you agree to pay an "Abuse Fee" of up to $250 as determined by Lyft in its sole discretion. Lyft reserves the right (but is not obligated) to verify or otherwise require documentation of abuse prior to processing the Abuse Fee.
- **Tolls**. In some instances tolls, toll estimates, or return tolls may apply to your ride. Please see our Help Center and your market's Lyft Cities Page for more information about toll charges. We do not guarantee that the amount charged by Lyft will match the toll charged to the Driver, if any.
- **Other Charges**. Other fees and surcharges may apply to your ride, including, but not limited to: actual or anticipated airport fees, state fees, local fees, event fees, fuel surcharges, wait time fees, or distance surcharges as determined by Lyft or its marketing partners. In addition, where required by law Lyft will collect applicable taxes. See your market's Lyft Cities Page for information on other Charges that may apply to your ride.
- **Tips**. Following a ride, you may have the opportunity to elect to tip your Driver in cash or through the Lyft Platform. You may also elect to set a default tip amount or percentage through the Lyft Platform. Any tips will be provided entirely to the applicable Driver.

Charges Generally.

- **Facilitation of Charges**. All Charges are facilitated through a third-party payment processor (First Data, Stripe, Inc., Braintree, a division of PayPal, Inc., etc.). Lyft may replace its third-party payment processor without notice to you. With the exception of tips and the purchase of Lyft Cash, cash payments are strictly prohibited unless expressly permitted by Lyft. Your payment of Charges to Lyft satisfies your payment obligation for your use of the Lyft Platform, Lyft Services, Third-Party Services, and Rideshare Services. Certain Charges may be collectively billed as a single purchase transaction to your selected payment method based on the payment frequency indicated in your settings. If your primary payment method expires, is invalid, or if Charges to your primary payment method are unable to be processed for whatever reason, then you agree that Lyft may charge your other available payment methods in the Lyft Platform. If you don't recognize a transaction, then check your ride receipts and payment history.
- **No Refunds**. All Charges are non-refundable except to the extent required by law. This no-refund policy shall apply at all times regardless of your decision to terminate usage of the Lyft Platform, any disruption to the Lyft Platform, Lyft Services, Third-Party Services, or Rideshare Services, or any other reason whatsoever.
- **Coupons**. You may receive coupons, credits, discounts, or other promotions (collectively, "Coupons") that you can apply toward payment of certain Charges. Coupons are valid only for use on the Lyft Platform, and are not transferable or redeemable for cash except as required by law. Coupons cannot be combined unless expressly provided otherwise, and if the cost of your Charges exceeds the applicable Coupon value, we may charge your payment method on file for the Charges in excess of the Coupon amount. With respect to Fares, Lyft may deduct the amount attributable to the Service Fee, Tolls, or Other Charges before application of the Coupon. Additional restrictions on Coupons may apply as communicated to you in a relevant promotion or by clicking on the relevant Coupon within the Rewards section of the Lyft Platform.
- **Supplemental Charges**. Charges related to Lyft Services (including the rental of bikes and scooters) may be further detailed in the applicable Supplemental Agreement.
- **Third-Party Charges**. If you choose to purchase Third-Party Services (described further in Section 20) through the Lyft Platform, you authorize your payment method on file to be charged according to the pricing terms set by Lyft or the third-party provider, or as otherwise provided in the terms of the purchased services.
- **Payment Card Authorization**. Upon addition of a new payment method or each request for Lyft Services, Rideshare Services, or Third-Party Services, Lyft may seek authorization of your selected payment method to verify the payment method, ensure the Charges will be covered, and protect against unauthorized behavior. The authorization is not a charge, however, it may reduce your available credit by the authorization amount until your bank's next processing cycle. Should the amount of our authorization exceed the total funds on deposit in your account, you may be subject to overdraft of NSF charges by the bank issuing your debit or prepaid card. Lyft is not responsible for these charges and is unable to assist you in recovering them from your issuing bank. Check out our Help Center to learn more about our use of pre-authorization holds.

For clarity, Lyft does not charge a fee for Users to access the Lyft Platform, but retains the right to charge Users and/or organizations, if applicable, a fee or any other Charge for accessing or

using Lyft Services, Rideshare Services, or Third-Party Services made available through the
Lyft Platform.

# Driver Payments

If you are a Driver, you will receive payment for your provision of Rideshare Services pursuant
to the terms of the Driver Addendum, which shall form part of this Agreement between you and
Lyft.

# Lyft Communications

By entering into this Agreement or using the Lyft Platform, you agree to receive
communications from us, our affiliates, or our third-party partners, at any of the phone numbers
provided to Lyft by you or on your behalf, and also via email, text message, calls, and push
notifications. You agree that texts, calls or prerecorded messages may be generated by
automatic telephone dialing systems. Communications from Lyft, its affiliated companies and/or
Drivers may include but are not limited to: operational communications concerning your User
account or use of the Lyft Platform, Lyft Services, Third-Party Services or Rideshare Services,
updates concerning new and existing features on the Lyft Platform, communications
concerning marketing or promotions run by us or our third-party partners, and news concerning
Lyft and industry developments. If you change or deactivate the phone number you provided to
Lyft, you agree to update your User account information to help prevent us from inadvertently
communicating with anyone who acquires your old number. Standard text messaging charges
applied by your cell phone carrier will apply to text messages we send.

IF YOU WISH TO OPT OUT OF PROMOTIONAL EMAILS, YOU CAN UNSUBSCRIBE FROM
OUR PROMOTIONAL EMAIL LIST BY FOLLOWING THE UNSUBSCRIBE OPTIONS IN THE
PROMOTIONAL EMAIL ITSELF. IF YOU WISH TO OPT OUT OF PROMOTIONAL CALLS OR
TEXTS, YOU MAY TEXT "END" TO 46080 FROM THE MOBILE DEVICE RECEIVING THE
MESSAGES. YOU ACKNOWLEDGE THAT YOU ARE NOT REQUIRED TO CONSENT TO
RECEIVE PROMOTIONAL TEXTS OR CALLS AS A CONDITION OF USING THE LYFT
PLATFORM OR RELATED SERVICES. IF YOU WISH TO OPT OUT OF ALL TEXTS OR
CALLS FROM LYFT (INCLUDING OPERATIONAL OR TRANSACTIONAL TEXTS OR
CALLS), YOU CAN TEXT THE WORD "STOPALL" TO 46080 FROM THE MOBILE DEVICE
RECEIVING THE MESSAGES; HOWEVER, YOU ACKNOWLEDGE THAT OPTING OUT OF
RECEIVING ALL TEXTS MAY IMPACT YOUR USE OF THE LYFT PLATFORM OR RELATED
SERVICES. WHEN YOU OPT OUT TEXTS OR CALLS, YOU MAY RECEIVE A ONE-TIME
OPT-OUT CONFIRMATION TEXT MESSAGE. NO FURTHER MESSAGES WILL BE SENT TO

YOUR MOBILE DEVICE, UNLESS INITIATED BY YOU. FOR COMMUNICATION SERVICE SUPPORT OR ASSISTANCE, PLEASE VISIT OUR <u>HELP CENTER</u>.

# Your Information

Your Information is any information you provide, publish or post, and any information provided on your behalf, to or through the Lyft Platform (including any profile information you provide) or send to other Users (including via in-application feedback, any email feature, or through any Lyft-related Facebook, Twitter or other social media posting) (your "Information"). You consent to us using your Information to create a User account that will allow you to use the Lyft Platform, Lyft Services, and participate in the Rideshare Services. Our collection and use of personal information in connection with the Lyft Platform, Lyft Services, and Rideshare Services is as provided in Lyft's <u>Privacy Policy</u>. You are solely responsible for your Information and your interactions with other members of the public, and we act only as a passive conduit for your online posting of your Information. You agree to provide and maintain accurate, current and complete Information and that we and other members of the public may rely on your Information as accurate, current and complete. To enable Lyft to use your Information for the purposes described in the Privacy Policy and this Agreement, or to otherwise improve the Lyft Platform, Lyft Services, or Rideshare Services you grant to us a non-exclusive, worldwide, perpetual, irrevocable, royalty-free, transferable, sub-licensable (through multiple tiers) right and license to exercise the copyright, publicity, and database rights you have in your Information, and to use, copy, perform, display and distribute such Information to prepare derivative works, or incorporate into other works, such Information, in any media now known or not currently known. Lyft does not assert any ownership over your Information; rather, as between you and Lyft, subject to the rights granted to us in this Agreement, you retain full ownership of all of your Information and any intellectual property rights or other proprietary rights associated with your Information.

# Promotions, Referrals, and Loyalty Programs

Lyft, at its sole discretion, may make available promotions, referral programs and loyalty programs with different features to any Users or prospective Users. Lyft reserves the right to withhold or deduct credits or benefits obtained through a promotion or program in the event that Lyft determines or believes that the redemption of the promotion or receipt of the credit or benefit was in error, fraudulent, illegal, or in violation of the applicable promotion or program

terms or this Agreement. Lyft reserves the right to terminate, discontinue, modify or cancel any promotions or programs at any time and in its sole discretion without notice to you.

Lyft's referral program may provide you with incentives to refer your friends and family to become new Users of the Lyft Platform in your country (the "Referral Program"). Your participation in the Referral Program is subject to this Agreement and the additional Referral Program rules.

# Restricted Activities

With respect to your use of the Lyft Platform, Lyft Services, Third-Party Services, and your participation in the Rideshare Services, you agree that you will not:

a. impersonate any person or entity;
b. stalk, threaten, or otherwise harass any person, or carry any weapons;
c. violate any law, statute, rule, permit, ordinance or regulation;
d. interfere with or disrupt the Lyft Platform or the servers or networks connected to the Lyft Platform;
e. post Information or interact on the Lyft Platform, Lyft Services, Third-Party Services, or Rideshare Services in a manner which is fraudulent, libelous, abusive, obscene, profane, sexually oriented, harassing, or illegal;
f. use the Lyft Platform in any way that infringes any third party's rights, including: intellectual property rights, copyright, patent, trademark, trade secret or other proprietary rights or rights of publicity or privacy;
g. post, email or otherwise transmit any malicious code, files or programs designed to interrupt, damage, destroy or limit the functionality of the Lyft Platform or any computer software or hardware or telecommunications equipment or surreptitiously intercept or expropriate any system, data or personal information;
h. forge headers or otherwise manipulate identifiers in order to disguise the origin of any information transmitted through the Lyft Platform;
i. "frame" or "mirror" any part of the Lyft Platform, without our prior written authorization or use meta tags or code or other devices containing any reference to us in order to direct any person to any other website for any purpose;
j. modify, adapt, translate, reverse engineer, decipher, decompile or otherwise disassemble any portion of the Lyft Platform;
k. rent, lease, lend, sell, redistribute, license or sublicense the Lyft Platform or access to any portion of the Lyft Platform;
l. use any robot, spider, site search/retrieval application, or other manual or automatic device or process to retrieve, index, scrape, "data mine", copy, access, acquire information, generate impressions or clicks, input or store information, search, monitor any portion of the Lyft Platform, or in any way reproduce or circumvent the navigational structure or presentation of the Lyft Platform or its contents;
m. link directly or indirectly to any other websites;
n. transfer, lend, or sell your User account, password and/or identification, or any other User's Information to any other party;

o. use a false email address or other identifying information, impersonate or misrepresent any person or entity, or your affiliation with any person or entity, or otherwise omit, misrepresent, or mislead as to the origin or source of any entity accessing the Lyft Platform;

p. discriminate against or harass anyone on the basis of race, national origin, religion, gender, gender identity or expression, physical or mental disability, medical condition, marital status, age or sexual orientation;

q. violate any of the Referral Program rules if you participate in the Referral Program;

r. commercialize the Rideshare Services, Third-Party Services, or our Lyft Services without an agreement directly with Lyft;

s. misuse or abuse the Rideshare Services, Third-Party Services, or our Lyft Services in violation of eligibility requirements as determined by Lyft;

t. violate Lyft's Policy Against Sexual Assault, Misconduct, and Harassment;

u. circumvent any measures implemented by Lyft to prevent or address violations of this Agreement; or

v. cause any third party to engage in the restricted activities above.

Should you suspect that any unauthorized party may be using your User account or you suspect any other breach of security or violation of this Agreement, you agree to notify us immediately.

# Driver Representations, Warranties and Agreements

By providing Rideshare Services as a Driver on the Lyft Platform, you represent, warrant, and agree that:

a. You possess a valid driver's license and are authorized and medically fit to operate a motor vehicle and have all appropriate licenses, approvals and authority to provide transportation to Riders in all jurisdictions in which you provide Rideshare Services.

b. You own, or have the legal right to operate, the vehicle you use when providing Rideshare Services; such vehicle is in good operating condition and meets the industry safety standards and all applicable statutory and state department of motor vehicle requirements for a vehicle of its kind; and any and all applicable safety recalls have been or will be remedied per manufacturer instructions.

c. You will not engage in reckless behavior while driving or otherwise providing Rideshare Services, drive unsafely, operate a vehicle that is unsafe to drive, permit an unauthorized third party to accompany you in the vehicle while providing Rideshare Services, provide Rideshare Services as a Driver while under the influence of alcohol or drugs, or take action that harms or threatens to harm the safety of the Lyft community or third parties.

d. You will only provide Rideshare Services using the vehicle that has been reported to, and approved by Lyft, and you will not transport more passengers than can securely be seated in such vehicle (and no more than seven (7) passengers in any instance).

e. You will not, while providing the Rideshare Services, operate as a public or common carrier or taxi service, accept street hails, charge for rides (except as expressly provided in this Agreement), demand that a rider pay in cash, or use a credit card reader, such as a Square Reader, to accept payment or engage in any other activity in a manner that is inconsistent with your obligations under this Agreement.

f. You will not attempt to defraud Lyft or Riders on the Lyft Platform or in connection with your provision of Rideshare Services. If we suspect that you have engaged in fraudulent activity we may withhold applicable Fares or other payments for the ride(s) in question and take any other action against you available under the law.

g. You will not discriminate against Riders with disabilities and agree to review Lyft's Anti-Discrimination Policies. You will make reasonable accommodations as required by law and our Service Animal Policy and Wheelchair Policy for Riders who travel with their service animals or who use wheelchairs (or other mobility devices) that can be folded for safe and secure storage in the car's trunk or backseat.

h. You agree that we may obtain information about you, including your criminal and driving records, and you agree to provide any further necessary authorizations to facilitate our access to such records during the term of the Agreement.

i. You have a valid policy of liability insurance (in coverage amounts consistent with all applicable legal requirements) that names or schedules you for the operation of the vehicle you use to provide Rideshare Services, and you agree to provide proof of such insurance and that information regarding such insurance may be released to Lyft upon Lyft's reasonable request.

j. You will pay all applicable federal, state and local taxes based on your provision of Rideshare Services and any payments received by you.

k. You will comply with Lyft's reasonable requests to provide information in connection with Rider complaints, law enforcement requests, or any other incident.

# Intellectual Property

All intellectual property rights in and to the Lyft Platform shall be owned by Lyft absolutely and in their entirety. These rights include database rights, inventions and patentable subject-matter patents, copyright, design rights (whether registered or unregistered), trademarks (whether registered or unregistered) and other similar rights wherever existing in the world together with the right to apply for protection of the same. All other trademarks, logos, service marks, company or product names set forth in the Lyft Platform are the property of their respective owners. You acknowledge and agree that any questions, comments, suggestions, ideas, feedback or other information ("Submissions") provided by you to us are non-confidential and shall become the sole property of Lyft. Lyft shall own exclusive rights, including all intellectual property rights, and shall be entitled to the unrestricted use and dissemination of these Submissions for any purpose, commercial or otherwise, without acknowledgment or compensation to you. Except for the explicit license grants hereunder, nothing in this Agreement shall be construed to transfer ownership of or grant a license under any intellectual property rights.

LYFT and other Lyft logos, designs, graphics, icons, scripts and service names are registered trademarks, trademarks or trade dress of Lyft in the United States and/or other countries (collectively, the "Lyft Marks"). If you provide Rideshare Services as a Driver, Lyft grants to you during the term of this Agreement, and subject to your compliance with the terms and conditions of this Agreement, a limited, revocable, non-exclusive license to display and use the Lyft Marks solely on the Lyft stickers/decals, and any other Lyft-branded items provided by Lyft directly to you in connection with providing the Rideshare Services ("License"). The License is non-transferable and non-assignable, and you shall not grant to any third party any right, permission, license or sublicense with respect to any of the rights granted hereunder without Lyft's prior written permission, which it may withhold in its sole discretion. The Lyft logo (or any Lyft Marks) may not be used in any manner that is likely to cause confusion, including but not limited to: use of a Lyft Mark in a domain name or Lyft referral code, or use of a Lyft Mark as a social media handle or name, avatar, profile photo, icon, favicon, or banner. You may identify yourself as a Driver on the Lyft Platform, but may not misidentify yourself as Lyft, an employee of Lyft, or a representative or agent of Lyft.

You acknowledge that Lyft is the owner and licensor of the Lyft Marks, including all goodwill associated therewith, and that your use of the Lyft logo (or any Lyft Marks) will confer no interest in or ownership of the Lyft Marks in you but rather inures to the benefit of Lyft. You agree to use the Lyft logo strictly in accordance with Lyft's Brand Guidelines, as may be provided to you and revised from time to time, and to immediately cease any use that Lyft determines to be nonconforming or otherwise unacceptable.

You agree that you will not: (1) create any materials that use the Lyft Marks or any derivatives of the Lyft Marks as a trademark, service mark, trade name or trade dress, other than as expressly approved by Lyft in writing; (2) use the Lyft Marks in any way that tends to impair their validity as proprietary trademarks, service marks, trade names or trade dress, or use the Lyft Marks other than in accordance with the terms, conditions and restrictions herein; (3) take any other action that would jeopardize or impair Lyft's rights as owner of the Lyft Marks or the legality and/or enforceability of the Lyft Marks, including, challenging or opposing Lyft's ownership in the Lyft Marks; (4) apply for trademark registration or renewal of trademark registration of any of the Lyft Marks, any derivative of the Lyft Marks, any combination of the Lyft Marks and any other name, or any trademark, service mark, trade name, symbol or word which is similar to the Lyft Marks; (5) use the Lyft Marks on or in connection with any product, service or activity that is in violation of any law, statute, government regulation or standard.

You agree you will not rent, lease, lend, sell, or otherwise redistribute the Lyft driver amp, or manufacture, produce, print, sell, distribute, purchase, or display counterfeit/inauthentic Lyft driver amps or other Lyft Marks or (including but not limited to signage, stickers, apparel, or decals) from any source other than directly from Lyft.

Violation of any provision of this License may result in immediate termination of the License, in Lyft's sole discretion, a takedown request sent to the appropriate ISP, or social media platform, and/or a Uniform Domain-Name Dispute-Resolution Policy Proceeding (or equivalent proceeding). If you create any materials (physical or digital) bearing the Lyft Marks (in violation of this Agreement or otherwise), you agree that upon their creation Lyft exclusively owns all right, title and interest in and to such materials, including any modifications to the Lyft Marks or derivative works based on the Lyft Marks or Lyft copyrights. You further agree to assign any interest or right you may have in such materials to Lyft, and to provide information and execute any documents as reasonably requested by Lyft to enable Lyft to formalize such assignment.

Lyft respects the intellectual property of others, and expects Users to do the same. If you believe, in good faith, that any materials on the Lyft Platform infringe upon your copyrights, please view our Copyright Policy for information on how to make a copyright complaint.

# Disclaimers

The following disclaimers are made on behalf of Lyft, our affiliates, subsidiaries, parents, successors and assigns, and each of our respective officers, directors, employees, agents, and shareholders.

Lyft does not provide transportation services, and Lyft is not a transportation carrier. Lyft is not a common carrier or public carrier. It is up to the Driver to decide whether or not to offer a ride to a Rider contacted through the Lyft Platform, and it is up to the Rider to decide whether or not to accept a ride from any Driver contacted through the Lyft Platform. We cannot ensure that a Driver or Rider will complete an arranged transportation service. We have no control over the quality or safety of the transportation that occurs as a result of the Rideshare Services. Any safety-related feature, process, policy, standard, or other effort undertaken by Lyft is not an indication of any employment or agency relationship with any User.

The Lyft Platform is provided on an "as is" basis and without any warranty or condition, express, implied or statutory. We do not guarantee and do not promise any specific results from use of the Lyft Platform, Lyft Services, Third-Party Services, and/or the Rideshare Services, including the ability to provide or receive Rideshare Services at any given location or time. Lyft reserves the right, for example, to limit or eliminate access to the Lyft Platform for Rideshare Services, Third-Party Services, and/or Lyft Services in specific geographic areas and/or at specific times based on commercial viability, public health concerns, or changes in law. To the fullest extent permitted by law, we specifically disclaim any implied warranties of title, merchantability, fitness for a particular purpose and non-infringement. Some states do not allow the disclaimer of implied warranties, so the foregoing disclaimer may not apply to you.

We do not warrant that your use of the Lyft Platform, Lyft Services, Third-Party Services, or Rideshare Services will be accurate, complete, reliable, current, secure, uninterrupted, always available, or error-free, or will meet your requirements, that any defects in the Lyft Platform will be corrected, or that the Lyft Platform is free of viruses or other harmful components. We disclaim liability for, and no warranty is made with respect to, connectivity, availability, accuracy, completeness, and reliability of the Lyft Platform, Lyft Services, Third-Party Services, or Rideshare Services, including with respect to mapping, navigation, estimated times of arrival, and routing services. You are responsible at all times for your conduct and the consequences of your conduct while using the Lyft Platform.

We cannot guarantee that each Rider or Driver is who he or she claims to be. Please use common sense when using the Lyft Platform, Lyft Services, Third-Party Services, and Rideshare Services, including looking at the photos of the Driver or Rider you have matched with to make sure it is the same individual you see in person. Please note that there are also risks of dealing with underage persons or people acting under false pretense, and we do not accept responsibility or liability for any content, communication or other use or access of the Lyft Platform by persons under the age of 18 in violation of this Agreement. We encourage you to communicate directly with each potential Driver or Rider prior to engaging in an arranged transportation service.

Lyft is not responsible for the conduct, whether online or offline, of any User of the Lyft Platform, Lyft Services, Third-Party Services, or Rideshare Services. You are solely responsible for your interactions with other Users. We do not procure insurance for, nor are we responsible for, personal belongings left in the car by Drivers or Riders. By using the Lyft Platform, Lyft Services, Third-Party Services, and participating in the Rideshare Services, you agree to accept such risks and agree that Lyft is not responsible for the acts or omissions of Users on the Lyft Platform, Lyft Services, Third-Party Services, or participating in the Rideshare Services.

You are responsible for the use of your User account and Lyft expressly disclaims any liability arising from the unauthorized use of your User account.

It is possible for others to obtain information about you that you provide, publish or post to or through the Lyft Platform (including any profile information you provide), send to other Users, or share during the Rideshare Services, and to use such information to harass or harm you. We are not responsible for the use of any personal information that you disclose to other Users on the Lyft Platform or through the Rideshare Services, Lyft Services, or Third-Party Services. Please carefully select the type of information that you post on the Lyft Platform or through the Rideshare Services, Lyft Services, or Third-Party Services or release to others. We disclaim all liability, regardless of the form of action, for the acts or omissions of other Users (including unauthorized users, or "hackers").

Opinions, advice, statements, offers, or other information or content concerning Lyft or made available through the Lyft Platform, but not directly by us, are those of their respective authors, and should not necessarily be relied upon. Such authors are solely responsible for such content. Under no circumstances will we be responsible for any loss or damage resulting from your reliance on information or other content posted by third parties, whether on the Lyft Platform or otherwise. We reserve the right, but we have no obligation, to monitor the materials posted on the Lyft Platform and remove any such material that in our sole opinion violates, or is alleged to violate, the law or this agreement or which might be offensive, illegal, or that might violate the rights, harm, or threaten the safety of Users or others.

Location data provided by the Lyft Platform is for basic location purposes only and is not intended to be relied upon in situations where precise location information is needed or where erroneous, inaccurate or incomplete location data may lead to death, personal injury, property or environmental damage. Neither Lyft, nor any of its content providers, guarantees the availability, accuracy, completeness, reliability, or timeliness of location data tracked or displayed by the Lyft Platform. Any of your Information, including geolocational data, you upload, provide, or post on the Lyft Platform may be accessible to Lyft and certain Users of the Lyft Platform.

Lyft advises you to use the Lyft Platform with a data plan with unlimited or very high data usage limits, and Lyft shall not be responsible or liable for any fees, costs, or overage charges associated with any data plan you use to access the Lyft Platform.

This paragraph applies to any version of the Lyft Platform that you acquire from the Apple App Store. This Agreement is entered into between you and Lyft. Apple, Inc. ("Apple") is not a party to this Agreement and shall have no obligations with respect to the Lyft Platform. Lyft, not Apple, is solely responsible for the Lyft Platform and the content thereof as set forth hereunder. However, Apple and Apple's subsidiaries are third-party beneficiaries of this Agreement. Upon your acceptance of this Agreement, Apple shall have the right (and will be deemed to have accepted the right) to enforce this Agreement against you as a third-party beneficiary thereof. This Agreement incorporates by reference Apple's Licensed Application End User License Agreement, for purposes of which, you are "the end-user." In the event of a conflict in the terms of the Licensed Application End User License Agreement and this Agreement, the terms of this Agreement shall control.

As a Driver, you may be able to use "Lyft Nav built by Google" while providing Rideshare Services on the Lyft Platform. Riders and Drivers may also use Google Maps while using the Lyft Platform. In either case, you agree that Google may collect your location data when the Lyft Platform is running in order to provide and improve Google's services, that such data may also be shared with Lyft in order to improve its operations, and that Google's terms and privacy policy will apply to this usage.

Lyft shall not be in breach of this Agreement nor liable for failure or delay in performing obligations under this Agreement if such failure or delay results from events, circumstances or causes beyond its reasonable control including (without limitation) natural disasters or acts of God; labor disputes or stoppages; war; government action; epidemic or pandemic; chemical or biological contamination; strikes; riots; acts of domestic or international terrorism; quarantines; national or regional emergencies; or any other cause, whether similar in kind to the foregoing or otherwise, beyond the party's reasonable control. All service dates under this Agreement affected by force majeure shall be tolled for the duration of such force majeure. The parties hereby agree, when feasible, not to cancel but reschedule the pertinent obligations as soon as practicable after the force majeure condition ceases to exist.

# State and Local Disclosures

Certain jurisdictions require additional disclosures to you. You can view any disclosures required by your local jurisdiction at www.lyft.com/terms/disclosures. Please check regularly for updates.

# Indemnity

You will indemnify and hold harmless and, at Lyft's election, defend Lyft including our affiliates, subsidiaries, parents, successors and assigns, and each of our respective officers, directors, employees, agents, or shareholders (collectively, the "Indemnified Parties") from and against any claims, actions, suits, losses, costs, liabilities and expenses (including reasonable attorneys' fees) relating to or arising out of your use of the Lyft Platform, Lyft Services, Third-Party Services, and participation in the Rideshare Services, including: (1) your breach of this Agreement or the documents it incorporates by reference; (2) your violation of any law or the rights of a third party, including, Drivers, Riders, other motorists, and pedestrians, as a result of your own interaction with such third party; (3) any allegation that any materials or Information that you submit to us or transmit through the Lyft Platform or to us infringes, misappropriates, or otherwise violates the copyright, trademark, trade secret or other intellectual property or other rights of any third party; (4) your ownership, use or operation of a motor vehicle or passenger vehicle, including your provision of Rideshare Services as a Driver; and/or (5) any other activities in connection with the Lyft Platform, Lyft Services, Third-Party Services, or Rideshare Services. This indemnity shall be applicable without regard to the negligence of any party, including any indemnified person. You will not, without Lyft's prior written consent, agree to any settlement on behalf of any Indemnified Party which includes either the obligation to pay any monetary amounts, or any admissions of liability, whether civil or criminal, on the part of any Indemnified Party.

# Limitation of Liability

IN NO EVENT WILL LYFT, INCLUDING OUR AFFILIATES, SUBSIDIARIES, PARENTS, SUCCESSORS AND ASSIGNS, AND EACH OF OUR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, OR SHAREHOLDERS (COLLECTIVELY "LYFT" FOR PURPOSES OF THIS SECTION), BE LIABLE TO YOU FOR ANY INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE, CONSEQUENTIAL, OR INDIRECT DAMAGES (INCLUDING DAMAGES FOR DELETION, CORRUPTION, LOSS OF DATA, LOSS OF PROGRAMS, FAILURE TO STORE ANY INFORMATION OR OTHER CONTENT MAINTAINED OR TRANSMITTED BY THE LYFT PLATFORM, SERVICE INTERRUPTIONS, OR FOR THE COST OF PROCUREMENT OF SUBSTITUTE SERVICES) ARISING OUT OF OR IN CONNECTION WITH THE LYFT PLATFORM, LYFT SERVICES, THE RIDESHARE SERVICES, OR THIS AGREEMENT, HOWEVER ARISING INCLUDING NEGLIGENCE, EVEN IF WE OR OUR AGENTS OR REPRESENTATIVES KNOW OR HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE LYFT PLATFORM MAY BE USED BY YOU TO REQUEST AND SCHEDULE TRANSPORTATION, GOODS, OR THIRD-PARTY SERVICES WITH THIRD-PARTY PROVIDERS, BUT YOU AGREE THAT LYFT HAS NO RESPONSIBILITY OR LIABILITY TO YOU RELATED TO ANY TRANSPORTATION, GOODS, OR THIRD-PARTY SERVICES SET FORTH IN THIS AGREEMENT. FOR CLARITY AND WITHOUT LIMITING THE FOREGOING, LYFT HAS NO RESPONSIBILITY OR LIABILITY FOR ANY DAMAGES ARISING OUT OF OR IN CONNECTION WITH YOUR USE OF OR RELIANCE ON TRANSPORTATION, GOODS, OR THIRD-PARTY SERVICES SET FORTH IN THIS AGREEMENT OR ANY TRANSACTION OR RELATIONSHIP BETWEEN YOU AND ANY THIRD-PARTY PROVIDER. CERTAIN JURISDICTIONS MAY NOT ALLOW THE EXCLUSION OR LIMITATION OF CERTAIN DAMAGES. IF THESE LAWS APPLY TO YOU, SOME OR ALL OF THE ABOVE DISCLAIMERS, EXCLUSIONS OR LIMITATIONS MAY NOT APPLY TO YOU AND YOU MAY HAVE ADDITIONAL RIGHTS.

# Term and Termination

This Agreement is effective upon your acceptance of this Agreement. This Agreement may be terminated: (a) by User, without cause, upon seven (7) days' prior written notice to Lyft; or (b) by either Party immediately, without notice, upon the other Party's material breach of this Agreement, including but not limited to any breach of Section 9 or breach of Section 10(a)-(i) of this Agreement. In addition, Lyft may terminate this Agreement or deactivate your User account immediately in the event: (1) you are no longer eligible to qualify as a User; (2) you no longer qualify to provide Rideshare Services or to operate the approved vehicle under applicable law,

rule, permit, ordinance or regulation; (3) you fall below Lyft's star rating or cancellation threshold; or (4) Lyft has the good faith belief that such action is necessary to protect the safety of the Lyft community or third parties, provided that in the event of a deactivation pursuant to (1)-(4) above, you will be given notice of the potential or actual deactivation and an opportunity to attempt to cure the issue to Lyft's reasonable satisfaction prior to Lyft permanently terminating the Agreement. For all other breaches of this Agreement, you will be provided notice and an opportunity to cure the breach. If the breach is cured in a timely manner and to Lyft's satisfaction, this Agreement will not be permanently terminated. Sections 2, 6, 7 (with respect to the license), 11-12, 14-19, and 21 shall survive any termination or expiration of this Agreement.

# DISPUTE RESOLUTION AND ARBITRATION AGREEMENT

**(a) Agreement to Binding Arbitration Between You and Lyft.**

YOU AND LYFT MUTUALLY AGREE TO WAIVE OUR RESPECTIVE RIGHTS TO RESOLUTION OF DISPUTES IN A COURT OF LAW BY A JUDGE OR JURY AND AGREE TO RESOLVE ANY DISPUTE BY ARBITRATION, as set forth below. This agreement to arbitrate ("Arbitration Agreement") is governed by the Federal Arbitration Act ("FAA"); but if the FAA is inapplicable for any reason, then this Arbitration Agreement is governed by the laws of the State of Delaware, including Del. Code tit. 10, § 5701 et seq., without regard to choice of law principles. This Arbitration Agreement survives after the Agreement terminates or your relationship with Lyft ends. ANY ARBITRATION UNDER THIS AGREEMENT WILL TAKE PLACE ON AN INDIVIDUAL BASIS; CLASS ARBITRATIONS AND CLASS ACTIONS ARE NOT PERMITTED. Except as expressly provided below, this Arbitration Agreement applies to all Claims (defined below) between you and Lyft, including our affiliates, subsidiaries, parents, successors and assigns, and each of our respective officers, directors, employees, agents, or shareholders. This Arbitration Agreement also applies to claims between you and Lyft's service providers, including but not limited to background check providers and payment processors; and such service providers shall be considered intended third-party beneficiaries of this Arbitration Agreement.

Except as expressly provided below, ALL DISPUTES AND CLAIMS BETWEEN US (EACH A "CLAIM" AND COLLECTIVELY, "CLAIMS") SHALL BE EXCLUSIVELY RESOLVED BY BINDING ARBITRATION SOLELY BETWEEN YOU AND LYFT. These Claims include, but are not limited to, any dispute, claim or controversy, whether based on past, present, or future events, arising out of or relating to: this Agreement and prior versions thereof (including the breach, termination, enforcement, interpretation or validity thereof), the Lyft Platform, the Rideshare Services, the Lyft Services, Lyft promotions, gift card, referrals or loyalty programs,

the Lyft Tablet, any other goods or services made available through the Lyft Platform by Lyft or a third-party provider, your relationship with Lyft, the threatened or actual suspension, deactivation or termination of your User Account or this Agreement, background checks performed by or on Lyft's behalf, payments made by you or any payments made or allegedly owed to you, any promotions or offers made by Lyft, any city, county, state or federal wage-hour law, trade secrets, unfair competition, compensation, breaks and rest periods, expense reimbursement, wrongful termination, discrimination, harassment, retaliation, fraud, defamation, emotional distress, breach of any express or implied contract or covenant, claims arising under federal or state consumer protection laws; claims arising under antitrust laws, claims arising under the Telephone Consumer Protection Act and Fair Credit Reporting Act; and claims arising under the Uniform Trade Secrets Act, Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Older Workers Benefit Protection Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act of 1974 (except for individual claims for employee benefits under any benefit plan sponsored by Lyft and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), and state statutes, if any, addressing the same or similar subject matters, and all other federal and state statutory and common law claims. All disputes concerning the arbitrability of a Claim (including disputes about the scope, applicability, enforceability, revocability or validity of the Arbitration Agreement) shall be decided by the arbitrator, except as expressly provided below.

BY AGREEING TO ARBITRATION, YOU UNDERSTAND THAT YOU AND LYFT ARE WAIVING THE RIGHT TO SUE IN COURT OR HAVE A JURY TRIAL FOR ALL CLAIMS, EXCEPT AS EXPRESSLY OTHERWISE PROVIDED IN THIS ARBITRATION AGREEMENT. This Arbitration Agreement is intended to require arbitration of every claim or dispute that can lawfully be arbitrated, except for those claims and disputes which by the terms of this Arbitration Agreement are expressly excluded from the requirement to arbitrate.

**(b) Prohibition of Class Actions and Non-Individualized Relief.**
YOU UNDERSTAND AND AGREE THAT YOU AND LYFT MAY EACH BRING CLAIMS IN ARBITRATION AGAINST THE OTHER ONLY IN AN INDIVIDUAL CAPACITY AND NOT ON A CLASS, COLLECTIVE ACTION, OR REPRESENTATIVE BASIS ("CLASS ACTION WAIVER"). YOU UNDERSTAND AND AGREE THAT YOU AND LYFT BOTH ARE WAIVING THE RIGHT TO PURSUE OR HAVE A DISPUTE RESOLVED AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, COLLECTIVE OR REPRESENTATIVE PROCEEDING. NOTWITHSTANDING THE FOREGOING, THIS SUBSECTION (B) SHALL NOT APPLY TO REPRESENTATIVE PRIVATE ATTORNEYS GENERAL ACT CLAIMS BROUGHT AGAINST LYFT, WHICH ARE ADDRESSED SEPARATELY IN SECTION 17(C).

The arbitrator shall have no authority to consider or resolve any Claim or issue any relief on any basis other than an individual basis. The arbitrator shall have no authority to consider or resolve any Claim or issue any relief on a class, collective, or representative basis. The

arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claims.

Notwithstanding any other provision of this Agreement, the Arbitration Agreement or the AAA Rules, disputes regarding the interpretation, applicability, or enforceability of the Class Action Waiver may be resolved only by a court and not by an arbitrator. In any case in which: (1) the dispute is filed as a class, collective, or representative action and (2) there is a final judicial determination that the Class Action Waiver is unenforceable with respect to any Claim or any particular remedy for a Claim (such as a request for public injunctive relief), then that Claim or particular remedy (and only that Claim or particular remedy) shall be severed from any remaining claims and/or remedies and may be brought in a court of competent jurisdiction, but the Class Action Waiver shall be enforced in arbitration on an individual basis as to all other Claims or remedies to the fullest extent possible.

**(c) Representative PAGA Waiver.**

Notwithstanding any other provision of this Agreement or the Arbitration Agreement, to the fullest extent permitted by law: (1) you and Lyft agree not to bring a representative action on behalf of others under the Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2698 et seq., in any court or in arbitration, and (2) for any claim brought on a private attorney general basis, including under the California PAGA, both you and Lyft agree that any such dispute shall be resolved in arbitration on an individual basis only (i.e., to resolve whether you have personally been aggrieved or subject to any violations of law), and that such an action may not be used to resolve the claims or rights of other individuals in a single or collective proceeding (i.e., to resolve whether other individuals have been aggrieved or subject to any violations of law) (collectively, "representative PAGA Waiver"). Notwithstanding any other provision of this Agreement, the Arbitration Agreement or the AAA Rules, disputes regarding the scope, applicability, enforceability, revocability or validity of this representative PAGA Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. If any provision of this representative PAGA Waiver is found to be unenforceable or unlawful for any reason: (i) the unenforceable provision shall be severed from this Agreement; (ii) severance of the unenforceable provision shall have no impact whatsoever on the Arbitration Agreement or the requirement that any remaining Claims be arbitrated on an individual basis pursuant to the Arbitration Agreement; and (iii) any such representative PAGA or other representative private attorneys general act claims must be litigated in a civil court of competent jurisdiction and not in arbitration. To the extent that there are any Claims to be litigated in a civil court of competent jurisdiction because a civil court of competent jurisdiction determines that the representative PAGA Waiver is unenforceable with respect to those Claims, the Parties agree that litigation of those Claims shall be stayed pending the outcome of any individual Claims in arbitration.

**(d) Rules Governing the Arbitration.**

Any arbitration conducted pursuant to this Arbitration Agreement shall be administered by the American Arbitration Association ("AAA") pursuant to its Consumer Arbitration Rules that are in effect at the time the arbitration is initiated, as modified by the terms set forth in this Agreement. Copies of these rules can be obtained at the AAA's website (www.adr.org) (the "AAA Rules"). Notwithstanding the foregoing, if requested by you and if proper based on the facts and circumstances of the Claims presented, the arbitrator shall have the discretion to select a different set of AAA Rules, but in no event shall the arbitrator consolidate more than one person's Claims, or otherwise preside over any form of representative, collective, or class proceeding. The parties may select a different arbitration administrator upon mutual written agreement.

As part of the arbitration, both you and Lyft will have the opportunity for reasonable discovery of non-privileged information that is relevant to the Claim. The arbitrator may award any individualized remedies that would be available in court. The arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claims. The arbitrator will provide a reasoned written statement of the arbitrator's decision which shall explain the award given and the findings and conclusions on which the decision is based.

The arbitrator will decide the substance of all claims in accordance with applicable law, and will honor all claims of privilege recognized by law. The arbitrator shall not be bound by rulings in prior arbitrations involving different Riders or Drivers, but is bound by rulings in prior arbitrations involving the same Rider or Driver to the extent required by applicable law. The arbitrator's award shall be final and binding and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof, provided that any award may be challenged in a court of competent jurisdiction.

**(e) Arbitration Fees and Awards.**

The payment of filing and arbitration fees will be governed by the relevant AAA Rules subject to the following modifications:

1. If Lyft initiates arbitration under this Arbitration Agreement, Lyft will pay all AAA filing and arbitration fees.
2. With respect to any Claims brought by Lyft against a Driver, or for Claims brought by a Driver against Lyft that: (A) are based on an alleged employment relationship between Lyft and a Driver; (B) arise out of, or relate to, Lyft's actual deactivation of a Driver's User account or a threat by Lyft to deactivate a Driver's User account; (C) arise out of, or relate to, Lyft's actual termination of a Driver's Agreement with Lyft under the termination provisions of this Agreement, or a threat by Lyft to terminate a Driver's Agreement; (D) arise out of, or relate to, Fares (as defined in this Agreement, including Lyft's commission or fees on the Fares), tips, or average hourly guarantees owed by Lyft to Drivers for Rideshare Services, other than disputes relating to referral bonuses, other Lyft promotions, or consumer-type disputes, or (E) arise out of or relate to background checks performed in connection with a user seeking to become a Driver (the subset of

Claims in subsections (A)-(E) shall be collectively referred to as "Driver Claims"), Lyft shall pay all costs unique to arbitration (as compared to the costs of adjudicating the same claims before a court), including the regular and customary arbitration fees and expenses (to the extent not paid by Lyft pursuant to the fee provisions above). However, if you are the party initiating the Driver Claim, you shall be responsible for contributing up to an amount equal to the filing fee that would be paid to initiate the claim in the court of general jurisdiction in the state in which you provide Rideshare Services to Riders, unless a lower fee amount would be owed by you pursuant to the AAA Rules, applicable law, or subsection (e)(1) above. Any dispute as to whether a cost is unique to arbitration shall be resolved by the arbitrator. For purposes of this Section 17(e)(2), the term "Driver" shall be deemed to include both Drivers and Driver applicants who have not been approved to drive.

3. Except as provided in Federal Rule of Civil Procedure 68 or any state equivalents, each party shall pay its own attorneys' fees and pay any costs that are not unique to the arbitration (i.e., costs that each party would incur if the claim(s) were litigated in a court such as costs to subpoena witnesses and/or documents, take depositions and purchase deposition transcripts, copy documents, etc.).

4. At the end of any arbitration, the arbitrator may award reasonable fees and costs or any portion thereof to you if you prevail, to the extent authorized by applicable law.

5. Although under some laws Lyft may have a right to an award of attorneys' fees and non-filing fee expenses if it prevails in an arbitration, Lyft agrees that it will not seek such an award unless you are represented by an attorney or the arbitrator has determined that the claim is frivolous or brought for an improper purpose (as measured by the standards of Federal Rule of Civil Procedure 11(b)).

6. If the arbitrator issues you an award that is greater than the value of Lyft's last written settlement offer made after you participated in good faith in the optional Negotiation process described in subsection (k) below, then Lyft will pay you the amount of the award or U.S. $1,000, whichever is greater.

**(f) Location and Manner of Arbitration.**

Unless you and Lyft agree otherwise, any arbitration hearings between Lyft and a Rider will take place in the county of your billing address, and any arbitration hearings between Lyft and a Driver will take place in the county in which the Driver provides Rideshare Services. If AAA arbitration is unavailable in your county, the arbitration hearings will take place in the nearest available location for a AAA arbitration. Your right to a hearing will be determined by the AAA Rules.

**(g) Exceptions to Arbitration.**

This Arbitration Agreement shall not require arbitration of the following types of claims: (1) small claims actions brought on an individual basis that are within the scope of such small claims court's jurisdiction; (2) a representative action brought on behalf of others under PAGA or other private attorneys general acts, to the extent the representative PAGA Waiver in Section 17(c) of such action is deemed unenforceable by a court of competent jurisdiction under applicable law not preempted by the FAA; (3) claims for workers' compensation, state disability insurance and unemployment insurance benefits; (4) claims that may not be subject to arbitration as a matter of generally applicable law not preempted by the FAA; and (5)

individual claims of sexual assault or sexual harassment in connection with the use of the Lyft Platform, Lyft Services, or Rideshare Services. Where these claims are brought in a court of competent jurisdiction, Lyft will not require arbitration of those claims. Lyft's agreement not to require arbitration of these claims does not waive the enforceability of any other provision of this Arbitration Agreement (including without limitation the waivers provided in Section 17(b)), or of the enforceability of this Arbitration Agreement as to any other dispute, claim, or controversy.

Nothing in this Arbitration Agreement prevents you from making a report to or filing a claim or charge with the Equal Employment Opportunity Commission, U.S. Department of Labor, Securities Exchange Commission, National Labor Relations Board ("NLRB"), or Office of Federal Contract Compliance Programs, or similar local, state or federal agency, and nothing in this Arbitration Agreement shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration However, should you bring an administrative claim, you may only seek or recover money damages of any type pursuant to this Arbitration Provision, and you knowingly and voluntarily waive the right to seek or recover money damages of any type pursuant to any administrative complaint, except for a complaint issued by the NLRB. Should you participate in an NLRB proceeding, you may only recover money damages if such recovery does not arise from or relate to a claim previously adjudicated under this Arbitration Provision or settled by you. Similarly, you may not recover money damages under this Arbitration Provision if you have already adjudicated such claim with the NLRB. Nothing in this Agreement or Arbitration Agreement prevents your participation in an investigation by a government agency of any report, claim or charge otherwise covered by this Arbitration Provision.

**(h) Severability.**
Except as otherwise provided in the severability provisions in subsections (b) and (c) above, in the event that any portion of this Arbitration Agreement is deemed illegal or unenforceable under applicable law not preempted by the FAA, such provision shall be severed and the remainder of the Arbitration Agreement shall be given full force and effect.

**(i) Driver Claims in Pending Settlement.**
If you are a member of a putative class in a lawsuit against Lyft involving Driver Claims and a Motion for Preliminary Approval of a Settlement has been filed with the court in that lawsuit prior to this Agreement's effective date (a "Pending Settlement Action"), then this Arbitration Agreement shall not apply to your Driver Claims in that particular class action. Instead, your Driver Claims in that Pending Settlement Action shall continue to be governed by the arbitration provisions contained in the applicable Agreement that you accepted prior to this Agreement's effective date.

**(j) Opting Out of Arbitration for Driver Claims That Are Not In a Pending Settlement Action.**

As a Driver or Driver applicant, you may opt out of the requirement to arbitrate Driver Claims defined in Section 17(e)(2) (except as limited by Section 17(i) above) pursuant to the terms of this subsection if you have not previously agreed to an arbitration provision in Lyft's Terms of Service where you had the opportunity to opt out of the requirement to arbitrate. If you have previously agreed to such an arbitration provision, you may opt out of any revisions to your prior arbitration agreement made by this provision in the manner specified below, but opting out of this arbitration provision has no effect on any previous, other, or future arbitration agreements that you may have with Lyft. If you have not previously agreed to such an arbitration provision and do not wish to be subject to this Arbitration Agreement with respect to Driver Claims, you may opt out of arbitration with respect to such Driver Claims, other than those in a Pending Settlement Action, by notifying Lyft in writing of your desire to opt out of arbitration for such Driver Claims, which writing must be dated, signed and delivered by electronic mail to arbitrationoptout@lyft.com.

In order to be effective, (A) the writing must clearly indicate your intent to opt out of this Arbitration Agreement with respect to Driver Claims that are not part of a Pending Settlement Action, (B) the writing must include the name, phone number, and email address associated with your User Account, and (C) the email containing the signed writing must be sent within 30 days after the date this Agreement is executed by you. Should you not opt out within the 30-day period, you and Lyft shall be bound by the terms of this Arbitration Agreement in full (including with respect to Driver Claims that are not part of a Pending Settlement Action). As provided in paragraph 17(i) above, any opt out that you submit shall not apply to any Driver Claims that are part of a Pending Settlement Action and your Driver Claims in any such Pending Settlement Action shall continue to be governed by the arbitration provisions that are contained in the applicable Lyft Terms of Use that you agreed to prior to the effective date of this Agreement.

Cases have been filed against Lyft and may be filed in the future involving Driver Claims. You should assume that there are now, and may be in the future, lawsuits against Lyft alleging class, collective, and/or representative Driver Claims in which the plaintiffs seek to act on your behalf, and which, if successful, could result in some monetary recovery to you. But if you do agree to arbitration of Driver Claims with Lyft under this Arbitration Agreement, you are agreeing in advance that you will bring all such claims, and seek all monetary and other relief, against Lyft in an individual arbitration, except for the Driver Claims that are part of a Pending Settlement Action. You are also agreeing in advance that you will not participate in, or seek to recover monetary or other relief, for such claims in any court action or class, collective, and/or representative action. You have the right to consult with counsel of your choice concerning this Arbitration Agreement and you will not be subject to retaliation if you exercise your right to assert claims or opt- out of any Driver Claims under this Arbitration Agreement.

**(k) Optional Pre-Arbitration Negotiation Process.**

Before initiating any arbitration or proceeding, you and Lyft may agree to first attempt to negotiate any dispute, claim or controversy between the parties informally for 30 days, unless this time period is mutually extended by you and Lyft. A party who intends to seek negotiation under this subsection must first send to the other a written notice of the dispute ("Notice"). The Notice must (1) describe the nature and basis of the claim or dispute; and (2) set forth the specific relief sought. All offers, promises, conduct and statements, whether oral or written, made in the course of the negotiation by any of the parties, their agents, employees, and attorneys are confidential, privileged and inadmissible for any purpose, including as evidence of liability or for impeachment, in arbitration or other proceeding involving the parties, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or as this could violate HIPAA non-discoverable as a result of its use in the negotiation.

**(l) Binding Effect; Third-Party Beneficiaries.**
This Arbitration Agreement shall be binding upon, and shall include any claims brought by or against any third parties, including but not limited to your spouses, heirs, third-party beneficiaries and permitted assigns, where their underlying claim(s) arise out of or relate to your use of the Lyft Platform, Lyft Services, or Rideshare Services. To the extent that any third-party beneficiary to this Agreement brings claims against a party, those claims shall also be subject to this Arbitration Agreement.

# Confidentiality

You agree not to use any technical, financial, strategic and other proprietary and confidential information relating to Lyft's business, operations and properties, information about a User made available to you in connection with such User's use of the Lyft Platform, which may include the User's name, pick-up location, contact information and photo ("Confidential Information") disclosed to you by Lyft for your own use or for any purpose other than as contemplated herein. You shall not disclose or permit disclosure of any Confidential Information to third parties, and you agree not to store separate and outside of the Lyft Platform any Confidential Information obtained from the Lyft Platform. As a Driver, you understand that some of the Confidential Information you receive may be protected by federal and/or state confidentiality laws, such as the Health Information Portability and Accountability Act of 1996 ("HIPAA"), governing the privacy and security of protected (patient) health information. In the event that you know a Rider, you should not disclose to anyone the identity of the Rider or the location that you picked up, or dropped off the Rider, as this could violate HIPAA. You understand that any violation of the Agreement's confidentiality provisions may violate HIPAA or state confidentiality laws and could result in civil or criminal penalties against you. You agree to take all reasonable measures to protect the secrecy of and avoid disclosure or use of Confidential Information of Lyft in order to prevent it from falling into the public domain. Notwithstanding the above, you shall not have liability to Lyft with regard to any Confidential

Information which you can prove: was in the public domain at the time it was disclosed by Lyft or has entered the public domain through no fault of yours; was known to you, without restriction, at the time of disclosure, as demonstrated by files in existence at the time of disclosure; is disclosed with the prior written approval of Lyft; becomes known to you, without restriction, from a source other than Lyft without breach of this Agreement by you and otherwise not in violation of Lyft's rights; or is disclosed pursuant to the order or requirement of a court, administrative agency, or other governmental body; provided, however, that You shall provide prompt notice of such court order or requirement to Lyft to enable Lyft to seek a protective order or otherwise prevent or restrict such disclosure.

# Relationship with Lyft

As a Driver on the Lyft Platform, you acknowledge and agree that you and Lyft are in a direct business relationship, and the relationship between the parties under this Agreement is solely that of independent contracting parties. You and Lyft expressly agree that (1) this is not an employment agreement and does not create an employment relationship between you and Lyft; and (2) no joint venture, franchisor- franchisee, partnership, or agency relationship is intended or created by this Agreement. You have no authority to bind Lyft, and you undertake not to hold yourself out as an employee, agent or authorized representative of Lyft.

Lyft does not, and shall not be deemed to, direct or control you generally or in your performance under this Agreement specifically, including in connection with your provision of Rideshare Services, your acts or omissions, or your operation and maintenance of your vehicle. You retain the sole right to determine when, where, and for how long you will utilize the Lyft Platform. Lyft does not, and shall not be deemed to, unilaterally prescribe specific dates, times of day, or any minimum number of hours for you to utilize the Lyft Platform. You retain the option to accept or to decline or ignore a Rider's request for Rideshare Services via the Lyft Platform, or to cancel an accepted request for Rideshare Services via the Lyft Platform, subject to Lyft's then-current cancellation policies. Lyft does not, and shall not be deemed to, require you to accept any specific request for Rideshare Services as a condition of maintaining access to the platform. With the exception of any signage required by law or permit/license rules or requirements, Lyft shall have no right to require you to: (a) display Lyft's names, logos or colors on your vehicle(s); or (b) wear a uniform or any other clothing displaying Lyft's names, logos or colors. You acknowledge and agree that you have complete discretion to provide Rideshare Services or otherwise engage in any other business or employment activities, including but not limited to providing services similar to the Rideshare Services to other companies, and that Lyft does not, and shall not be deemed to, restrict you from engaging in any such activity.

# Third-Party Services

In addition to connecting Riders with Drivers, the Lyft Platform may enable Users to provide services or receive services from other third parties. For example, Users may be able to use the Lyft Platform to plan and reserve rides on public transportation, take a ride in an autonomous vehicle provided by a third party, rent vehicles, bikes, scooters, or other similar personal transportation devices provided by a third party, receive roadside assistance, or obtain financial, vehicle repair, insurance, or other services provided by third parties (collectively, the "Third-Party Services"). This Agreement between you and Lyft governs your use of the Lyft Platform in connection with the Third-Party Services.

In addition, you understand that the Third-Party Services may also be subject to terms and pricing of the third-party provider (collectively, the "Third-Party Terms") which will govern your relationship with such third-party provider, as applicable. You agree that Lyft is not responsible and may not be held liable for the Third-Party Services or the actions or omissions of the third-party provider. Such Third-Party Services may not be investigated, monitored or checked for accuracy, appropriateness, or completeness by Lyft, and Lyft is not responsible for any Third-Party Services accessed through the Lyft Platform. This Agreement incorporates by reference ADT Mobile Security Monitoring Terms, which are Third-Party Terms.

In the event of a conflict in the terms of any Third-Party Terms and this Agreement, the terms o this Agreement shall control with respect to Lyft and your agreements with Lyft herein, and the limitations of liability set forth in Section 15 above shall also apply to the third-party provider. The Dispute Resolution and Arbitration Agreement provisions in Section 17 above shall apply instead of any terms in any Third-Party Terms for all purposes except with respect to claims that are solely against the third-party provider.

# General

Except as provided in Section 17, this Agreement shall be governed by the laws of the State of California without regard to choice of law principles. This choice of law provision is only intended to specify the use of California law to interpret this Agreement and is not intended to create any other substantive right to non-Californians to assert claims under California law whether by statute, common law, or otherwise. If any provision of this Agreement is or becomes invalid or non-binding, the parties shall remain bound by all other provisions of this Agreement. In that event, the parties shall replace the invalid or non-binding provision with provisions that are valid and binding and that have, to the greatest extent possible, a similar effect as the invalid or non-binding provision, given the contents and purpose of this Agreement. You agree that this Agreement and all incorporated agreements may be automatically assigned by Lyft, in our sole discretion by providing notice to you. You may not assign this Agreement without Lyft's prior written approval. Any purported assignment by you ir violation of this Section 21 shall be void. Except as explicitly stated otherwise, any notices to

Lyft shall be given by certified mail, postage prepaid and return receipt requested to Lyft, Inc., 548 Market Street, #68514 San Francisco, CA 94104. Any notices to you shall be provided to you through the Lyft Platform or given to you via the email address or physical address you provide to Lyft during the registration process. Headings are for reference purposes only and in no way define, limit, construe or describe the scope or extent of such section. The words "include", "includes" and "including" are deemed to be followed by the words "without limitation". A party's failure to act with respect to a breach by the other party does not constitute a waiver of the party's right to act with respect to subsequent or similar breaches, any such waiver shall be in writing. This Agreement sets forth the entire understanding and agreement between you and Lyft with respect to the subject matter hereof and supersedes all previous understandings and agreements between the parties, whether oral or written.

If you have any questions regarding the Lyft Platform, Lyft Services, or Rideshare Services, please contact us through our Help Center.

# Lyft Privacy Policy

Last Updated: December 12, 2022

At Lyft our mission is to improve people's lives with the world's best transportation, providing a platform to help you get from point A to point B and enjoy the ride. To do that, we need to collect, use, and share some of your personal information. This Privacy Policy is meant to help you understand how Lyft does that and how to exercise the choices and rights you have in your information.

Lyft's privacy homepage provides additional information about our commitment to respecting your personal information, including ways for you to access and delete that information.

# The Scope of This Policy

This policy applies to all Lyft users, including Riders and Drivers (including Driver applicants), and to all Lyft platforms and services, including our applications, websites, technology, facilities, and other services (collectively, the "Lyft Platform"). This policy applies only to personal information, not to aggregate information or information that does not identify you. Please remember that your use of the Lyft Platform is also subject to our Terms of Service. Certain elements of the Lyft Platform may operate under separate or additional terms or practices different from or in addition to those described in this policy; in those cases, you will be provided separate notice and information relevant to your use of those parts of the Lyft Platform.

**For users in California, Colorado, Connecticut, Utah, and Virginia:** Additional information regarding Lyft's privacy practices under state-specific privacy laws is available here.

# The Information We Collect

When you use the Lyft Platform, we collect the information you provide, usage information, and information about your device. We also collect information about you from other sources like service providers, and optional programs in which you participate, which we may combine with other information we have about you. Here are the types of information we collect about you:

## A. Information You Provide to Us

**Account Registration.** When you create an account with Lyft, we collect the information you provide us, such as your name, email address, phone number, birth date, profile photo, and payment information. You may choose to share additional info with us for your Rider profile, like saved addresses (e.g., home or work), and set up other preferences (such as your preferred pronouns). We may ask that you provide additional information related to the identity of your account, such as documents related to identification (e.g., driver's license), a profile picture, or "selfie" imagery. If you choose to engage in additional offerings on the Lyft Platform (e.g., services for your vehicle or linking to other accounts like travel rewards), you may provide us additional information relevant to those offerings.

**Driver Information.** If you apply to be a Driver, we will collect the information you provide in your application, including your name, email address, phone number, birth date, profile photo, physical address, government identification number (such as social security number), driver's license information, vehicle information, and car insurance information. We collect the payment information you provide us, including your bank routing numbers, and tax information. Depending on where you want to drive, we may also ask for additional business license or permit information or other information to manage driving and programs relevant to that location. We may need additional information from you at some point after you become a Driver, including information to confirm your identity (like "selfie" imagery).

**Ratings and Feedback.** When you rate and provide feedback about the Lyft Platform (including about Riders or Drivers), we collect all of the information you provide in your feedback.

**Communications.** When you contact us or we contact you, including through surveys or research projects, we collect any information that you provide, including the contents of the messages or attachments you send us.

## B. Information We Collect When You Use the Lyft Platform

**Location Information.** Great rides start with an easy and accurate pickup. The Lyft Platform collects location information (including GPS and WiFi data, IP address, and Bluetooth data) differently depending on your Lyft app settings and device permissions as well as whether you are using the platform as a Rider or Driver:

- Riders: We collect your device's precise location when you open and use the Lyft app, including while the app is running in the background from the time you request a ride until it ends. Lyft also tracks the precise location of scooters and e-bikes at all times.
- Drivers: We collect your device's precise location when you open and use the app, including while the app is running in the background. We also collect precise location for a limited time after you exit driver mode in order to detect ride incidents, and continue collecting it until a reported or detected incident is no longer active. If you choose to install a Lyft Platform device in or on your vehicle (e.g., a Lyft dashboard device or tablet), that device may collect precise location information when turned on.

**Usage Information.** We collect information about your use of the Lyft Platform, including ride information like the date, time, destination, distance, route, payment, and whether you used a promotional or referral code. Our e-bikes and scooters may collect mobile sensor data, such as speed, direction, height, acceleration, deceleration, and other technical data. We also collect information about your interactions with the Lyft Platform like our apps and websites, including the pages and content you view and the dates and times of your use. We may also infer information from your use of or information you provide us in your interactions with the Lyft Platform.

**Device Information.** We collect information about the devices you use to access the Lyft Platform, including device model, IP address, type of browser, version of operating system, identity of carrier and manufacturer, radio type (such as 4G), preferences and settings (such as preferred language), application installations, device identifiers, advertising identifiers, and push notification tokens. If you are a Driver, we also collect mobile sensor data from your device (such as speed, direction, height, acceleration, deceleration, and other technical data). If you have installed a Lyft Platform device in your vehicle (e.g., a Lyft dashboard device or tablet), that device may similarly collect sensor data and other information like location, as described when you choose and set up such devices.

**Communications Between Riders and Drivers.** We work with a third party to facilitate phone calls and text messages between Riders and Drivers without sharing either party's actual phone number with the other. But while we use a third party to provide the communication service, we collect information about these communications and Lyft Platform chat communications, including the participants' phone numbers, the date and time, and the contents of SMS and chat messages. For security purposes, we may also monitor or record the contents of phone calls made through the Lyft Platform, but we will always let you know we are about to do so before the call begins.

**Address Book Contacts.** You may set your device permissions to grant Lyft access to your contact lists and direct Lyft to access your contact list, for example to help you refer friends to Lyft. If you choose to do this, we will access the names and contact information of the people in your address book.

**Calendar Information.** You may set your device permissions or otherwise grant Lyft access to your chosen calendar and direct Lyft to access calendar information, for example to help you get alerts to order a ride for your upcoming trip. If you choose to do this, we will access and store information available in your calendar to use in providing you these optional features.

**Cookies, Analytics, and Third-Party Technologies.** We collect information through the use of "cookies", tracking pixels, data analytics tools like Google Analytics, SDKs, and other third-party technologies to understand how you navigate through the Lyft Platform and interact with Lyft advertisements, to make your Lyft experience safer, to learn what content is popular, to improve your site experience, to serve you better ads on other sites, and to save your preferences. Cookies are small text files that web servers place on your device; they are designed to store basic information and to help websites and apps recognize your browser. We may use both session cookies and persistent cookies. A session cookie disappears after you close your browser. A persistent cookie remains after you close your browser and may be accessed every time you use the Lyft Platform.

## C. Information We Collect From Other Sources

**Service Providers and Other Parties.** Service providers and other parties provide us with information needed for core aspects of the Lyft Platform, as well as for additional services, programs, loyalty benefits, and promotions that can enhance your Lyft experience. These service providers and other parties include background check providers, insurance partners, financial service providers, marketing providers, and other businesses. We obtain the following information about you from these parties:

- Information to make the Lyft Platform safer, like background check information or identity verification information;
- Information about your participation in third-party programs that provide things like insurance coverage and financial instruments, such as insurance, payment, transaction, and fraud detection information;

- Information to operationalize loyalty and promotional/marketing programs or applications, services, or features you choose to connect or link to your Lyft account, such as information about your use of such programs, applications, services, or features; and
- Information about you provided by specific services, such as vehicle, demographic and market segment information.

**Enterprise and Delivery Programs.** If you use Lyft through your employer or other organization that participates in one of our Lyft Business enterprise programs, we will collect information about you from those parties, such as your name and contact information. If an organization has utilized Lyft to fulfill a delivery to you, we may receive information like your name and delivery address from the organization in order to fulfill the delivery.

**Concierge Service.** Sometimes another business or entity may order you a Lyft ride. If an organization has ordered a ride for you using our Concierge service, they will provide us your contact information and the pickup and drop-off location of your ride.

**Referral Programs.** Friends help friends use the Lyft Platform. If someone refers you to Lyft, we will collect information about you from that referral including your name and contact information.

**Other Users and Sources.** Other users or public or third-party sources such as law enforcement, insurers, media, or pedestrians may provide us information about you, for example as part of an investigation into an incident or to provide you support.

# How We Use Your Information

We use your personal information to:

- Provide the Lyft Platform;
- Maintain the security and safety of the Lyft Platform and its users;
- Build and maintain the Lyft community;
- Provide customer support;
- Improve the Lyft Platform; and
- Respond to legal proceedings and obligations.

**Providing the Lyft Platform.** We use your personal information to provide an intuitive, useful, efficient, and worthwhile experience on our platform. To do this, we use your personal information to:

- Verify your identity and maintain your account, settings, and preferences;
- Connect you to your rides and track their progress;
- Provide various Lyft Platform offerings to you, such as vehicles services and third party promotional advertisements that may be personalized to you;
- Calculate prices and process payments;

- Allow Riders and Drivers to connect regarding their ride and to choose to share their location with others;
- Communicate with you about your use of the Lyft Platform and experience;
- Collect feedback regarding your experience;
- Facilitate additional services and programs with third parties; and
- Operate contests, sweepstakes, and other promotions.

**Maintaining the Security and Safety of the Lyft Platform and its Users.** Providing you a secure and safe experience drives our platform, both on the road and on our apps. To do this, we use your personal information to:

- Authenticate and verify users;
- Verify that Drivers and their vehicles meet safety requirements;
- Investigate and resolve incidents, accidents, and insurance claims;
- Encourage safe driving behavior and avoid unsafe activities;
- Find and prevent fraud; and
- Block and remove unsafe or fraudulent users from the Lyft Platform.

**Building and Maintaining the Lyft Community.** Lyft works to be a positive part of the community. We use your personal information to:

- Communicate with you about events, promotions, elections, and campaigns;
- Personalize and provide content, experiences, communications, and targeted advertising to promote and grow the Lyft Platform; and
- Help facilitate donations you choose to make through the Lyft Platform.

**Providing Customer Support.** We work hard to provide the best experience possible, including supporting you when you need it. To do this, we use your personal information to:

- Investigate and assist you in resolving questions or issues you have regarding the Lyft Platform; and
- Provide you support or respond to you.

**Improving the Lyft Platform.** We are always working to improve your experience and provide you with new and helpful features. To do this, we use your personal information to:

- Perform research, testing, and analysis;
- Develop new products, features, partnerships, and services;
- Prevent, find, and resolve software or hardware bugs and issues; and
- Monitor and improve our operations and processes, including security practices, algorithms, and other modeling.

**Responding to Legal Proceedings and Requirements.** Sometimes the law, government entities, or other regulatory bodies impose demands and obligations on us with respect to the services we seek to provide. In such a circumstance, we may use your personal information to respond to those demands or obligations.

# How We Share Your Information

We do not sell your personal information to third parties for money -- no one can buy the personal information we collect from and about you and we do not act as a data broker. However, we may need to share your personal information with other users, third parties, and service providers to make the Lyft Platform work and to deliver relevant personalized ads to you on and off the Lyft Platform. Some of these disclosures may constitute "sharing" or "selling of personal information under certain U.S. state privacy laws, which we describe in more detail <u>here</u>. This section otherwise explains when and why we share your information.

## A. Sharing Between Lyft Users
**Riders and Drivers.**

*Rider information shared with Driver:* As part of surfacing the ride request and enabling the ride, we share with the Driver the Rider's pickup and destination, location, name, profile photo, rating, Rider statistics (like approximate number of rides and years as a Rider), and information the Rider includes in their Rider profile (like preferred pronouns) as well as any additional stops the Rider inputs into the Lyft app. Once the ride is finished, we also eventually share the Rider's rating and feedback with the Driver. (We remove the Rider's identity associated with ratings and feedback when we share it with Drivers, but a Driver may be able to identify the Rider that provided the rating or feedback.)

*Driver information shared with Rider:* Upon a Driver accepting a requested ride, we will share with the Rider the Driver's name, profile photo, preferred pronouns, rating, real-time location, and the vehicle make, model, color, and license plate, as well as other information in the Driver's Lyft profile, such as information Drivers choose to add (like country flag and why you drive) and Driver statistics (like approximate number of rides and years as a Driver).

Although we help Riders and Drivers communicate with one another to arrange a pickup, we do not share your actual phone number or other contact information with other users when enabling this. If you report a lost or found item to us, we will seek to connect you with the relevant Rider or Driver, which may include sharing actual contact information with your consent.

**Shared Ride Riders.** When Riders use a Lyft Shared ride, we share each Rider's name and profile picture to ensure safety. Riders may also see each other's pickup and drop-off locations as part of knowing the route while sharing the ride.

**Rides Requested or Paid For by Others.** Some rides you take may be requested or paid for by others. If you take one of those rides using your Lyft Business Profile account; a pass, code or coupon; a subsidized program (e.g., transit or government); a corporate credit card linked to

another account; or another user or entity otherwise requests or pays for a ride (or portion of a ride) for you, we may share some or all of your ride details with that other party, including your identity (e.g., name, phone number), the date, time, charge, rating given, region of trip, and pick up and drop off location of your ride.

**Linked Accounts and Sharing Upon Your Request.** If you use the Lyft Platform as part of a Lyft Family account linked with others or if you direct us to share your information with trusted contacts, we will then share with those parties information about your use of the Lyft Platform, such as the live location of your ride.

**Referral Programs.** If you refer someone to the Lyft Platform, we will let them know that you generated the referral. If another user referred you, we may share information about your use of the Lyft Platform with that user. For example, a referral source may receive a bonus when you join the Lyft Platform or complete a certain number of rides and would receive such information.

## B. Sharing With Service Providers to Provide the Lyft Platform, and Other Parties

Depending on whether you're a Rider or a Driver, Lyft may share the following categories of your personal information to provide you with a variety of the Lyft Platform's features and services:

- Personal identifiers, such as your name, address, email address, phone number, date of birth, government identification number (such as social security number), driver's license information, vehicle information, and car insurance information;
- Financial information, such as bank routing numbers, tax information, and any other payment information you provide us;
- Commercial information, such as ride information, Driver/Rider statistics and feedback, and Driver/Rider transaction history;
- Internet or other electronic network activity information, such as your IP address, type of browser, version of operating system, carrier and/or manufacturer, device identifiers, and mobile advertising identifiers;
- Location data; and
- This and other information you may direct us to share with other parties, such as when you choose to link your Lyft account with a separate travel rewards program or when you choose to engage with an offering from another company through the Lyft Platform, such as a vehicle service.

We disclose those categories of personal information to these other parties and service providers to fulfill the following purposes:

- Maintaining and servicing your Lyft account;
- Processing or fulfilling rides or other offerings of the Lyft Platform;
- Providing you customer service;
- Processing transactions and payments;
- Processing Driver applications;
- Verifying the identity of users;
- Detecting and preventing fraud and unsafe activity;

- Processing insurance claims;
- Providing Driver loyalty and promotional programs;
- Providing marketing and advertising services to Lyft, including to provide targeted and cross-contextual behavioral advertising personalized to you;
- Providing financing;
- Providing requested emergency services;
- Providing analytics services to Lyft; and
- Undertaking research to develop and improve the Lyft Platform.

## C. For Legal Reasons and to Protect the Lyft Platform

We may share your personal information in response to a legal obligation, or if we have determined that sharing your personal information is reasonably necessary or appropriate to:

- Comply with any applicable federal, state, or local law or regulation, civil, criminal or regulatory inquiry, investigation or legal process, enforceable governmental request, or requirement as condition to operate (e.g., operating permit, license or agreement);
- Respond to legal process (such as a search warrant, subpoena, summons, or court order);
- Enforce our Terms of Service;
- Cooperate with law enforcement agencies concerning conduct or activity that we reasonably and in good faith believe may violate federal, state, or local law; or
- Exercise or defend legal claims, protect against harm to our rights, property, interests, or safety or the rights, property, interests, or safety of you, third parties, or the public as required or permitted by law.

## D. In Connection with Sale or Merger

We may share your personal information while negotiating or in relation to a change of corporate control such as a restructuring, merger, or sale of our assets.

## E. Upon Your Further Direction

With your permission or upon your direction, we may disclose your personal information to interact with a third party or for other purposes.

# How We Store and Protect Your Information

We retain your information for as long as necessary to provide you and our other users the Lyft Platform. This means we keep your profile information for as long as you maintain an account. We retain transactional information such as rides and payments for at least seven years to ensure we can perform legitimate business functions, such as accounting for tax obligations. We also retain your information as necessary to comply with our legal obligations, resolve disputes and enforce our terms and policies. If you request account deletion, we will delete your information as set forth in the "Deleting Your Account" section below.

We take reasonable and appropriate measures designed to protect your personal information. But no security measures can be 100% effective, and we cannot guarantee the security of you information, including against unauthorized intrusions or acts by third parties.

# Your Rights And Choices Regarding Your Data

As explained more below and on our privacy homepage, Lyft provides ways for you to access and delete your personal information as well as exercise applicable data rights that give you certain control over your personal information.

### A. All Users
**Email Subscriptions.** You can always unsubscribe from our commercial or promotional emails by clicking unsubscribe in those messages. We will still send you transactional and relational emails about your use of the Lyft Platform.

**Text Messages.** You can opt out of receiving commercial or promotional text messages by texting the word END to 46080 from the mobile device receiving the messages. You may also opt out of receiving all texts from Lyft (including transactional or relational messages) by texting the word STOPALL to 46080 from the mobile device receiving the messages. Note that opting out of receiving all texts may impact your use of the Lyft Platform. Drivers can also opt out of driver-specific messages by texting STOP in response to a driver SMS. To re-enable texts you can text START in response to an unsubscribe confirmation SMS.

**Push Notifications.** You can opt out of receiving push notifications through your device settings. Please note that opting out of receiving push notifications may impact your use of the Lyft Platform (such as receiving a notification that your ride has arrived).

**Profile Information.** You can review and edit certain account information you have chosen to add to your profile by logging in to your account settings and profile.

**Location Information.** You can prevent your device from sharing location information through your device's system settings. But if you do, this may impact Lyft's ability to provide you our full range of features and services. You may also control some elements of sharing your location with Lyft in your Lyft account settings.

**Cookie Tracking.** You can modify your cookie settings on your browser. You may also further control your cookie setting here.

**Accessing Your Information.** If you would like to access your personal information, please visit our privacy homepage. You can also see information we have about you by logging into your account and viewing things like your profile, settings, and preferences (like preferred pronouns and address shortcuts such as home and work), ride history, or payment information. In addition, you may have some information included in things we have sent to you, such as ride receipts.

**Deleting Your Account.** If you would like to delete your Lyft account, please visit our privacy homepage. In some cases, we will be unable to delete your account, such as if there is an issue with your account related to trust, safety, or fraud. When we delete your account, we may retain certain information for legitimate business purposes or to comply with legal or regulatory obligations. For example, we may retain your information to resolve open insurance claims, or we may be obligated to retain your information as part of an open legal claim. When we retain such data, we do so in ways designed to prevent its use for other purposes.

## B. State-Specific Rights

Some states such as California, Colorado, Connecticut, Utah, and Virginia provide specific rights to residents of the state regarding personal information. To see more information about these rights and how to exercise them, see here.

# Children's Data

Lyft is not directed to children, and we don't knowingly collect personal information from children under the age of 13. If we find out that a child under 13 has given us personal information, we will take steps to delete that information. If you believe that a child under the age of 13 has given us personal information, please contact us at our Help Center.

# Links to Third-Party Websites

The Lyft Platform may contain links or references to third-party websites, products, or services. Those third parties may have privacy policies that differ from ours. We are not responsible for those third parties and their websites, products or services, and we recommend that you review their policies. Please contact those parties directly if you have any questions about their privacy policies.

# Changes to This Privacy Policy

We may update this policy from time to time as the Lyft Platform changes and privacy law evolves. If we update it, we will do so online, and if we make material changes, we will let you know through the Lyft Platform or by some other method of communication like email. When you use Lyft, you are agreeing to the most recent terms of this policy.

# Contact Us

If you have any questions or concerns about your privacy or anything in this policy, including if you need to access this policy in an alternative format, we encourage you to contact us.



**DRIVER**

**RIDER**

**LYFT**

Lyft driver app

Lyft rider app

Ride on web

Terms    Privacy    Accessibility Statement    Your Privacy Choices    © 2023 Lyft, Inc.
CPUC ID No. TCP0032513-P

# EXHIBIT G

SHOP     CART     CHECKOUT

**HUTTRONICS**

Log In     



# LED Signs

→ SHOP NOW

# RIDESHARE & DELIVERY

## BRIGHT. WIRELESS. RECHARGEABLE.

❮









❯

**Uber Blue LED Sign**
$36.99

**Lyft LED Sign**
$36.99

**Lyft LED Sign – White Outline**
$36.99

**Uber Blue/Lyft LED Sign – White Outline**
$36.99

● ● ● ●



# Features

If you want to make your vehicle stand out to customers, a Huttronics sign is a must-have addition to your car to let passengers know you have arrived.

- Ultra-Bright LED lights make your car visible
- Perfect size to be noticeable to customers
- No messy wires, powered by a built-in battery
- Rechargeable lithium battery lasts up to 10 hours
- Removeable sign with adhesive holder
- Extremely easy installation

SHOP NOW



**Free Shipping on US Orders**

# Get Your Sign Today

Huttronics is your go-to provider of rideshare and delivery LED signs and accessories for a gig economy driver. We are specialized in creating top-quality light signs, and our customers rate us with an average rating of 4.9/5 based on 471 customer reviews. Get your sign today and enjoy free shipping to the United States

→ SHOP NOW



If you want to make your vehicle stand out to customers, a
passengers know you have arrived.

- Ultra-Bright LED lights make your car visible
- Perfect size to be noticeable to customers
- No messy wires, powered by a built-in battery
- Rechargeable lithium battery lasts up to 10 hours
- Removeable sign with adhesive holder
- Extremely easy installation

SHOP NOW

## Free Shipping on US Orders

# Get Your Sign Today

Huttronics is your go-to provider of rideshare and delivery LED signs and accessories for a gig economy driver. We
are specialized in creating top-quality light signs, and our customers rate us with an average rating of 4.9/5
based on 471 customer reviews. Get your sign today and enjoy free shipping to the United States

→ SHOP NOW

### Categories

All Products

Rideshare Led Signs

Delivery LED Signs

Accessories

### Company

About Us

Contact Us

### Resources

FAQ

Customer Reviews

My account

### Policies

Shipping Policy

Returns & Refund Policy

Privacy Policy

Terms of Service

Copyright © 2023 HUTTRONICS

FREE SHIPPING ON US ORDERS

SHOP    CART    CHECKOUT

**HUTTRONICS**

Log In







⭐⭐⭐⭐⭐ 49 reviews

# Lyft LED Sign – White Outline



## $36.99

If you want to make your vehicle stand out to customers, a Lyft sign is a must-have addition to your car to let passengers know you have arrived.

### Features

- Ultra Bright LED lights make your car visible
- Perfect size to be noticeable to customers
- No messy wires, powered by a built-in battery
- Rechargeable lithium battery lasts up to 10 hours
- Removable sign with adhesive holder
- Easy installation

**Availability:** In stock

[ − ] 1 [ + ]

**Buy now** ▶

— OR —

**ADD TO CART**

Free shipping on US Orders!

✓ Secure Payments
✓ 30 Day Money Back Guarantee
✓ No Hassle Refunds


Guaranteed Safe Checkout

PayPal Pay in 4 interest-free payments of $9.25. Learn more


Pay now or pay later

## Customer Reviews

⭐⭐⭐⭐⭐ ▇▇▇▇▇ 45

# Customer Reviews

 **4.92 out of 5**
Based on 49 reviews
collected by Judge.me

| | | |
|---|---|---|
| ★★★★★ | | 45 |
| ★★★★☆ | | 4 |
| ★★★☆☆ | | 0 |
| ★★☆☆☆ | | 0 |
| ★☆☆☆☆ | | 0 |



Verified by Judge.me

---

Most Recent

★★★★★                                                                                      12/03/2022

Carlos Cotto  `Verified`

Lyft LED Sign - White Outline

---

★★★★★                                                                                      11/18/2022

nidal ramadan  `Verified`

**Lyft LED sign**

Love it just the right size and looks great at night!

---

★★★★☆                                                                                      11/10/2022

Geno Monroe  `Verified`

**LYFT LED SIGN**

The sign does exactly as it said it would.

---

★★★★★                                                                                      10/25/2022

Gilbert Munoz  `Verified`

Great item looks really good and professional

---

★★★★★                                                                                      10/07/2022

Omar  `Verified`

Great

---

**1**   2   3   ›   »

## You may also like...

   

## You may also like...



★★★★★ 224 reviews
**Uber Lyft LED Sign**
$36.99



★★★★★ 113 reviews
**Uber LED Sign**
$36.99



★★★★★ 58 reviews
**Uber Blue/Lyft LED Sign**
$36.99



OUT OF STOCK
★★★★★ 50 reviews
**Lyft LED Sign**
$36.99

## Related products



★★★★★ 30 reviews
**Uber Lyft LED Sign – Uppercase**
$36.99



★★★★★ 44 reviews
**Uber Blue LED Sign**
$36.99



★★★★★ 52 reviews
**DoorDash LED Sign**
$36.99



★★★★★ 32 reviews
**Uber Eats LED Sign**
$36.99

### Categories

All Products
Rideshare Led Signs
Delivery LED Signs
Accessories

### Company

About Us
Contact Us

### Resources

FAQ
Customer Reviews
My account

### Policies

Shipping Policy
Returns & Refund Policy
Privacy Policy
Terms of Service

Copyright © 2023 HUTTRONICS

Document title: Lyft LED Sign - White Outline - HUTTRONICS
Capture URL: https://huttronics.com/products/lyft-led-light-sign/
Capture timestamp (UTC): Tue, 31 Jan 2023 16:47:46 GMT

FREE SHIPPING ON US ORDERS

SHOP     CART     CHECKOUT

**HUTTRONICS**

Log In

  0

Home » Shop » Lyft LED Sign



 

 

★★★★★ 50 reviews

< >

# Lyft LED Sign

## $36.99

If you want to make your vehicle stand out to customers, a Lyft sign is a must-have addition to your car to let passengers know you have arrived.

### Features

- Ultra Bright LED lights make your car visible
- Perfect size to be noticeable to customers
- No messy wires, powered by a built-in battery
- Rechargeable lithium battery lasts up to 10 hours
- Removable sign with adhesive holder
- Easy installation

Out of stock

**Free shipping on US Orders!**

✓ Secure Payments
✓ 30 Day Money Back Guarantee
✓ No Hassle Refunds

Guaranteed Safe Checkout

     

## Customer Reviews

★★★★★ 4.94 out of 5
Based on 50 reviews
collected by Judge.me

| | | |
|---|---|---|
| ★★★★★ | | 47 |
| ★★★★☆ | | 3 |
| ★★★☆☆ | | 0 |
| ★★☆☆☆ | | 0 |
| ★☆☆☆☆ | | 0 |

Most Recent

★★★★★                                                                12/30/2022

JUAN HARDIN  Verified

Great!

Most Recent

★★★★★                                                                          12/30/2022



JUAN HARDIN  `Verified`

Great!

★★★★★                                                                          12/25/2022

Robert Johnson  `Verified`

Lyft LED Sign

★★★★★                                                                          12/02/2022

Eric Biber  `Verified`

**Pretty cool**

This is exactly what I needed. It is bright- looks totally legit- and you can remove it easily when you are not driving for Lyft.

★★★★★                                                                          11/25/2022

Marion Lynn Mosher  `Verified`

**Lyft sign**

They work perfectly and are easy to install, recharge in no time.

★★★★★                                                                          11/04/2022

Sammy Holaso  `Verified`

**Lfty**

Great Lfty signs. It is visible with dark tinting windows

**1**   2   3   ›   »

## You may also like...





★★★★★ 58 reviews        ★★★★★ 224 reviews        ★★★★★ 49 reviews        ★★★★★ 113 reviews
**Uber Blue/Lyft LED Sign**   **Uber Lyft LED Sign**      **Lyft LED Sign – White Outline**   **Uber LED Sign**
$36.99                      $36.99                      $36.99                      $36.99

## Related products







## You may also like...



★★★★★ 58 reviews
**Uber Blue/Lyft LED Sign**
$36.99



★★★★★ 224 reviews
**Uber Lyft LED Sign**
$36.99



★★★★★ 49 reviews
**Lyft LED Sign – White Outline**
$36.99



★★★★★ 113 reviews
**Uber LED Sign**
$36.99

## Related products



Sale!
OUT OF STOCK
**~Car Headrest Backseat 3-in-1 Fast Power Charging Station with Retractable Cords**
~~$36.99~~ $32.99



★★★★★ 30 reviews
**Uber Lyft LED Sign – Uppercase**
$36.99



★★★★★ 7 reviews
**Instacart LED Sign**
$36.99



★★★★★ 44 reviews
**Uber Blue LED Sign**
$36.99

### Categories

All Products
Rideshare Led Signs
Delivery LED Signs
Accessories

### Company

About Us
Contact Us

### Resources

FAQ
Customer Reviews
My account

### Policies

Shipping Policy
Returns & Refund Policy
Privacy Policy
Terms of Service

Copyright © 2023 HUTTRONICS

FREE SHIPPING ON US ORDERS

SHOP    CART    CHECKOUT

**HUTTRONICS**

Log In

  0

---

Home » Shop » Uber LED Sign



   



★★★★★ 113 reviews

< >

# Uber LED Sign

## $36.99

If you want to make your vehicle stand out to customers, an Uber sign is a must-have addition to your car to let passengers know you have arrived.

### Features

- Ultra Bright LED lights make your car visible
- Perfect size to be noticeable to customers
- No messy wires, powered by a built-in battery
- Rechargeable lithium battery lasts up to 10 hours
- Removable sign with adhesive holder
- Easy installation

**Availability:** In stock

− 1 +


Buy now ▶

— OR —

ADD TO CART

**Free shipping on US Orders!**

✔ Secure Payments
✔ 30 Day Money Back Guarantee
✔ No Hassle Refunds

Guaranteed Safe Checkout

VISA   MasterCard   AMERICAN EXPRESS   DISCOVER   PayPal   Apple Pay

PayPal Pay in 4 interest-free payments of $9.25. Learn more



Pay now or pay later

---

# Customer Reviews

★★★★★ _____ 102

## Customer Reviews



★★★★★ 4.87 out of 5
Based on 113 reviews
collected by Judge.me

★★★★★ ▇▇▇▇▇ 102
★★★★☆ ▏ 7
★★★☆☆ ▏ 4
★★☆☆☆ 0
★☆☆☆☆ 0

BRONZE
TRANSPARENCY
3
89.6
Verified by Judge.me

Most Recent

★★★★☆                                                           12/31/2022

Michael Peeples  Verified

Uber LED Sign

★★★★★                                                           12/30/2022

MICHAEL BARTHOLOMEW  Verified

**nice**

nice

★★★★★                                                           12/12/2022

Phillip Pahl  Verified

**Well worth every penny.**

I love this led sign it is professional looking and lights up brightly. Do not settle with the poorly made led signs. You won't be disappointed.

★★★★★                                                           12/12/2022

Quinn Olson  Verified

**Just perfect!**

Really helps riders find me.

★★★★★                                                           12/07/2022

Paul M  Verified

**Excellent product**

I couldn't be happy with the product I received in the mail. Looking forward to buying another one. Thank you!

**1**   2   3   ›   »

## You may also like...

## You may also like...



★ ★ ★ ★ ★ 32 reviews

**Uber Eats LED Sign**

$36.99



★ ★ ★ ★ ★ 49 reviews

**Lyft LED Sign – White Outline**

$36.99



★ ★ ★ ★ ★ 44 reviews

**Uber Blue LED Sign**

$36.99



★ ★ ★ ★ ★ 224 reviews

**Uber Lyft LED Sign**

$36.99

## Related products



★ ★ ★ ★ ★ 7 reviews

**Instacart LED Sign**

$36.99



★ ★ ★ ★ ★ 10 reviews

**Grubhub LED Sign**

$36.99



★ ★ ★ ★ ★ 30 reviews

**Uber Lyft LED Sign – Uppercase**

$36.99



★ ★ ★ ★ ★ 30 reviews

**Uber Blue/Lyft LED Sign – White Outline**

$36.99

**Categories**

All Products

Rideshare Led Signs

Delivery LED Signs

Accessories

**Company**

About Us

Contact Us

**Resources**

FAQ

Customer Reviews

My account

**Policies**

Shipping Policy

Returns & Refund Policy

Privacy Policy

Terms of Service

Copyright © 2023 HUTTRONICS

Document title: Uber LED Sign - HUTTRONICS
Capture URL: https://huttronics.com/products/uber-led-light-sign/
Capture timestamp (UTC): Tue, 31 Jan 2023 16:41:59 GMT

## You may also like...



★★★★★ 32 reviews

**Uber Eats LED Sign**
$36.99



★★★★★ 49 reviews

**Lyft LED Sign – White Outline**
$36.99



★★★★★ 44 reviews

**Uber Blue LED Sign**
$36.99



★★★★★ 224 reviews

**Uber Lyft LED Sign**
$36.99

## Related products



★★★★★ 7 reviews

**Instacart LED Sign**
$36.99



★★★★★ 10 reviews

**Grubhub LED Sign**
$36.99



★★★★★ 30 reviews

**Uber Lyft LED Sign – Uppercase**
$36.99



★★★★★ 30 reviews

**Uber Blue/Lyft LED Sign – White Outline**
$36.99

**Categories**

All Products

Rideshare Led Signs

Delivery LED Signs

Accessories

**Company**

About Us

Contact Us

**Resources**

FAQ

Customer Reviews

My account

**Policies**

Shipping Policy

Returns & Refund Policy

Privacy Policy

Terms of Service

Copyright © 2023 HUTTRONICS

SHOP    CART    CHECKOUT

**HUTTRONICS**

Log In    0



   



Home » Shop » Uber Blue LED Sign

★★★★★ 44 reviews

< >

# Uber Blue LED Sign

## $36.99

If you want to make your vehicle stand out to customers, an Uber sign is a must-have addition to your car to let passengers know you have arrived.

### Features

- Ultra Bright LED lights make your car visible
- Perfect size to be noticeable to customers
- No messy wires, powered by a built-in battery
- Rechargeable lithium battery lasts up to 10 hours
- Removable sign with adhesive holder
- Easy installation

**Availability:** In stock

−  1  +

Buy now ▸

— OR —

ADD TO CART

Free shipping on US Orders!

✓ Secure Payments
✓ 30 Day Money Back Guarantee
✓ No Hassle Refunds

Guaranteed Safe Checkout



PayPal Pay in 4 interest-free payments of $9.25. Learn more

PayPal    venmo

Pay now or pay later

## Customer Reviews

★★★★★    41

Pay now or pay later

# Customer Reviews

⭐⭐⭐⭐⭐ **4.93 out of 5**
Based on 44 reviews
collected by Judge.me

| | | |
|---|---|---|
| ⭐⭐⭐⭐⭐ | | 41 |
| ⭐⭐⭐⭐☆ | | 3 |
| ⭐⭐⭐☆☆ | | 0 |
| ⭐⭐☆☆☆ | | 0 |
| ⭐☆☆☆☆ | | 0 |

Most Recent

⭐⭐⭐⭐⭐                                                                       01/03/2023

Nathaniel Chavez [Verified]

**Uber sign**

Definitely looks way better than the cheaper uber lights and not as bliding for the me as a driver. I bought 2 of them, very clean looking that battery life is superior on it

⭐⭐⭐⭐⭐                                                                       12/21/2022

Paul Vanover [Verified]

**Blue Uber Light**

This is my second light and I love them both. They are bright, highly visible, easy to install, easy to operate, easy to charge and the battery life is excellent. I am very satisfied with this product. Btw, rideshare drivers and required by state law to display illuminated signage when driving at night in both North and South Carolina. So, this sign also makes me legal.

⭐⭐⭐⭐⭐                                                                       12/11/2022

Vernon [Verified]

**Excellent uber light**

Very professional looking . Very bright and battery is long lasting. I just ordered a second led light for rear window.

⭐⭐⭐⭐⭐                                                                       12/01/2022

Shawn Pace [Verified]

I like them

⭐⭐⭐⭐⭐                                                                       12/01/2022

cristian alvarado bravo [Verified]

Uber Blue LED Sign

**1**   2   3   ›   »

## You may also like...






## You may also like...



★ ★ ★ ★ ★ 224 reviews
**Uber Lyft LED Sign**
$36.99



★ ★ ★ ★ ★ 113 reviews
**Uber LED Sign**
$36.99



★ ★ ★ ★ ★ 32 reviews
**Uber Eats LED Sign**
$36.99



★ ★ ★ ★ ★ 49 reviews
**Lyft LED Sign – White Outline**
$36.99

## Related products



★ ★ ★ ★ ★ 30 reviews
**Uber Blue/Lyft LED Sign – White Outline**
$36.99



★ ★ ★ ★ ★ 10 reviews
**Grubhub LED Sign**
$36.99



OUT OF STOCK

★ ★ ★ ★ ★ 50 reviews
**Lyft LED Sign**
$36.99



★ ★ ★ ★ ★ 52 reviews
**DoorDash LED Sign**
$36.99

**Categories**

All Products
Rideshare Led Signs
Delivery LED Signs
Accessories

**Company**

About Us
Contact Us

**Resources**

FAQ
Customer Reviews
My account

**Policies**

Shipping Policy
Returns & Refund Policy
Privacy Policy
Terms of Service

Copyright © 2023 HUTTRONICS

Document title: Uber Blue LED Sign - HUTTRONICS
Capture URL: https://huttronics.com/products/uber-blue-led-light-sign/
Capture timestamp (UTC): Tue, 31 Jan 2023 16:45:39 GMT

SHOP    CART    CHECKOUT

**HUTTRONICS**

Log In     

0

Home » Shop » Uber Eats LED Sign



   



★★★★★ 32 reviews



# Uber Eats LED Sign

**$36.99**

If you want to make your vehicle stand out to customers, an Uber Eats sign is a must-have addition to your car to let passengers know you have arrived.

**Features**

- Ultra Bright LED lights make your car visible
- Perfect size to be noticeable to customers
- No messy wires, powered by a built-in battery
- Rechargeable lithium battery lasts up to 10 hours
- Removable sign with adhesive holder
- Easy installation

**Availability:** In stock

−  1  +

**Buy now** ▶

— OR —

ADD TO CART

Free shipping on US Orders!

✔ Secure Payments
✔ 30 Day Money Back Guarantee
✔ No Hassle Refunds

Guaranteed Safe Checkout



PayPal Pay in 4 interest-free payments of $9.25. Learn more

PayPal

venmo

Pay now or pay later

## Customer Reviews

★★★★★                        29

# Customer Reviews

 4.81 out of 5
Based on 32 reviews
collected by Judge.me



| | |
|---|---|
| ★★★★★ | 29 |
| ★★★★☆ | 2 |
| ★★★☆☆ | 0 |
| ★★☆☆☆ | 0 |
| ★☆☆☆☆ | 1 |



90.9
Verified by Judge.me

---

Most Recent

★★★★★                                                               11/29/2022

Russell Richardson  Verified

**Uber eats light Is up sign**

Works great shows up perfectly on my front window love it

---

★★★★★                                                               10/08/2022

Roberto Vargas  Verified

**Loved it!**

Looks great. Now people will know who is in the driveway. I have leave at the door customers coming out to get their orders. Really works. Awesome!

---

★★★★★                                                               10/01/2022

Ike Santos  Verified

Uber Eats LED Sign

---

★★★★★                                                               09/25/2022

Marianly Mendez  Verified

Uber Eats LED Sign

---

★★★★★                                                               09/11/2022

AlphaRica B Kabigting  Verified

Uber Eats LED Sign

---

**1**  2  3  ›  »

## You may also like...

   

## You may also like…









★★★★★ 10 reviews

★★★★★ 12 reviews

★★★★★ 7 reviews

★★★★★ 52 reviews

**Grubhub LED Sign**
$36.99

**~Replacement Holder for LED Signs**
$12.99

**Instacart LED Sign**
$36.99

**DoorDash LED Sign**
$36.99

## Related products









★★★★★ 224 reviews

★★★★★ 30 reviews

★★★★★ 49 reviews

★★★★★ 113 reviews

**Uber Lyft LED Sign**
$36.99

**Uber Blue/Lyft LED Sign – White Outline**
$36.99

**Lyft LED Sign – White Outline**
$36.99

**Uber LED Sign**
$36.99

### Categories

All Products
Rideshare Led Signs
Delivery LED Signs
Accessories

### Company

About Us
Contact Us

### Resources

FAQ
Customer Reviews
My account

### Policies

Shipping Policy
Returns & Refund Policy
Privacy Policy
Terms of Service

Copyright © 2023 HUTTRONICS

Document title: Uber Eats LED Sign - HUTTRONICS
Capture URL: https://huttronics.com/products/uber-eats-led-light-sign/
Capture timestamp (UTC): Tue, 31 Jan 2023 16:48:56 GMT

*HUTTRONICS*

Home » Shop » Uber Lyft LED Sign – Uppercase



  

 

⭐⭐⭐⭐⭐ 30 reviews

# Uber Lyft LED Sign – Uppercase

## $36.99

If you are looking to make your vehicle stand out to customers, an Uber Lyft sign is a must-have addition to your car to let passengers know you have arrived.

### Features

- Ultra Bright LED lights make your car visible
- Perfect size to be noticeable to customers
- No messy wires, powered by built-in battery
- Rechargeable lithium battery lasts up to 10 hours
- Removable sign with adhesive holder
- Easy installation

**Availability:** In stock

[ − ] [ 1 ] [ + ]

**Buy now** ▶

— OR —

**ADD TO CART**

Free shipping on US Orders!

✔ Secure Payments
✔ 30 Day Money Back Guarantee
✔ No Hassle Refunds

Guaranteed Safe Checkout

VISA   MasterCard   AMERICAN EXPRESS   DISCOVER   PayPal   ⊗ Pay

PayPal Pay in 4 interest-free payments of $9.25. Learn more

**PayPal**

**venmo**

Pay now or pay later

## Customer Reviews




Pay now or pay later

# Customer Reviews

★★★★★ <u>4.97 out of 5</u>
Based on 30 reviews
<u>collected by Judge.me</u>

| | | |
|---|---|---|
| ★★★★★ | | 29 |
| ★★★★☆ | | 1 |
| ★★★☆☆ | | 0 |
| ★★☆☆☆ | | 0 |
| ★☆☆☆☆ | | 0 |

Most Recent

★★★★★ 11/09/2022

Mario Méndez **Verified**

Uber Lyft LED Sign - Uppercase

★★★★★ 10/25/2022

Customer **Verified**

Uber Lyft LED Sign - Uppercase

★★★★★ 08/22/2022

Zoltan Takacs **Verified**

**Great quality**

Happy with my purchase the item is durable and serves its purpose well done

★★★★★ 08/16/2022

Jose Amstutz **Verified**

👍

★★★★★ 08/01/2022

Mark Kirkwood **Verified**

Uber Lyft LED Sign - Uppercase

1  2  3  ❯  ❯❘

## You may also like...


★★★★★ 58 reviews


★★★★★ 30 reviews


★★★★★ 224 reviews


★★★★★ 113 reviews

## You may also like...



★★★★★ 58 reviews

**Uber Blue/Lyft LED Sign**

$36.99



★★★★★ 30 reviews

**Uber Blue/Lyft LED Sign – White Outline**

$36.99



★★★★★ 224 reviews

**Uber Lyft LED Sign**

$36.99



★★★★★ 113 reviews

**Uber LED Sign**

$36.99

## Related products



★★★★★ 12 reviews

**~Replacement Holder for LED Signs**

$12.99



OUT OF STOCK

**~Car Headrest Backseat 3-in-1 Fast Power Charging Station with Retractable Cords**

$36.99 $32.99



★★★★★ 52 reviews

**DoorDash LED Sign**

$36.99



★★★★★ 10 reviews

**Grubhub LED Sign**

$36.99

### Categories

All Products

Rideshare Led Signs

Delivery LED Signs

Accessories

### Company

About Us

Contact Us

### Resources

FAQ

Customer Reviews

My account

### Policies

Shipping Policy

Returns & Refund Policy

Privacy Policy

Terms of Service

Copyright © 2023 HUTTRONICS

SHOP   CART   CHECKOUT

**HUTTRONICS**

Log In

Home » Shop » Uber Blue/Lyft LED Sign – White Outline



   

⭐⭐⭐⭐⭐ 30 reviews

# Uber Blue/Lyft LED Sign – White Outline

## $36.99

If you want to make your vehicle stand out to customers, an Uber Lyft sign is a must-have addition to your car to let passengers know you have arrived.

### Features

- Ultra Bright LED lights make your car visible
- Perfect size to be noticeable to customers
- No messy wires, powered by a built-in battery
- Rechargeable lithium battery lasts up to 10 hours
- Removable sign with adhesive holder
- Easy installation

**Availability:** In stock

−  1  +

**Buy now** 🔵

— OR —

ADD TO CART

Free shipping on US Orders!

✓ Secure Payments
✓ 30 Day Money Back Guarantee
✓ No Hassle Refunds

Guaranteed Safe Checkout

VISA   MasterCard   AMERICAN EXPRESS   DISCOVER   PayPal   Apple Pay

PayPal Pay in 4 interest-free payments of $9.25. Learn more

PayPal   venmo

Pay now or pay later

## Customer Reviews



Pay now or pay later

## Customer Reviews

★★★★★ [4.93 out of 5](#)
Based on 30 reviews
[collected by Judge.me](#)

| | | |
|---|---|---|
| ★★★★★ | | 28 |
| ★★★★☆ | | 2 |
| ★★★☆☆ | | 0 |
| ★★☆☆☆ | | 0 |
| ★☆☆☆☆ | | 0 |

Most Recent



★★★★★                                                                 12/27/2022

Tom Cz  Verified

**Perfect Product**

A FULL 12 Hours of staying lit up before Finally running out of battery!

It was quick to charge and I was also able to plug it in the cig lighter to run off 12v 2A power!
Thanks for the fast shipping!

★★★★★                                                                 12/05/2022

mervin nunez  Verified

Uber Blue/Lyft LED Sign - White Outline

★★★★★                                                                 11/27/2022

Asra QADIR  Verified

Uber Blue/Lyft LED Sign - White Outline

★★★★★                                                                 11/25/2022

Henry Enríquez Hernández  Verified

**Perfecto**

Es útil y luce espectacular

★★★★★                                                                 11/24/2022

Jeffrey Sippy  Verified

**Lyft /Uber lighted window sign.**

I am pleased with my lighted car window sign. It looks nice and functions well. Thank you.

**1**   2   3   ›   »|

## You may also like...

## You may also like...



★★★★★ 224 reviews

**Uber Lyft LED Sign**
$36.99



★★★★★ 30 reviews

**Uber Lyft LED Sign –
Uppercase**
$36.99



★★★★★ 58 reviews

**Uber Blue/Lyft LED Sign**
$36.99



★★★★★ 113 reviews

**Uber LED Sign**
$36.99

## Related products



★★★★★ 32 reviews

**Uber Eats LED Sign**
$36.99



★★★★★ 49 reviews

**Lyft LED Sign – White Outline**
$36.99



★★★★★ 44 reviews

**Uber Blue LED Sign**
$36.99



★★★★★ 10 reviews

**Grubhub LED Sign**
$36.99

### Categories

All Products
Rideshare Led Signs
Delivery LED Signs
Accessories

### Company

About Us
Contact Us

### Resources

FAQ
Customer Reviews
My account

### Policies

Shipping Policy
Returns & Refund Policy
Privacy Policy
Terms of Service

Copyright © 2023 HUTTRONICS

Document title: Uber Blue/Lyft LED Sign - White Outline - HUTTRONICS
Capture URL: https://huttronics.com/products/blue-uber-lyft-led-sign/
Capture timestamp (UTC): Tue, 31 Jan 2023 16:41:07 GMT

SHOP    CART    CHECKOUT

**HUTTRONICS**

Log In

 

0

Home » Shop » Uber Lyft LED Sign



   



⭐⭐⭐⭐⭐ 224 reviews

# Uber Lyft LED Sign

**$36.99**

If you want to make your vehicle stand out to customers, an Uber Lyft sign is a must-have addition to your car to let passengers know you have arrived.

**Features**

- Ultra Bright LED lights make your car visible
- Perfect size to be noticeable to customers
- No messy wires, powered by a built-in battery
- Rechargeable lithium battery lasts up to 10 hours
- Removable sign with adhesive holder
- Easy installation

**Availability:** In stock

[ − ] [ 1 ] [ + ]

**Buy now** ▶

— OR —

**ADD TO CART**

Free shipping on US Orders!

✓ Secure Payments
✓ 30 Day Money Back Guarantee
✓ No Hassle Refunds

Guaranteed Safe Checkout



PayPal Pay in 4 interest-free payments of $9.25. Learn more

**PayPal**    **venmo**

Pay now or pay later

## Customer Reviews

⭐⭐⭐⭐⭐ ▉▉▉▉▉ 206

# Customer Reviews



★★★★★ [4.89 out of 5](#)
Based on 224 reviews
collected by Judge.me

| | | |
|---|---|---|
| ★★★★★ | | 206 |
| ★★★★☆ | | 13 |
| ★★★☆☆ | | 4 |
| ★★☆☆☆ | | 0 |
| ★☆☆☆☆ | | 1 |



Most Recent

★★★★★                                                                                          01/07/2023

J.B. Verified

**Great product, fast shipping!**

Does everything it says it does. Looks great and lights up very nicely at night. My only request is to have a switch between Uber-only, Lyft-only, or both. The mount is a little flimsy but secures well with the provided 3M tape.

★★★★★                                                                                          12/30/2022

Mustafa Alobaidi Verified

Uber Lyft LED Sign

★★★★★                                                                                          12/28/2022

Mike Comero Verified

**Lyft light**

Came.pretty quick, works great..

★★★★★                                                                                          12/25/2022

Saiful Islam Verified

Uber Lyft LED Sign

★★★★★                                                                                          12/23/2022

Daniel Montgomery Verified

**The sign is great**

I love the sign, i drive at night mostly, so my customers being able to see my car helps a lot. It also helps with driving for both lyft and Uber.

**1**   2   3   ›   »|

## You may also like...






## You may also like...



★★★★★ 58 reviews

**Uber Blue/Lyft LED Sign**

$36.99



★★★★★ 113 reviews

**Uber LED Sign**

$36.99



★★★★★ 30 reviews

**Uber Lyft LED Sign –
Uppercase**

$36.99



★★★★★ 30 reviews

**Uber Blue/Lyft LED Sign –
White Outline**

$36.99

## Related products



Sale!

OUT OF STOCK

**~Car Headrest Backseat 3-
in-1 Fast Power Charging
Station with Retractable
Cords**

$36.99 **$32.99**



★★★★★ 10 reviews

**Grubhub LED Sign**

$36.99



★★★★★ 52 reviews

**DoorDash LED Sign**

$36.99



★★★★★ 12 reviews

**~Replacement Holder for LED
Signs**

$12.99

**Categories**

All Products

Rideshare Led Signs

Delivery LED Signs

Accessories

**Company**

About Us

Contact Us

**Resources**

FAQ

Customer Reviews

My account

**Policies**

Shipping Policy

Returns & Refund Policy

Privacy Policy

Terms of Service

Copyright © 2023 HUTTRONICS

Document title: Uber Lyft LED Sign - HUTTRONICS
Capture URL: https://huttronics.com/products/uber-lyft-led-light-sign/
Capture timestamp (UTC): Tue, 31 Jan 2023 16:44:00 GMT

FREE SHIPPING ON US ORDERS

SHOP   CART   CHECKOUT

**HUTTRONICS**

Log In





Home » Shop » Uber Blue/Lyft LED Sign



   

★★★★★ 58 reviews

# Uber Blue/Lyft LED Sign



## $36.99

If you want to make your vehicle stand out to customers, an Uber Lyft sign is a must-have addition to your car to let passengers know you have arrived.

### Features

- Ultra Bright LED lights make your car visible
- Perfect size to be noticeable to customers
- No messy wires, powered by a built-in battery
- Rechargeable lithium battery lasts up to 10 hours
- Removable sign with adhesive holder
- Easy installation

**Availability:** In stock

− 1 +

Buy now ▶▶

— OR —

ADD TO CART

Free shipping on US Orders!

✔ Secure Payments
✔ 30 Day Money Back Guarantee
✔ No Hassle Refunds

Guaranteed Safe Checkout



PayPal Pay in 4 interest-free payments of $9.25. Learn more



Pay now or pay later

## Customer Reviews

★★★★★ 56

## Customer Reviews

 4.97 out of 5
Based on 58 reviews
collected by Judge.me

| | | |
|---|---|---|
| ★★★★★ | | 56 |
| ★★★★☆ | | 2 |
| ★★★☆☆ | | 0 |
| ★★☆☆☆ | | 0 |
| ★☆☆☆☆ | | 0 |

---

Most Recent

★★★★★         12/26/2022

 Steven Tricarico  `Verified`

**Awesome unit**

Great item ... lasts well and very professional looking

---

★★★★★         12/26/2022

Kirk Singer  `Verified`

Uber Blue/Lyft LED Sign

---

★★★★☆         12/20/2022

Mark Torre  `Verified`

**Looks Great!**

I haven't had a chance to see how long the battery lasts, however these look superior to others I've seen. How long these will hold a charge and how many times they'll recharge to nearly maximum capacity will be the other criteria by which these will be reviewed. It would be nice if they included a way to order an additional mounting frame.

---

★★★★★         12/01/2022

 Michael Callaghan  `Verified`

**Perfect uber lyft combo sign**

Sets me apart from the other drivers

---

★★★★★         11/24/2022

power Amioku  `Verified`

**Great**

The Uber Lyft LED sign works good and creates awareness for my riders

---

**1**  2  3  ›  »

## You may also like...






## You may also like...



★★★★★ 113 reviews

**Uber LED Sign**

$36.99



★★★★★ 224 reviews

**Uber Lyft LED Sign**

$36.99



★★★★★ 30 reviews

**Uber Lyft LED Sign –
Uppercase**

$36.99



★★★★★ 30 reviews

**Uber Blue/Lyft LED Sign –
White Outline**

$36.99

## Related products



★★★★★ 10 reviews

**Grubhub LED Sign**

$36.99



★★★★★ 44 reviews

**Uber Blue LED Sign**

$36.99



★★★★★ 12 reviews

**~Replacement Holder for LED
Signs**

$12.99



★★★★★ 52 reviews

**DoorDash LED Sign**

$36.99

**Categories**

All Products

Rideshare Led Signs

Delivery LED Signs

Accessories

**Company**

About Us

Contact Us

**Resources**

FAQ

Customer Reviews

My account

**Policies**

Shipping Policy

Returns & Refund Policy

Privacy Policy

Terms of Service

Copyright © 2023 HUTTRONICS

Document title: Uber Blue/Lyft LED Sign - HUTTRONICS
Capture URL: https://huttronics.com/products/uber-blue-lyft-led-light-sign/
Capture timestamp (UTC): Tue, 31 Jan 2023 16:44:45 GMT

FREE SHIPPING ON US ORDERS

SHOP     CART     CHECKOUT



Log In

 

# About Us

Thank you for visiting us here at HUTTRONICS! As a US-based company here in California, we've seen firsthand the need for easy-to-use, high-visibility lighted rideshare signs and gig economy accessories. Not only do our signs help our customers connect with *their* customers quickly and easily, they also eliminate many of the common hassles – parking problems, customer identification issues, and more – experienced every day by the millions of hardworking gig workers nationwide. Our items are designed, built, and manufactured with real users in mind, and customer satisfaction is, and always will be, our top priority.

We're proud to be a crucial part of the gig economy, and look forward to *lighting the way* to easier pickups, drop-offs, and runs as you work on the road.

Have questions or comments? Please feel free to reach out to us directly at: Support@Huttronics.com – we're always happy to hear from you!

### Categories

All Products
Rideshare Led Signs
Delivery LED Signs
Accessories

### Company

About Us
Contact Us

### Resources

FAQ
Customer Reviews
My account

### Policies

Shipping Policy
Returns & Refund Policy
Privacy Policy
Terms of Service

Copyright © 2023 HUTTRONICS

Document title: About Us - HUTTRONICS
Capture URL: https://huttronics.com/about-us/
Capture timestamp (UTC): Tue, 31 Jan 2023 17:40:04 GMT

FREE SHIPPING ON US ORDERS

SHOP    CART    CHECKOUT

**HUTTRONICS**

Log In



# Contact Us

If you have any questions our FAQ section does not answer, or if you have comments or feedback that you'd like to share, please get in touch by filling out the form below. A Huttronics team member will reach out within two working days!

**Customer Service Email Address**

support@huttronics.com

**Categories**

All Products
Rideshare Led Signs
Delivery LED Signs
Accessories

**Company**

About Us
Contact Us

**Resources**

FAQ
Customer Reviews
My account

**Policies**

Shipping Policy
Returns & Refund Policy
Privacy Policy
Terms of Service

Copyright © 2023 HUTTRONICS